# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHASE STANDAGE, Midshipman First Class, United States Naval Academy,<br><br>*Plaintiff*,<br><br>vs.<br><br>KENNETH J. BRAITHWAITE, Secretary of the Navy; and SEAN S. BUCK, Vice Admiral, Superintendent, United States Naval Academy;<br><br>*Defendants*. | Civil Action No. _____<br><br>**EMERGENCY HEARING REQUESTED** |

# MEMORANDUM OF LAW IN SUPPORT OF
# PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**INTRODUCTION**

Defendant Vice Admiral (VADM) Sean S. Buck, the Superintendent of the U. S. Naval Academy, intends to recommend to Defendant Kenneth J. Braithwaite, the Secretary of the Navy, that Plaintiff Midshipman (MIDN) Chase Standage be separated from the Naval Academy on the basis of misconduct.  The sole basis for such recommendation is that VADM Buck found that the content of certain social media posts MIDN Standage made on the Twitter platform violated the Academy's proscription against political activities and constituted conduct unbecoming a midshipman.  As further set forth below and in MIDN Standage's Complaint, both such findings do not comport with applicable law and constituted viewpoint discrimination in violation of the First Amendment.  In addition, MIDN Standage was deprived of due process under the Fifth Amendment given the impossibility of receiving fair and impartial hearings. Among other things, the Complaint seeks an order enjoining the Superintendent and the Secretary of the Navy from moving forward with the separation process.

An emergency hearing on that requested relief is necessary because MIDN Standage was advised by his chain of command that they want him gone from the Academy no later than Wednesday, September 30, 2020.  To this end, and in violation of applicable procedure, they insisted that he commence his check-out process prematurely, ostensibly to expedite his separation before he can reasonably pursue relief.  Thus there is an imminent threat of irreparable injury, including a separate Due Process violation by the Defendants, that will compound and render moot the constitutional violations for which MIDN Standage seeks relief in his Complaint.

MIDN Standage's final step in the administrative conduct adjudication process was an interview with the Superintendent on Wednesday, September 23, 2020.  At that interview, the Superintendent advised MIDN Standage that he was going to recommend to the Secretary of the

Navy (through his delegate, the Assistant Secretary of the Navy for Manpower & Reserve Affairs) that MIDN Standage be separated. Pursuant to the local instruction governing the Academy's Administrative Performance and Conduct System, COMDTMIDNINST 1610.27,

> If the Superintendent concurs with the Commandant's recommendation for separation, whether as a result of a hearing or record review, the midshipman will be advised of the decision in writing, and further advised of their right to submit a statement to the Secretary of the Navy showing cause why they should be retained at the Naval Academy. The Superintendent's Staff Judge Advocate shall ensure that the midshipman is advised of all rights regarding their potential separation from the Naval Academy. Unless otherwise authorized to do so, midshipmen recommended for separation by the Superintendent ***may not begin checking out until a Show Cause Statement has been waived or submitted***.[1]

This procedure requires that the Superintendent provide to MIDN Standage a copy of the Superintendent's "Memorandum Report for the Assistant Secretary of the Navy," to which MIDN Standage then has five business days to respond with a Show Cause Statement. To date, no such Memorandum Report has issued. Accordingly, the checkout process in not yet ripe. Nonetheless, the day after his interview with the Superintendent, MIDN Standage was told to begin checking out and was told in no uncertain terms that his chain of command wanted him separated from the Naval Academy without advising him of, much less allowing him to exercise, all of his rights regarding the potential separation. In short, the Defendants are railroading MIDN Standage out of the Naval Academy prematurely, tarnishing his reputation while also threatening to deny him the opportunity to pursue redress for violations of his First and Fifth Amendment rights under the United States Constitution.

---

[1] COMDTMIDNINST 1610.2J, Section 3.2.b.(1) (emphasis added); see also 10 U.S.C. § 8462.

Given this impending and improper deadline, an emergency hearing is necessary enjoin the Superintendent from taking any further steps physically to remove MIDN Standage from the Naval Academy.

