# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CHASE STANDAGE, Midshipman First
Class, United States Naval Academy,

          *Plaintiff,*

    vs.

KENNETH J. BRAITHWAITE, Secretary of
the Navy; and SEAN S. BUCK, Vice Admiral,
Superintendent, United States Naval Academy;

          *Defendants.*

Civil Action No. 1:20-cv-02830-ELH

**AMENDED COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## STATEMENT OF THE CASE

1.    Defendant Vice Admiral (VADM) Sean S. Buck, the Superintendent of the U. S. Naval Academy, intends to recommend to Defendant Kenneth J. Braithwaite, the Secretary of the Navy, that Plaintiff Midshipman (MIDN) Chase Standage be separated from the Naval Academy on the basis of misconduct. The sole basis for such recommendation is that VADM Buck found that the content of certain social media posts MIDN Standage made on the Twitter platform violated the Academy's proscription against political activities and constituted conduct unbecoming a midshipman. For the reasons that follow, both such findings do not comport with applicable law and constituted viewpoint discrimination in violation of the First Amendment. In addition, MIDN Standage was deprived of due process under the Fifth Amendment given the impossibility of receiving fair and impartial hearings.

2.    MIDN Standage is a young white midshipman of exceptional character who has been the friend and roommate of a black midshipman for three years and has never exhibited racial

animus towards anyone. MIDN Standage is an aerospace engineer with an impeccable performance record that led to his selection for participation in the prestigious Volunteer Graduate Education Program following the completion of his undergraduate course work in December of this year. He is an accomplished pilot, whose singular goal since the age of 16 has been to serve his Country as a Navy fighter pilot.

3.     MIDN Standage now faces having his exemplary achievements and his future as a Navy pilot canceled solely because he responded to heated exchanges on social media concerning issues of national concern. These exchanges took place over a frightening one-week period in June 2020, during which MIDN Standage sat in the home of his parents, both career Los Angeles Police Department officers, who, in the midst of the riots in Los Angeles by thousands of protestors (including some who were deemed by the President, the U.S. Attorney General, and a resolution introduced in the U.S. Senate to be domestic terrorists), putting their lives at risk.

4.     The subject matter of these exchanges included a black conservative woman's views as to the roots of economic disparities among various demographics; pronouncements by the President and Commander-in-Chief as to whether the U.S. military should be employed to combat the domestic terrorists destroying Los Angeles and other U.S. cities; the police shooting of a black woman; and the Navy Football Team. MIDN Standage's comments were not inherently political, were not published while in uniform or while acting in any official capacity that necessarily reflects poorly on the military, were not directed at the military or intended to undermine unit discipline, and were not subject to any bright lines or prior notice or comment. MIDN Standage thus faces separation from the Naval Academy for making social media comments that neither he nor other servicemembers had reason to know are "prohibited speech," while at the same time the Naval Academy protects the rights of midshipmen to comment on social

media in a manner that violates each of these guardrails.

5.     In the first stage of the conduct adjudication process, the Deputy Commandant of Midshipmen, Captain (CAPT) Robert Mathewson, made clear to MIDN Standage that there existed only **ONE** correct and acceptable position with respect to each of these issues (some of which included implicit criticisms of the President).  The Deputy Commandant further made clear that MIDN Standage's deviation from that position rendered his social media posts racist, unprofessional, and a threat to good order and discipline.  Ignoring the law governing the conduct offenses with which MIDN Standage was charged, COMDMIDNNOTE 5720 and UCMJ Article 133, the Deputy Commandant trampled MIDN Standage's First Amendment rights, found him guilty of both offenses, and forwarded him for separation.

6.     For his own part, the Commandant of Midshipmen, CAPT Thomas Buchanan, has made clear to the Brigade of Midshipmen the he, and they, must embrace the Black Lives Matter (BLM) and Anti-Racist movements' core principal – that passivity in the face of "racism" is unacceptable, or as the activists like to say, "silence is violence."  His daughter's social media biography includes "ACAB" (All Cops Are Bastards) and the abolishment of the U.S. Customs and Immigration Service.  Among other things, in her tweets and retweets she endorses allegiance to ANTIFA, cheers someone saying, "F[] the police," and agrees that the President of the United States, "Mango Mussolini," should go f[] himself.  And, like Herod's daughter, she has called for MIDN Standage's head.

7.     The Superintendent, VADM Buck, has made clear through repeated public pronouncements that he unconditionally embraces the structural and institutional racism tenets of the BLM and Anti-Racist movements and that those tenets will be drilled into the minds of every member of the Brigade of Midshipmen through mandatory training, irrespective of the fact that

the President of the United States has ordered that no such training take place at any federal agency through an Office of Management and Budget (OMB) Directive and Executive Order. The Superintendent has also made clear that he intends to root out and separate any midshipman who fails to get "on board" with these policies. During his interview of MIDN Standage – the final step in the conduct adjudication process – the Superintendent made good on that threat, evidencing a contempt for law enforcement and leaving no doubt that he viewed threats against MIDN Standage's parents and other police officers as overblown and no excuse for committing indiscriminate acts of violence against "innocent civilians."

8.      Meanwhile, numerous current and former midshipmen have, for many months, aggressively engaged in the weaponization of social media in a manner that can only be described as disgraceful, pernicious, racist, nihilistic, and seditious. Among other things, the posts call for the removal of all white politicians; compare the President to Hitler and Saddam Hussein; advocate shooting a white couple who defended their property with a gun; applaud the mockery, desecration, and destruction of federal and state statues and monuments; endorse rioting, looting, and a countrywide revolution; and call for violence against, and even the death of, MIDN Standage. Despite the fact that dozens of such posts were called to the attention of the Academy's senior leadership, MIDN Standage – and only MIDN Standage – faces separation.