**BACKGROUND**

MIDN Standage is a young white midshipman of exceptional character who has been the friend and roommate of a black midshipman for three years and has never exhibited racial animus towards anyone. MIDN Standage is an aerospace engineer with an impeccable performance record that led to his selection for participation in the prestigious Volunteer Graduate Education Program following the completion of his undergraduate course work in December of this year. He is an accomplished pilot, whose singular goal since the age of 16 has been to serve his Country as a Navy fighter pilot.

MIDN Standage now faces having his exemplary achievements and his future as a Navy pilot canceled solely because he responded to heated exchanges on social media concerning issues of national concern. These exchanges took place over a frightening one-week period in June 2020, during which MIDN Standage sat in the home of his parents, both career Los Angeles Police Department officers, who, in the midst of the riots in Los Angeles by thousands of protestors (including some who were deemed by the President, the U.S. Attorney General, and a resolution introduced in the U.S. Senate), putting their lives at risk.

The subject matter of these exchanges included a black conservative woman's views as to the roots of economic disparities among various demographics; whether the U.S. military should be employed to combat the domestic terrorists destroying Los Angeles and other U.S. cities; the police shooting of a black woman; and the Navy Football Team. MIDN Standage's comments were not inherently political, were not published while in uniform or while acting in any official capacity that necessarily reflects poorly on the military, were not directed at the military or

3

intended to undermine unit discipline, and were not subject to any bright lines or prior notice or comment.  MIDN thus faces separation from the Naval Academy for making social media comments that neither he nor other servicemembers had reason to know are "prohibited speech," while at the same time the Naval Academy protects the rights of midshipmen to comment on social media in a manner that violates each of these guardrails.

In the first stage of the conduct adjudication process, the Deputy Commandant of Midshipmen, Captain (CAPT) Robert Mathewson, made clear to MIDN Standage that there existed only **ONE** correct and acceptable position (some of which included implicit criticisms of the President) with respect to each of these issues.  The Deputy Commandant further made clear that MIDN Standage's deviation from that position rendered his social media posts racist, unprofessional, and a threat to good order and discipline.  Ignoring the law governing the conduct offenses with which MIDN Standage was charged, COMDMIDNNOTE 5720 and UCMJ Article 133, the Deputy Commandant trampled MIDN Standage's First Amendment rights, found him guilty of both offenses, and forwarded him for separation.

For his own part, the Commandant of Midshipmen, CAPT Thomas Buchanan, has made clear to the Brigade of Midshipmen the he, and they, must embrace the Black Lives Matter (BLM) and Anti-Racist movements' core principal – that passivity in the face of "racism" is unacceptable, or as the activists like to say, "silence is violence."  His daughter's social media biography includes "ACAB" (All Cops Are Bastards) and the abolishment of the U.S. Customs and Immigration Service.  Among other things, in her tweets and retweets she endorses allegiance to ANTIFA, cheers someone saying, "F[] the police," and agrees that the President of the United States, "Mango Mussolini," should go f[] himself.  And, like Herod's daughter, she has called for MIDN Standage's head.


The Superintendent, VADM Buck, has made clear through repeated public pronouncements that he unconditionally embraces the structural and institutional racism tenets of the BLM and Anti-Racist movements and that those tenets will be drilled into the minds of every member of the Brigade of Midshipmen through mandatory training, irrespective of the fact that the President of the United States has ordered that no such training take place at any federal agency.  He has also made clear that he intends to root out and separate any midshipman who fails to get "on board" with these policies.  During his interview of MIDN Standage – the final step in the conduct adjudication process – the Superintendent made good on that threat, evidencing a contempt for law enforcement and leaving no doubt that he viewed threats against MIDN Standage's parents and other police officers as overblown and no excuse for committing indiscriminate acts of violence against "innocent" civilians.

Meanwhile, numerous current and former midshipmen have, for many months, aggressively engaged in the weaponization of social media in a manner that can only be described as disgraceful, pernicious, racist, nihilistic, and seditious.  Among other things, the posts call for the removal of all white politicians; compare the President to Hitler and Saddam Hussein; advocate shooting a white couple who defended their property with a gun; applaud the mockery, desecration, and destruction of federal and state statues and monuments; endorse rioting, looting, and a countrywide revolution; and call for violence against, and even the death of, MIDN Standage.  Despite the fact that dozens of such posts were called to the attention of the Academy's senior leadership, MIDN Standage – and only MIDN Standage – faces separation.