9.      The conduct and statements of the Superintendent, the Commandant, and the Deputy Commandant amount to unconstitutional viewpoint discrimination against MIDN Standage.

10.     At issue is the Academy's monolithic adoption of, and insistence upon, unilateral positions with respect to vitally important issues of public concern and the extent to which any or all of those issues evoke the specter of racism, as framed and defined by movements such as BLM

and Anti-Racism. These movements demand recognition as the sole arbiters of what does or does not constitute "racial insensitivity" or "racism" in this Country, and insist that any position contrary to their pronouncements – even passive silence – is inherently racist and must be condemned.

11.     Those tenets have been embraced by the Naval Academy's senior leadership in direct, continuing violation of a Presidential OMB Directive and Executive Order and have made their pernicious assault on the First Amendment manifest through the disposition of MIDN Standage's conduct case and the Superintendent's separation recommendation.

12.     To be clear, whether the Superintendent and his Command take the position that "racism" is a pernicious evil that needs to be eradicated is not the viewpoint at issue here; that is a laudable assertion of a command ethic. Rather, it is the Command's monolithic insistence as to **what constitutes racism**, a subject of enormous debate across the Country, and its insistence that people like MIDN Standage are not entitled to weigh in on that issue without being branded as a racist, that is the viewpoint discrimination raised by MIDN Standage in this Complaint.

13.     Such discrimination is all the more apparent where, as here, midshipmen who clearly associate themselves with movements such as Black Lives Matter, Anti-Racism, or even ACAB and ANTIFA, are afforded greater protections by the Command in the interests of encouraging "dialogue," irrespective of how racist, inflammatory, insubordinate, or anti-law enforcement that speech is, while any contrary view is not only intolerable, but condemned as racist itself, and, as the present case makes all too clear, can result in condemnation, punishment, and the specter of separation from the Naval Academy.

14.     Through this Complaint, MIDN Standage seeks a declaration from this Court that the Superintendent's implementation of mandatory indoctrination grounded in critical race theory violates the President's OMB Directive and Executive Order as well MIDN Standage's rights

under the First Amendment, a declaration that the administrative conduct proceedings at issue here violated MIDN Standage's rights under the First and Fifth Amendments, a declaration that the findings of guilt in the case against him have no basis in applicable law and must be overturned, an injunction halting any further training at the Naval Academy grounded in critical race theory, and an injunction halting the separation process, thereby allowing MIDN Standage to finish his undergraduate course work, participate in the VGEP program next semester, graduate from the Naval Academy, and receive his commission as an Ensign in the Navy.

## PARTIES

15.     Plaintiff, Chase Standage, is a midshipman first class (senior) at the U. S. Naval Academy.  He is a resident of the State of California.

16.     Defendant Kenneth J. Braithwaite is the Secretary of the Navy.  In accordance with 10 U.S.C. § 8462(b), the Secretary of the Navy is the only Department of the Navy official vested with the authority to separate a midshipman from the Naval Academy on the basis of misconduct.

17.     Defendant Sean S. Buck, Vice Admiral, is the Superintendent of the Naval Academy.  In accordance with 10 U.S.C. § 8462(a), the Superintendent is the only officer in the Naval Academy chain of command who has the authority to recommend separation of a midshipman to the Secretary of the Navy on the basis of misconduct.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction under 28 U.S.C. § 1331.

19.     The Court may award declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and under the First and Fifth Amendments to the United States Constitution.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and 1391(e)

## STATEMENT OF FACTS

*Background*

21.     Chase Standage is 21 years old and hales from Moorpark, California.  His mother, Amy Maureen Standage, is a 25-year veteran of the Los Angeles Police Department in its Hollywood Division; she currently works in Community Relations.  MIDN Standage's father, Kevin Kenneth Standage, is a 30-year veteran of the LAPD and is an Assistant Chief Pilot in its Air Support Division.  Among his many law enforcement experiences, Kevin experienced, first hand, the Los Angeles riots of 1992.  MIDN Standage's great-grandfather was a Marine and fought at Guadalcanal in WWII.  His grandfather flew E-2 Hawkeyes in the Navy before becoming a career corporate pilot.

22.     MIDN Standage attended Moorpark High School, where he excelled in academics, athletics, and the Navy Sea Cadet program.  He graduated 4 out of 469 with a 4.46 GPA and was a four-year member of the National Honor Society.  He lettered in both varsity cross country and track.  His accomplishments in the Sea Cadet program were exceptional.  In 2015, he won the "Blue Jacket of the Year" Award.  In 2016, he was the Trident Patrol Squadron Cadet of the Year, the Pacific Southwest Region 11 Cadet of the Year, and was nominated to be the NSCC National Cadet of the year.  He was also the Valedictorian of the Petty Officer Leadership Academy.

23.     Following in his father's and grandfather's footsteps, and with his sights firmly fixed on a career as a Navy pilot and test pilot, MIDN Standage soloed at the age of 16, received his Private Pilot's Rating at 17, earned his Advanced Ground Instructor and Instrument Ratings at 19, and obtained his Commercial Rating at 21.  His endorsements include High Performance, Complex, Tailwheel, Spin, and High-Altitude.  He is also a qualified PADI open-water SCUBA

diver and a member of the American Institute of Aerospace Engineers.