The conduct and statements of the Superintendent, the Commandant, and the Deputy Commandant amount to blatant and unconstitutional viewpoint discrimination against MIDN Standage.

At issue is the Academy's monolithic adoption of, and insistence upon, unilateral positions with respect to vitally important issues of public concern and the extent to which any or all of those issues evoke the specter of racism, as framed and defined by movements such as BLM and Anti-Racism. These movements demand recognition as the sole arbiters of what does or does not constitute "racial insensitivity" or "racism" in this Country, and insist that any position contrary to their pronouncements – even passive silence – is inherently racist and must be condemned.

Those tenets have been embraced by the Naval Academy's senior leadership and have made their pernicious assault on the First Amendment manifest through the disposition of MIDN Standage's conduct case and the Superintendent's separation recommendation.

To be clear, whether the Superintendent and his Command take the position that "racism" is a pernicious evil that needs to be eradicated is not the viewpoint at issue here; that is a laudable assertion of a command ethic. Rather, it is the Command's monolithic insistence as to ***what constitutes racism***, a subject of enormous debate across the Country, and its insistence that people like MIDN Standage are not entitled to weigh in on that issue without being branded as a racist, that is the viewpoint discrimination raised by MIDN Standage in his Complaint.

Such discrimination is all the more apparent where, as here, midshipmen who clearly associate themselves with movements such as Black Lives Matter, Anti-Racism, or even ACAB and ANTIFA, are afforded greater protections by the Command in the interests of encouraging "dialogue," irrespective of how racist, inflammatory, insubordinate, or anti-law enforcement that speech is, while any contrary view is not only intolerable, but condemned as racist itself, and, as the present case makes all too clear, can result in condemnation, punishment, and the specter of separation from the Naval Academy.

Through this Complaint, MIDN Standage seeks a declaration from this Court that the conduct proceedings at issue here violated his rights under the First and Fifth Amendments, a declaration that the findings of guilt in the case against him have no basis in applicable law and must be overturned, and an injunction halting the separation process and allowing MIDN Standage to finish his undergraduate course work, participate in the VGEP program next semester, graduate from the Naval Academy, and receive his commission as an Ensign in the Navy.

## ARGUMENT

To obtain a preliminary injunction, Plaintiffs must demonstrate that (1) they are "likely to succeed on the merits"; (2) they "will likely suffer irreparable harm absent an injunction"; (3) "the balance of hardships weighs in their favor"; and (4) "the injunction is in the public interest." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). Plaintiffs satisfy each of the relevant factors here.

**I.     Plaintiff Is Likely to Succeed on the Merits.**

Plaintiff is likely to succeed on his claims. As the overwhelming, particularized facts alleged in the Complaint demonstrate, the statements and actions of the Superintendent and his Command constitute "viewpoint discrimination." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (internal quotation marks omitted). It is axiomatic that the Government may not restrict speech in order "to suppress a disfavored message." *Id.* at 572; *see also Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment). Yet that is precisely the state action at issue here.

7

As an initial matter, the well-pleaded facts show that the speech at issue – the contents of certain Twitter posts ("tweets") made during one emotionally-fraught week in the midst of the Los Angeles riots – are protected speech.

In *United States v. Wilcox*,[2] a private first class in the U.S. Army was convicted by a general court-martial of, among other things, violating Article 134 by advocating anti-government and disloyal statements, and racial intolerance. The U.S. Court of Appeals for the Armed Forces held that, in the absence evidence that the speech constituted dangerous speech which interfered with or prevented the orderly accomplishment of the mission or presented a clear danger to loyalty, discipline, mission, or morale of the troops, the communications at issue constituted protected speech under the First Amendment and could not be criminalized under the General Article on a "prejudice to good order and discipline" theory. The Court first turned to the issue of whether "racially charged" speech is protected under the First Amendment, and had little difficulty affirming that legal principle:[3]