24.     Consistent with his desire to be the best Navy pilot possible, MIDN Standage passed on an ROTC scholarship at MIT in favor of the Naval Academy and chose Aerospace Engineering as his major.  He currently carries a 3.8 grade point average and has been selected for the Volunteer Graduate Education Program at the University of Maryland.  He was an instructor for USNA Ground School Powered Flight in 2018 and 2019, serving as block lead during the second stint.  He continued to instruct during the Spring Semester of 2020.  And he scored a perfect 9-9-9 on his Aviation Standard Test Battery.  On top of these exceptional efforts, MIDN Standage managed to find time to work on the SEDS (Society for the Exploration and Development of Space) "ThinSat" satellite from 2017 to 2019.

*The Los Angeles Riots of June 2020*

25.     The following statement is provided by MIDN Standage's mother, Sergeant Amy Standage, LAPD, describing the context in which MIDN Standage made the comments that are the basis for the Superintendent's and his Command's efforts to separate him from the Naval Academy:

> On May 30, 2020, all able bodied LAPD Officers were officially mobilized.  From that point on, days off were cancelled until the civil unrest was done and order was restored to the city.  The official mobilization and unrest continued until June 10, 2020.  I was deployed for 12 days straight, and worked 13-18 hours each day.  In all, I worked over 71 hours of overtime in 12 days, in addition to my 80 hours of normal work schedule.  Additionally, I was scheduled to work prior to and immediately following the mobilization period.
>
> In addition to the violent rioting seen within the city, there were groups protesting daily in front of my police station, and at one point, they even threatened to overtake the station.  There were certain days where the Antifa/BLM-affiliated protestors declared that they were going to hit the neighborhoods and homes where white people live.  There were also plans to raid officers' homes while we were mobilized and not able to protect our families.  This made us feel even more vulnerable than before.  A

greater number of us specifically feared for our children, who were at home unprotected at this time. Although things have slowed down in the past couple of weeks, we still feel threatened by the innumerable individuals who seek harm against us and our families.

Stress coupled with fear and exhaustion were my daily diet. I lost 10 lbs during this time. Additionally, pre-existing stress-based medical issues flared up to painful levels. I saw very little of my family, and was typically only home for a shower before getting whatever sleep I could. In all my years as a police officer, I have never felt so personally threatened as we do today, and this feeling is well shared across the department.

26.     MIDN Standage's father, Assistant Chief Pilot Kevin Standage, provides the following commendation issued by his supervisor, which graphically depicts the extraordinary efforts made by Officer Standage and his fellow pilots during the 2020 Los Angeles riots:

Several controversial police events throughout the country resulted in nationwide protests demanding police reform during the weeks of May 27 through June 10, 2020. The City of Los Angeles was not immune to these protests which drew large crowds of up to 60,000 people. Unfortunately, some the elements among the protesters chose to take advantage of the situation by attacking officers with rocks, bottles, bricks, urine and other means. Looting, arson and vandalism to both City and private property were also occurring at various locations throughout the City.

Air Support Division (ASD) quickly realized they would be an integral part of the Department's command and control response over these incidents and pockets of civil unrest. Air Support Division established a control center in the watch commander's office to track deployed personnel, the status of downlink capable helicopters, manage overtime and monitor fatigue of the aircrews; a critical component in aviation. Additionally, due to the complex nature of the fleet of helicopters ASD fly's [sic], contact was made with General Services Division (GSD) and Information Technology Agency (ITA) who employs the City's helicopter mechanics and aviation technicians. They were made aware of the need to have round the clock coverage at Hooper Memorial Heliport and Van Nuys Airport hangar in order to maintain the fleet of helicopters and to complete necessary maintenance and troubleshooting to ensure ASD could meet the needs of ground personnel. This was one of the most critical elements of ASD's pre-planning.

It was not uncommon for several marches/protests to be occurring simultaneously, and ASD was expected to be overhead to provide critical information to the Incident Commanders and command posts as well as

fulfill their mission to provide support to patrol operations. This resulted in ASD aircrews flying above and beyond their weekly average, and they did so without a single maintenance overflight or safety mishap. To put this into perspective, during an average week, ASD will fly approximately 260 hours including Special Flights surveillance and training flights. During this two-week period, even with training canceled, ASD aircrews flew nearly 600 hours a week, more than double the average. To do so without any mishaps demonstrates the professionalism of the entire ASD crew and the dedication and attention to duty of ITA and GSD personnel.

While over incidents, ASD aircrews were called upon to give continual updates on crowd movements, crowd size estimates, and downlink images to command posts. When trouble started, ASD aircrews were utilized to provide critical information to ground personnel where looting and/or other unrest were occurring. There were several instances where ground personnel were overwhelmed and outnumbered. ASD aircrews provided crucial directions to responding personnel to get them to the officers in need of help. During one incident near Fairfax and Melrose Avenues, ground assets were task saturated and were attempting to control several pockets of unruly protestors content on looting and destroying property as well as causing harm to the officers. A voice came over the radio announcing, "air unit, take over!" Air Support aircrews began to strategically deploy blocking forces to limit their ability to wreak havoc, and provide responding personnel with ingress and egress options when responding to the area. Air Support watch commanders received numerous unsolicited phone calls from supervisors and officers alike commending the aircrews and the way they assisted with the operations.