> Appellant's various communications on the Internet—which, while repugnant, are not criminal in the civilian world, *see Brandenburg*, 395 U.S. at 447, 89 S.Ct. 18276y (holding that even advocacy of racist violent speech is protected speech if it is not likely to incite or produce such violence)—did not constitute unprotected "dangerous speech" under the circumstances of this case. No evidence was admitted that showed the communications either "interfere[d] with or prevent[ed] the orderly accomplishment of the mission," or "present[ed] a clear danger to loyalty, discipline, mission, or morale of the troops." *Brown,* 45 M.J. at 395 (citations omitted).
>
> Further, while one might colloquially describe the ideas expressed by Appellant as obscene, they are not legally obscene as defined by First Amendment jurisprudence. *See Miller,* 413 U.S. at 24–25, 93 S.Ct. 2607 (requiring that the material contain a depiction or description of sexual

---

[2] 66 M.J. 442 (CAAF, 2008).

[3] We do not for one moment concede that any of the posts at issue were "racially charged" or "racially motivated." The point of the analysis here is simply to point out that, even if that argument could be made, the speech is protected by the First Amendment.

> conduct in a patently offensive way to be considered obscenity). Neither can they be classified as unprotected "fighting words." *See Chaplinsky,* 315 U.S. at 572, 62 S.Ct. 766 (defining "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace").
>
> Consequently, we conclude that Appellant's speech is protected speech under the First Amendment and must now turn to an analysis of whether the Government has shown a reasonably direct and palpable connection between the speech and the military mission or military environment.
>
> . . . .
>
> The leading cases involving the intersection of Article 134, UCMJ, and the First Amendment have involved facts adduced at trial that showed that the appellant at least attempted to direct his speech to servicemembers. *See, e.g., Parker,* 417 U.S. at 761, 94 S.Ct. 2547 (finding a violation of Article 134, UCMJ, when servicemember "publicly urge[d] enlisted personnel to refuse to obey orders"); *Brown,* 45 M.J. at 398 (holding that organizing a unit-wide meeting to advocate desertion violated Article 134, UCMJ); *Priest,* 21 C.M.A. at 572, 45 C.M.R. at 346 (finding direct and palpable connection to good order and discipline when the appellant distributed an extremist newspaper at the Pentagon and Navy exchange); *Daniels,* 19 C.M.A. at 533–35, 42 C.M.R. at 135–37 (concluding that there was a direct connection to good order and discipline when the appellant assembled all African–American members of his unit and attempted to convince them to not fight in "the white man's war"). Because in those cases the speech was directed to servicemembers, the effect of the speech on the military mission was both palpable and obvious.[4]

No such evidence exists in this case. MIDN Standage was not responding to military members or seeking a military audience. He was not fomenting dissent or the adoption of extremist views by any military unit, let alone the Brigade of Midshipmen. To the contrary, his views were expressly directed to non-military members of the general public.

Moreover, the pleadings allege in particularity the extent to which the Superintendent, the Commandant of Midshipmen, and the Deputy Commandant of Midshipman have unconditionally embraced fundamental tenets of the Black Lives Matter and Anti-Racist

---

[4] *Id*. at 449-50 (footnotes omitted).

9

movements that deem themselves the sole arbiters of what does or does not constitute "racial insensitivity" or "racism" in this Country and at the Naval Academy. Like these movements, the Superintendent and his Command insist that any position contrary to their pronouncements – even passive silence – is inherently racist and must be condemned.

Mandatory adherence to a monolithic cultural position was, without question, the message the Deputy Commandant delivered to MIDN Standage in his adjudication. It is certainly the message the Commandant recently delivered to the Brigade when, invoking the credo of the Anti-Racist movement, he stated "We have evidence that there are pockets of midshipmen that don't have good belief structures here... We need to educate ourselves about racism... we need to move from 'not' to 'anti.' 'Not racist' is passive. To be anti-racist, we must take the offensive and confront others." And it is unequivocally the message the Superintendent delivered, both in his blast e-mail of September 9 and in his interview of MIDN Standage.