This was just one example of many instances where ASD aircrews assisted ground personnel at a time when they were in dire need of assistance. As the saying goes, "there is no better sound than the sound of an airship arriving overhead when you need help." Air Support Division's ability to fly as many hours as they did and seemingly be in several places at once was only made possible by the tireless efforts of GDS and ITA personnel keeping the fleet airworthy.

27.    MIDN Standage was alone at his parents' house in Moorpark, California throughout this period as his parents dealt with these crises.

**MIDN Standage's Social Media Posts in the Midst of the Los Angeles Riots**

28.    MIDN Standage posted the tweets as issue over a period of one week in June 2020. Each and every one of the tweets was a ***response*** to one or more tweets posted by others. The tweets are attached as Exhibit A. It bears emphasis that the screen shots of the tweets do not

accurately present the sequence of the tweets or the tweets to which MIDN Standage was actually responding. The persons who created the screen shots deliberately cut and pasted them in a manner intended to frame the tweets in the most negative context possible.

29.     None of the tweets contain racial epithets or slurs. In fact, none of the tweets makes any reference to anyone's race or ethnicity.

30.     In none of the posts does MIDN Standage identify himself as being a Naval Academy midshipman or a member of the U.S. military.

### *Use of Force Against Domestic Terrorists*

31.     Several of MIDN Standage's tweets referred to ANTIFA protests as "terrorists." MIDN Standage did so only after the President himself and the U.S. Attorney General publicly announced them as such.

32.     Some of these same posts repeated statements by the President and other senior administration officials that the federal government would, if necessary, employ both federal law enforcement and the military to combat the domestic terrorists laying waste to American cities, including Los Angeles. At no time did any of MIDN Standage's tweets advocate the use of such force against "protestors" or other civilians.

33.     The photograph MIDN Standage included in one of these tweets that stated, "Law and Order from 25,000 feet" was exactly that: a picture taken through the Forward Looking Infrared (FLIR) camera of a U.S. military aircraft that was used to support police officers during civil unrest in Seattle through overhead surveillance. Similar military aircraft were used for such surveillance in Minneapolis, Portland, and other U.S. cities at the direction of the Department of Homeland Security and the Federal Bureau of Investigation.

*Police Shooting of Breonna Taylor*

34.     Numerous individuals tweeted that the officers involved in the raid leading to the death of Breonna Taylor were guilty of murder or should be killed.

35.     MIDN Standage knew that the officers had entered the home and had been fired upon. He also believed that Ms. Taylor had been involved in a drug-trafficking conspiracy and stated that in a tweet.

36.     MIDN Standage pictured his mother as one of the officers fired upon that day. Given the extremely dangerous circumstances in which both of his parents found themselves in the midst of the Los Angeles riots in June, MIDN Standage overreacted with a tweet that had nothing to do with Ms. Taylor's race or ethnicity.

*Economic Disparities Among Varied Demographics*

37.     MIDN Standage posted one or more tweets in support of Candace Owens, a black, conservative commentator. Ms. Owens had originally posted an 8-minute video narrative describing how she and her family each made a life for themselves by merit of hard work and the American Dream. In the video, she denied the notion that people need outside government assistance in order to see the merits of their work. She was repeatedly and savagely attacked in the comments and replies section of Twitter. MIDN Standage's tweet was in response to one such attacker, not the tweet cut and pasted into the screenshot. MIDN Standage agreed with the position espoused by Ms. Owens, and thus was not intentionally making any racially charged comments merely by criticizing someone who did not agree with Ms. Owens.

38.     The tweet MIDN Standage posted on this subject matter was simply a reaffirmation of the American dream, involving principles MIDN Standage believes are applicable to all Americans, regardless of race or ethnicity. Of course, the person who provided

the screenshot of MIDN Standage's tweet cut and pasted the tweet to avoid disclosing any of this essential context.

### *The Navy Football Team*

39.     In one tweet, MIDN Standage responded to another tweeter who asked why the Naval Academy was focusing on developing players for the NFL, rather than warriors for the Navy and Marine Corps.  The tweet had nothing to do with the tragic loss of the football player pictured in the tweet (who was white), nor did it have anything to do with race.  The tweet also pales in comparison to social media posts made by other midshipmen on apps such as Jodel concerning their dislike for the football team and the gross disparities in treatment the players receive.

### *The Naval Academy Culture War*

40.     It is essential to understand the broader context within which that conduct, and MIDN Standage's fear for his parents' safety, occurred:  a visceral and vicious culture war currently taking place in the Brigade of Midshipmen, one that not only mirrors the broader culture war at which the Country currently finds itself, but one that is exacerbated by the unprecedented external stressor of the coronavirus pandemic and many midshipmen's reckless abuse of social media.  Even a cursory review of samples of the social media posts made at the hands of current and former Naval Academy midshipmen starkly reflects the speech that the Superintendent and his Command directly and implicitly condone,

       a.     Extreme animosity towards police and law enforcement, including mockery, insults, and the advocacy of defunding the police or committing violent acts against them.  Examples are attached as Exhibit B, but one such retweet by a 2019 Naval Academy graduate, sent to many current midshipmen, illustrates these

sentiments:



b. Calls for the removal of all white politicians (Exhibit C).

c. Mockery, desecration, and destruction of federal and state statues and monuments  (Exhibit D).

d. Shooting whites who confront black protestors (Exhibit E)

e. Endorsing rioting, looting, and a countrywide revolution (Exhibit F)

f. Insulting, denigrating, or using racial epithets against whites, women, gays, and blacks who are conservative or support President Trump (Exhibit G).  One such egregious example is a post by a current member of the Navy football team.  The post criticizes a gay black man who is a supporter of the President as "an accurate picture of a chicken eating at KFC":

g.