Moreover, at the same time they seek to punish and irreparably harm MIDN Standage for the content of his social media posts, numerous current and former midshipmen have, for many months, aggressively engaged in the weaponization of social media in a manner that can only be described as disgraceful, pernicious, racist, nihilistic, and seditious. These posts are just the tip of a very disturbing iceberg. The exhibits to the Complaint include numerous posts by current and former midshipmen, many of which identify the senders as midshipmen. Among other things, the posts call for the removal of all white politicians; compare the President to Hitler and Saddam Hussein; advocate shooting a white couple who defended their property with a gun; applaud the mockery, desecration, and destruction of federal and state statues and monuments; endorse rioting, looting, and a countrywide revolution; and call for violence against, and even the death of, MIDN Standage.

In the midst of this social media onslaught, MIDN Standage – and only MIDN Standage -- stands at the precipice of separation and having his entire life of exceptional achievement canceled.  The only plausible explanation for these moral and logical inconsistencies is that, as far as the only police the Naval Academy seems to care about -- the Thought Police -- are concerned, MIDN Standage's tweets constituted culturally unacceptable speech, while the overtly racist and inflammatory posts of the other midshipmen are now recognized as "acceptable" in the name of "diversity" and "social justice."  Any such distinctions constitute viewpoint discrimination in violation of the First Amendment.

## II.     Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  For this reason, "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." *Gracepointe Church v. Jenkins*, 2006 WL 1663798, at *3 (D.S.C. June 8, 2006) (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003)).

In addition, MIDN Standage stands at the precipice of having his entire exemplary performance as a midshipman and a pilot, as well his bright future as a graduate student in aerospace engineering and as a Navy pilot, canceled.  MIDN Standage's reputation will also suffer irreparably if the biased, politically motivated, and unfair process that wrongfully branded him as a "racist" is not halted and overturned.

**III.     The Balance of Hardships and the Public Interest Support a Preliminary Injunction.**

The balance of hardships and the public interest also support a temporary injunction. "These [two] factors merge when the government is the opposing party." *Nken*, 556 U.S. at 435; *see also J.O.P. v. U.S. Dep't of Homeland Sec.*, No GJH19-1944, 2019 WL 3536786, at *7 (D. Md. Aug. 2, 2019) (similar). Here, the balance of hardships overwhelmingly favors Plaintiff. Plaintiff faces unconstitutional restriction on their speech and extraordinarily damaging condqeuences on the most important issues facing our country. Conversely, Defendants are "in no way harmed by issuance of an injunction that prevents [them] from enforcing unconstitutional restrictions." *Legend Night Club*, 637 F.3d at 302-03. Indeed, "upholding constitutional rights" always is in "the public interest." *Id.* That is particularly true where, as here, the Command's adoption and enforcement of a pernicious ideological speech code that not only chills free speech, but vilifies, ostracizes, and punishes anyone who tries to exercise such speech, is absolutely anathema to its core mission and flouts the directives of the President of the United States.

## CONCLUSION

For the reasons set forth above, Plaintiff requests that this Court enter a preliminary injunction enjoining the Superintendent and the Secretary of the Navy from separating MIDN Standage from the Naval Academy and from otherwise interfering with his good standing as a midshipman first class at the Naval Academy solely because of his exercise of protected speech under the First Amendment.

Dated: September 30, 2020    Respectfully submitted,

　　/S/ Crighton A. Chase＿＿＿＿＿＿＿＿＿＿
Crighton A. Chase
D. Md. Bar No. 30098
HILLMAN, BROWN & DARROW, P.A.
221 Duke of Gloucester Street
Annapolis, Maryland 21401-2500
(410) 263-3131


　　/S/ Jeffrey E. McFadden＿＿＿＿＿＿＿＿＿
Jeffrey E. McFadden
(D. Md. Bar No. 08738 (renewal pending))
LAW OFFICES OF JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
(410) 490-1163


*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of September, 2020, I caused this Memorandum in Support of Plaintiff's Motion for Preliminary Injunction to be served by electronic mail on

>CAPT Lawrence Hill, Jr., JAGC, USN
>Staff Judge Advocate
>United States Naval Academy
>lhill@usna.edu
>
>Mark A. Romano, Esq.
>Assistant General Counsel
>Assistant Secretary of the Navy (Manpower & Reserve Affairs)
>mark.romano1@navy.mil

>*[s]Crighton A. Chase*
>Crighton A. Chase