h. Advocating MIDN Standage's separation from the Naval Academy and threatening violence or death against him and other "racist mids" (Exhibit H)

i. Extreme animosity between varsity athletes, particularly the football team, and non-athletes, whom the athletes refer to as "NARPs" (Non-Athletic Regular Persons). The number of such posts and the level of animosity and resentment reflected in them caused the Commandant to weigh in on the issue, which only served to generate more visceral comments. The posts are too numerous to include in their entirety, and thus we only provide a representative sample. (Exhibit I)

***Social Media Posts by the Commandant's Daughter and Mother***

41. The Commandant's daughter, Anita Buchanan, lives with her father and family in

the Commandant's quarters on the Naval Academy grounds. Her social media "bio," which includes a photograph of her, her brother, and her father in uniform, says "acab" and "abolish ice." "ACAB" stands for "All Cops are Bastards," and "ICE" is the U.S. Department of Immigration and Customs Enforcement. The post also shows that Anita Buchanan has 17 followers. One of those followers is her father, the Commandant. Another one of her followers is the Commandant's mother, Theresa Buchanan.

42.     In one particular set of "tweets" made on June 3, 2020, Ms. Buchanan retweeted three posts. The first post was by "Puff the Magic Hater," who said, "Everyone should be declaring themselves antifascist in solidarity with antifa. Unless you're with the f[]ng fascists." Ms. Buchanan was endorsing solidarity with ANTIFA, whom the President has deemed to be a terrorist organization.

43.     The second post that day was by "marnie the dog" and said, "Oh sorry I meant f[] the police." Ms. Buchanan's retweet of this post is consistent with her "ACAB" self-description.

44.     The third post Ms. Buchanan retweeted was by "Anonymous," which is an ANTIFA hacker collective. It ends with, "Do us a favor and go f[] yourself Mango Mussolini." "Mango Mussolini" is a reference to the President.

45.     In another post, Ms. Buchanan stated, "I don't feel safe with boys like Chase Standage protecting this country. Kick his ass out." She retweeted in a separate post the sentiment that all men should be killed.

46.     In her own separate post, the Commandant's mother, Theresa Buchanan, endorsed her granddaughter's view that the Naval Academy should "kick [MIDN Standage's] ass out."

47.     All of the posts described in Paragraphs 41-46 above were made before MIDN

Standage's conduct adjudication process began. They are attached as Exhibit J.

48.     The Commandant recused himself from that adjudication process.

**The President's OMB Directive and Executive Order**

49.     On September 4, 2020, Russell Vought, the Director of the Executive Office of the President, Office of Management and Budget, issued a Memorandum for the Heads of Executive Departments and Agencies regarding Training in the Federal Government (the "OMB Directive"). A copy of this Directive is attached as Exhibit L. Director Vought states, "The President has directed me to ensure that Federal agencies cease and desist from using taxpayer dollars to fund these divisive, un-American propaganda training sessions. . . [A]ll agencies are directed to begin to identify all contracts or other agency spending related to any training on "critical race theory," "white privilege,' or any other training or propaganda effort that teaches or suggests either (1) that the United States is an inherently racist or evil country or (2) that any race or ethnicity is inherently racist or evil."

50.     On September 22, 2020, the President issued an Executive Order on Combating Race and Sex Stereotyping (the "Executive Order"). A copy of the Executive Order is attached as Exhibit M. The Executive Order forbids the promotion of "race or sex stereotyping or scapegoating in the Federal workforce or in the Uniformed Services." After recounting the significant strides the United States has made in its history in eradicating racism and sexism, the President states,

> Today however, many people are pushing a different vision of America that is grounded in hierarchies based on collective social and political identities rather than in the inherent and equal dignity of every person as an individual. This ideology is rooted in the pernicious and false belief that America is an irredeemably racist and sexist country; that some people, simply on account of their race or sex, are oppressors; and that racial and sexual identities are more important than our common status as

human beings and Americans.

He then goes on to observe,

> But training like that discussed above perpetuates racial stereotypes and division and can use subtle coercive pressure to ***ensure conformity of viewpoint***.  Such ideas may be fashionable in the academy, but they have no place in programs and activities supported by Federal taxpayer dollars.
>
> .  .  .  .
>
> ***[O]ur Uniformed Services should not teach our heroic men and women in uniform the lie that the country for which they are willing to die is fundamentally racist.  Such teachings could directly threaten the cohesion and effectiveness of our Uniformed Services.***

51.    Yet that is precisely what the Superintendent and the Naval Academy are doing.

***The Commandant's Views and Statements and Their Clear Violation of the President's OMB Directive and Executive Order***

52.    The Commandant's recusal notwithstanding, the views of his daughter appear to be having an impact on, have been impacted by, or are consistent with, the Commandant's views.  On Friday, 14 August, 2020, the Commandant held a Commandant's Call, in which he stated, "We have evidence that there are pockets of midshipmen that don't have good belief structures here... We need to educate ourselves about racism... we need to move from 'not' to 'anti.' 'Not racist' is passive. To be anti-racist, we must take the offensive and confront others." This is the credo of the Anti-Racist Movement:  "silence is violence" -- anyone who does not actively and affirmatively agree with the kind of inflammatory, seditious, anti-police, polemical, racist prolix espoused by the Commandant's daughter and the authors of the posts contained in Exhibits B through J is a racist.

53.    In a recent video posted to all midshipmen, the Commandant discussed his intention to read *White Fragility* by Robin DiAngelo.  The book is a critical race theory bible. DiAngelo argues that whites are inescapably racist, stating, "All white people are invested in and

collude with racism," and that "The white collective fundamentally hates blackness for what it reminds us of: that we are incapable and guilty of perpetrating immeasurable harm and that our gains come through the subjugation of others."

54. The ideology espoused in DiAngelo's book is antithetical to free speech. As one commentator has noted, "[I]f DiAngelo accuses you of [white] fragility and you disagree with her in any way – through argument, silence, or withdrawal – your reaction is considered proof of your fragility. DiAngelo leaves white readers with only two options. Either acknowledge your fragility, which proves DiAngelo's theory, or deny your fragility, which according to DiAngelo, also proves her theory. This is a logical fallacy known as a Kafkatrap. *If our legal system worked this way, no person accused of a crime would ever be acquitted because their denial would prove their guilt.*"

55. No observation more accurately characterizes the Kafkatrap that was MIDN Standage's adjudication process.

56. These are precisely the attributes of critical race theory the President's OMB Directive and Executive Order are intended to proscribe with respect to "diversity" training at federal agencies, including the Naval Academy.

***The Superintendent's Views and Statements and Their Clear Violation of the President's OMB Directive and Executive Order***

57. The Superintendent has released a video and public statements that readily demonstrate the extent to which he is a true believer in the woke culture and its insistence that "systemic" racism permeates the Naval Academy.

58. The Superintendent has made it his mission to "acknowledge prejudice within our own institution and eradicate it from the service for good."

59. In or about September 17, 2020, on a video-conference call with "Blue & Gold Officers" across the country who are volunteers serving a key recruitment and candidate vetting function for the Naval Academy, the Superintendent told the Officers that they were "the wrong color and the wrong sex" and that they had "better do something about it."

60. In a statement issued to the entire Naval Academy community on or about September 9, 2020, the Superintendent applauds the formation of a team under the guidance of the Academy's Chief Diversity Officer that is "developing a midshipman-led, comprehensive plan to identify midshipmen-level shortfalls within our Naval Academy family with the goal of proposing a plan to resolve these issues of ***privilege, bias, and racial injustice.***"  He further notes that "[o]ur Faculty Senate recently passed a resolution with overwhelming support to investigate and address any practices at the Naval Academy that ***perpetuate systemic racism***."  The statement is accompanied by a video featuring various midshipmen who, among other things, discuss their allegiance to Black Lives Matter and make repeated references to "the Movement;" that is, the movement grounded in critical race theory.

61. Commentators have reacted swiftly to these pronouncements, decrying the Superintendent's intention to subject midshipmen to mandatory training in critical race theory, the very training the President has directed all federal agencies not to provide or participate in. One commentator, a Naval Academy graduate, identifies the Superintendent's ultimate objective as "Brigade-wide conformity of thought, with no dissension permitted!"  Another commentator, an Asian Naval Academy 2017 graduate who says he never experienced racism at the Academy, writes, "[T]he new diversity training implemented by the Superintendent and the alumni-led group's policy demands are misguided and perverted by a regressive ideological agenda infused with elements of critical race theory, which emphasizes the Marxist-influenced class conflict

paradigm between the 'oppressed' and the 'oppressor.'"

***The Administrative Conduct Charges and the Legal Defenses MIDN Standage Raised to Them***

62.     MIDN Standage was charged with two offenses under the Academy's Administrative Conduct System:  1) engaging in political activities in violation of a local instruction, COMDTMIDNOTE 5720, a copy of which is attached as Exhibit K, and 2) conduct unbecoming a midshipman in violation of Article 133 of the Uniform Code of Military Justice (UCMJ).

63.     In response to the first charge, MIDN Standage argued through written submissions of counsel that COMDTMIDNOTE 5720 was the Naval Academy's restatement of the Hatch Act and that, by analogy, none of the social media posts at issue concerned "political subjects."  The Command ignored that argument and never addressed it.

64.     In response to the second charge, MIDN Standage argued through written submissions of counsel that, under controlling case law, the content of each and every one of the posts constituted protected speech under the First Amendment unless such speech is directed and military service members in an effort to compromise good order and discipline.  He further argued that, given the lack of any such evidence, given the Command's repeated pronouncements regarding its sole, monolithic, and unilateral position on what constitutes "racism," and given the gross disparity in treatment between the content of his posts and the content of the posts described in Paragraphs 40a. through 40i. above, the Command's disposition of the offenses against him constituted blatant viewpoint discrimination in violation of the First Amendment.  The Command ignored these arguments as well, simply stating that MIDN Standage was not being punished for what he said, but how he said it.

***The Adjudication Before the Deputy Commandant***

65.      MIDN Standage's adjudication before the Deputy Commandant on August 6,

2020 was nothing of the kind; the Deputy was not interested in getting to the truth.  Having pre-

determined MIDN Standage's guilt, the Deputy spent his time demonstrating to MIDN Standage

1) how the Deputy, as the representative of the Command, was in sole possession of the truth –

and thus the only acceptable position -- as to every subject matter of MIDN Standage's tweets, 2)

how MIDN Standage was wrong as to each such position, and, 3) because he was wrong, why

his speech was prejudicial to good order and discipline and not protected by the First

Amendment.  Simply stated, the adjudication was an exercise in blatant viewpoint

discrimination.  Among the most notable "truth statements" were the following:

a.   COMDTMIDNOTE 5720 states that NO unprofessional posts are
     tolerated at any level.

b.   The Deputy Commandant claimed to have found MIDN Standage's
     profile and bio (including his association with the Naval Academy) on
     Flickr and You Tube, proof that MIDN Standage had "extensive social
     media influence."  Both assertions proved to be wrong.  He was then
     forced to revert to the argument that, because anyone could find MIDN
     Standage's Instagram account on Google, one could reasonably make the
     logical leap that his Twitter posts were made on behalf of the Department
     of Defense.

c.   The officers who shot Breonna Taylor are guilty.  When MIDN Standage
     explained that, rightly or wrongly, he viewed the incident through the lens
     of his parents, the Deputy retorted as to why his parents would shoot an

innocent person.  A grand jury has now proven the Deputy Commandant wrong.

d. As to MIDN Standage's tweets concerning wealth disparity, MIDN Standage explained that "they" referred to anyone, regardless of race, and that the statements were a reaffirmation of the American Dream.  The Deputy rejected that explanation out of hand, accused MIDN Standage of lying, and said that any logical person would think MIDN Standage was a racist and that the Department of Defense is racist. The fundamental problem with the Deputy Commandant's "logical person" comment is that the tweet at issue reflected MIDN Standage's agreement with the statements of a black woman.

e. The Deputy concluded that MIDN Standage advocated "indiscriminate military actions" against U.S. citizens, using the terms "terrorists" and "protestors" interchangeably (even though MIDN Standage's tweets do not) and scoffing at the notion that ANTIFA was a "terrorist" organization just because the Commander-in-Chief declared them to be so.  He challenged MIDN Standage to cite "specific legislation that says they're a terror group."  Although MIDN Standage could not do so, on July 18, 2020, Senator Bill Cassidy (R-LA) introduced a Senate Resolution calling for the "groups and organizations acting under the banner of Antifa to be designated as domestic terrorist organizations."  Moreover, and as MIDN Standage stated during the adjudication, U.S. Attorney General William Barr declared on May 31, 2020 that the U.S. Department of Justice would

view protests by ANTIFA as "acts of domestic terrorism." The Deputy also scoffed at the idea that the Commander-in-Chief sets the standard for the conduct of the military he commands.

f. The Deputy became particularly vehement and long-winded as to the supremacy of the Navy Football Program over virtually any other aspect of the Naval Academy's mission. Not interested in the particulars of MIDN Standage's tweet on the subject, and ignoring the fact that, as with every other one of his tweets, MIDN Standage was ***responding*** to someone else's comment on the subject, the Deputy reasoned that because the Superintendent originates service commitment waivers for football players to compete in professional football, MIDN Standage's tweet, which does not mention the Superintendent, waivers, or professional sports, was nonetheless insubordinate and thus a violation of good order and discipline as set forth in COMDTMIDNNOTE 5720. He then went on to assert that

    i. The football team is one of the most important organizations on the Yard.

    ii. The football players are some of the Academy's best and most important midshipmen.

    iii. Football players make the sacrifice to gain weight, compromise their body fat, and get waivers so that Navy can win.

    iv. It is vitally important that the Naval Academy WIN in Navy Football.

     v.  Football players represent the Academy well, unlike MIDN
          Standage.

66.    This rant, which, like most of the Deputy's purported justifications for his findings, has no legal significance and serves only to prove exactly what MIDN Standage and many other midshipmen had the right to comment on.

***The Superintendent's Interview***

67.    The Superintendent's Interview, which took place on 23 September, was less of an interview and more of a lecture. Over the course of that lecture, the Superintendent

    a.  Disbelieved that MIDN Standage's parents or any other LAPD police officer was at serious risk during the June riots;

    b.  Asked whether MIDN Standage's desire for using military force against innocent civilians reflected his own views or those of his police parents;

    c.  Wondered how MIDN Standage was still able to obtain an A in the summer school class he was taking during the riots, stating that he himself had to "bust his ass" to get an A in any class when he was a midshipman;

    d.  Sought to invade the attorney/client privilege by asking MIDN Standage what his counsel "told him to say" at the interview;

    e.  Criticized MIDN Standage for filing an appeal, expressing the "professional judgment" that MIDN Standage's efforts to defend himself was the "wrong approach;"

    f.  Ignored the recommendation of MIDN Standage's black roommate and squad leader that MIDN Standage be retained;

    g.  Asked MIDN Standage if he hated the football team and, when MIDN

Standage replied "No," said, "That's not the answer I'm looking for;" and

h.  With respect to MIDN Standage's performance record, said, "We have enough smart officers in the military; what we need now are officers of character."

68.  Each and every one of these statements glaringly reflected the same monolithic, authoritarian, militantly intolerant pro-BLM and pro-Anti-Racist positions the Academy has now completely bought into: the presence of "systemic" racism with no objective, empirical data to back it up, total disrespect for law enforcement, the clear bias that police officers are inherently and indiscriminately violent, rejection and criticism of the President's and other senior administration officials' position that the military should be utilized to combat ANTIFA and other domestic terrorists, and the biased conclusion that anyone's criticism of the Navy football team is inherently racist.

## COUNT 1
### (Content and Viewpoint Discrimination in Violation of the First Amendment)

69.  Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

70.  Government action that targets speech based on its content is presumptively unconstitutional and is justified only of the government demonstrates that it is narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015). Defendants could not possibly make that showing here given their previous and on-going violations of the President's OMB Directive and Executive Order.

71.  "When the government targets not subject matter but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or

perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rectors and Visitors of the University of Virginia*, 515 U.S. 819, 829 (1995).

72.     The conduct and statements of the Superintendent, Commandant, and Deputy Commandant make clear that the Naval Academy has embraced a political ideology and critical race theory that reserves to itself the unilateral, authoritarian right to define what is or is not racism, and to deem any person who does not agree with that ideology as fundamentally and inherently racist.

73.     The Superintendent's implementation of a mandatory indoctrination program grounded in critical race theory violated, and continues to violate, the President's Executive Order and OMB directive as well as MIDN Standage's First Amendment rights.  The doctrinal tenets of critical race theory are antithetical to free speech and have chilled, and continue to chill, MIDN Standage's freedom of expression under the First Amendment.  The Secretary of the Navy has done nothing to stop these violations.

74.     In the ruthless execution of that ideology, the Naval Academy's senior leadership viewed each and every one of MIDN Standage's social media posts as inherently racist and/or taking positions on issues of national concern that did not align with the Academy's own monolithic position on those same issues.

75.     That the Superintendent and his Command directly and implicitly condone the disgraceful, pernicious, racist, nihilistic, and seditious social media posts of other midshipmen exposes the fact that any purported deference to which they may feel themselves entitled on the basis of "professional judgment," "good order and discipline," or "unit cohesion" is ephemeral and nothing more than a pretext for their constitutional violations.

76.     The Academy's senior leadership manifested this viewpoint discrimination by

wrongfully finding MIDN Standage guilty of engaging in speech on political subjects in violation of the Hatch Act and of conduct unbecoming a midshipman, ignoring the law governing those offenses in the name of "rooting out systemic racism" from the Naval Academy.

77.    Those guilty findings, MIDN Standage's continued indoctrination in critical race theory, and the subsequent decision by the Superintendent to recommend MIDN Standage for separation, are arbitrary and capricious, an abuse of discretion, not in accordance with law, are contrary to constitutional rights under the First Amendment as the product of unconstitutional viewpoint discrimination, and must be enjoined and overturned in accordance with 5 U.S.C. § 706(2)(A) and (B).

78.    The harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable.  Other than the declaratory and injunctive relief requested, there exists no adequate remedy at law.

## COUNT 2
### (Deprivation of Due Process in Violation of the Fifth Amendment)

79.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

80.    Fundamental to the due process protections afforded by the Fifth Amendment is the right to a fair and impartial hearing.

81.    The allegations set forth throughout the Complaint make clear that the Superintendent, Commandant, and Deputy Commandant are intent on turning the Naval Academy into an "anti-racist" laboratory and re-education camp.  It is supremely ironic that MIDN Standage faces separation for expressing "political" views that were nothing of the kind, while the Command is imposing an oppressive political ideology on the Brigade of Midshipmen that seeks to chill free speech and punish any midshipman who does not actively "get with the program."  The command climate the Superintendent, Commandant, and Deputy Commandant

have created rendered it impossible for MIDN Standage to receive a fair adjudication of the conduct charges against him. As set forth above, every stage of MIDN Standage's adjudication was nothing more than a "Kafkatrap."

82.     The effects of this command climate are graphically illustrated by the numerous social media posts of midshipmen who have labeled MIDN Standage a racist, called for MIDN Standage's separation, or stated their intentions to do physical harm to him. Despite the fact that all of these posts have been brought to the attention of the Academy's senior leadership, they have done nothing about them, further evidence that it is the mob, and not the law, that brought about the results this Complaint seeks to overturn and enjoin.

83.     The administrative conduct process to which MIDN Standage was arbitrary and capricious, an abuse of discretion, not in accordance with law, contrary to constitutional rights under the Fifth Amendment as the deprivation of due process, and must be enjoined and overturned in accordance with 5 U.S.C. § 706(2)(A) and (B).

84.     The harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable. Other than the declaratory and injunctive relief requested, there exists no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff seeks an order and judgment to

a.   Declare that the Superintendent's mandatory indoctrination of the Brigade of Midshipmen and MIDN Standage in critical race theory violated, and continues to violate, the President's Executive Order, the President's OMB Directive, and MIDN Standage's First Amendment rights;

b.   Declare that the Naval Academy's senior leadership impermissibly

discriminated, and continue to discriminate, against MIDN Standage based on the content and/or viewpoint of his speech in violation of the First Amendment;

c.   Declare that MIDN Standage's social media posts did not violate COMDTMIDNNOTE 5720 and did not constitute conduct unbecoming a midshipman;

d.   Enjoin any further training at the Naval Academy grounded in critical race theory as proscribed by the President's OMB Directive and Executive Order;

e.   Enjoin Defendants' efforts to separate MIDN Standage from the Naval Academy;

f.   Return MIDN Standage to class for the completion of his course work; and

g.   Award all other relief that the Court deems just and proper.

h.   In connection with the injunctive relief sought in this Amended Complaint, Plaintiff adopts and restates his Motion for Preliminary Injunction and Memorandum in Support filed September 30, 2020.

Dated: October 16, 2020                   Respectfully submitted,


_____/s/_____
Jeffrey E. McFadden
(D. Md. Bar No. 08738)
LAW OFFICES OF JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD  21638
(410) 490-1163
jmcfadden@jmcfaddenlaw.com
*Counsel for Plaintiff*