# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHASE STANDAGE, Midshipman First
Class, United States Naval Academy,

                *Plaintiff*,

    vs.

KENNETH J. BRAITHWAITE, Secretary of
the Navy; and SEAN S. BUCK, Vice Admiral,
Superintendent, United States Naval Academy;

                *Defendants.*

Civil Action No. 1:20-cv-02830-ELH

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

Plaintiff's court filings shine a harsh light on discriminatory and unconstitutional practices at the Naval Academy in which the Superintendent and his Command have ordered MIDN Standage to stop engaging in social media, have punished him, and have determined to separate him from the Academy in his final year merely because of social media posts he made, despite the fact that he did not identify himself as a midshipman or member of the military. Contrary to the facially false assertion by Defendants that there is no First Amendment violation here because the Chief of Staff recommended separation based on the "manner" in which MIDN Standage made his comments, and not the content, this is without question a clear and

compelling case of viewpoint discrimination.  MIDN Standage's free speech has been chilled, and he has been punished and faces separation (and the Government's demand for repayment of the value of his education) not because he tweeted, but rather for the content of his tweets. The Supreme Court has found viewpoint discrimination to be a most pernicious form of free speech depravation in violation of the First Amendment.  *See Rosenberger v. Rectors and Visitors of the University of Virginia*, 515 U.S. 819, 829 (viewpoint discrimination is an egregious form of content discrimination).  For that very reason, the Supreme Court requires lower federal courts to subject such discrimination to the most exacting scrutiny.  *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015) (town sign code imposing content-based restrictions on speech "can stand only if they survive strict scrutiny").   Supreme Court precedent also makes clear that the injury to MIDN Standage is not merely prospective; he already has been irreparably harmed.  *See Elrod v. Burns*, 427 U.S. 347 (1976) (finding that even the prospect of first amendment violations, for minimal periods of time, constitute irreparable harm).

Defendants try to sidestep this analysis by urging deference, predicated on the boilerplate incantation in the Chief of Staff's ruling that he had "lost … confidence in [MIDN Standage's] ability to make sound decisions and to uphold the core values expected from an officer in the Navy."  This is the rote language the Command uses when it separates a midshipman for all manner of conduct violations, not just conduct unbecoming.  Here, the conduct is the content of MIDN Standage's tweets, and the Chief of Staff's "ruling" is devoid of any legal analysis and is based almost entirely on an unwritten record that does not address how MIDN Standage could possibly have been on notice that his otherwise protected speech falls outside the Navy's standard of conduct.  Nor does it address why MIDN Standage should be singled out for punishment and separation while all other midshipmen go unpunished and actually are

encouraged to continue their weaponization of social media in the name of "discourse" and "cultural understanding." In fact, on the merits, MIDN Standage's ostensibly "improper" speech reflects the views of the President/Commander-in-Chief and a female black conservative.

In short, Defendants know they cannot withstand the close scrutiny of their viewpoint discrimination. They thus attempt to sidestep that analysis altogether by conjoining in its response a motion to dismiss alleging, among other defenses, sovereign immunity. We respectfully submit that the Court should not allow Defendants to so readily avoid scrutiny, especially where core constitutional protections are at issue.

## ARGUMENT

I. **PLAINTIFF SATISFIES EACH OF THE FOUR FACTORS WARRANTING PRELIMINARY RELIEF.**

    A. **Plaintiff Is Likely to Succeed on the Merits.**

        1. **Plaintiff Will Prevail on His First Amendment Claim.**

            a. **Plaintiff Has Alleged Overwhelming Evidence of Viewpoint Discrimination and Will Adduce Such Evidence Through Discovery and Trial.**

The Amended Complaint contains substantial, well-pleaded allegations not only establishing a plausible case of viewpoint discrimination, but demonstrating a strong likelihood of success on the merits. That is particularly true where, as here, Defendants have failed to address a single one of those allegations in their Opposition.

The Amended Complaint alleges that the Superintendent is indoctrinating the Brigade of Midshipmen, including MIDN Standage, in a form of "diversity training" grounded in critical race theory principles. (Am. Compl., ¶¶ 7, 10, 72-73.)[1] It further alleges that such training has

---

[1] Paragraph 60 of the Amended Complaint discusses the Superintendent's all-hands e-mail of September 9, 2020, a copy of which is attached as Exhibit A. The contents of the e-mail were later republished in the magazine of the Naval Academy Alumni Association, *Shipmate*, after Plaintiff filed this law suit. A copy of the Shipmate re-

violated, and continues to violate, an OMB Directive and Executive Order issued by the President.  (*Id.*, ¶¶ 7, 11, 51, 56.)  One particular statement from the Executive Order is particularly relevant to the allegations of viewpoint discrimination at issue here:

> But training like that discussed above perpetuates racial stereotypes and division and can use subtle coercive pressure to ***ensure conformity of viewpoint***.  Such ideas may be fashionable in the academy, but they have no place in programs and activities supported by Federal taxpayer dollars.[2]

Indeed, the Amended Complaint alleges that conformity of viewpoint lies at the core of critical race theory as espoused by movements such as Black Lives Matter and Anti-Racism.  (*Id.*, ¶¶ 6, 10.)  The Amended Complaint then sets forth multiple examples of how this doctrinal insistence on conformity of viewpoint manifested itself both in general statements by the Superintendent and Commandant (*id.*, ¶¶ 6, 7, 52-54, 57-60) [3] and in questions and statements made by both the Deputy Commandant and the Superintendent in their respective adjudications of MIDN Standage's conduct.  (*Id.*, ¶¶ 5, 7, 65-68.)  Finally, the Amended Complaint alleges the glaringly disparate treatment MIDN Standage has received for his speech compared to the treatment of other midshipmen whose social media activities clearly violate the standards that form the basis of MIDN Standage's punishment.   (*Id.*, ¶¶ 8, 13, 64, 75.)  The severity of the disparate treatment in this case constitutes compelling evidence of viewpoint discrimination and renders Defendants' platitudes about "professional judgment," "standards of conduct," and "Navy core values" hollow, disingenuous, and pretextual.

---

publication is attached as Exhibit B.   Attached as Exhibit C are multiple examples of the calls to the mandatory training at issue in this case.  The first such example quotes Angela Davis:  "**In a racist society, it is not enough to be non-racist.  We must be anti-racist.**"

[2] Am. Compl. ¶ 50 and Exhibit M (emphasis added).

[3] Additional statements to this effect by the Commandant are attached as Exhibit D.

### b.     The Military is Not Free to Engage in Viewpoint Discrimination.

Defendants assert that *Parker v. Levy,* 417 U.S. 733 (1974) and *United States v. Hartwig*, 39 M.J 125 (1994) stand for proposition that a "civilian viewpoint discrimination standard" can never apply to the military.  The cases stand for no such thing.  *Parker* and *Hartwig* simply stand for the unremarkable proposition that certain viewpoints expressed by a servicemember, such as publicly urging military personnel to refuse to obey orders (*Parker*) or writing a sexually suggestive letter to a schoolgirl (*Hartwig*) can be punishable as conduct unbecoming if the expression of those viewpoints meets the conduct unbecoming legal standard.  Neither of those obviously egregious factual scenarios has anything to do with the content of the tweets at issue here.[4]  As Defendants would have it, this exception would swallow the rule that governmental discrimination against anyone, civilian or military, on the basis of viewpoint is unconstitutional.

This case about a uniform standard of politically and culturally acceptable speech, which neither the military nor any other governmental entity has a right to enforce.  The President's Executive Order alone could not make that more clear.  No case, military or otherwise, has ever stood for the proposition that a uniform military content-of-speech code like that espoused by critical race theorists at the Naval Academy can never affront the First Amendment.[5]

---

[4] Once again, it is not MIDN Standages' tweets, but rather the disgraceful, pernicious, racist, nihilistic, and seditious social media posts attached to Amended Complaint as Exhibits B through J and to this Reply as Exhibits M, N, and Q that could well fall within the ambit of conduct unbecoming circumscribed by *Parker* and *Hartwig.*

[5] Defendants claim that decisions about conduct unbecoming are non-justiciable and then cite two court cases in support of their legal standard.

c.      **The Chief of Staff's Conclusory Finding That MIDN Standage's Punishment Did Not Violate the First Amendment is Wrong and Not Entitled to Any Deference.**

MIDN Standage took a timely appeal from the Deputy Commandant's findings of guilt as to the two underlying conduct charges. The appeal was 24 pages long, single-spaced, and attached may of the exhibits that are now exhibits to the Amended Complaint, including all of the incendiary social media posts made by other midshipmen and the Commandant's daughter.[6] The Chief of Staff disposed of the appeal in two sentences:

> The issue with your social media comments was in the manner in which you expressed your opinions, not necessarily with the opinions themselves. You are not being punished for your beliefs, but for the fact that you failed to express them in a way that is consistent with our Navy core values.[7]

This disposition is a classic example of the extent to which the execution of the Administrative Conduct System at the Naval Academy is a legal sham bereft of due process. The disposition is conclusory and vague to the point of incomprehensibility. It makes reference to "Navy core values" but does not explain what those core values are. It makes no reference to the record below because there is no record; the Deputy Commandant was careful not to record the proceedings before him or to produce any evidence of his question and statements or MIDN Standage's answers. The disposition cites no legal authority, nor does it address the elements of the offenses of which MIDN Standage was charged or the sufficiency of the evidence satisfying each and every one of those elements. Indeed, it does not address the other offense with which MIDN Standage was charged at all.[8] The Memorandum Report to the Secretary of the Navy the

---

[6] A copy of the appeal, without the exhibits, is attached as Exhibit E.

[7] Def. Opp., Ex. G.

[8] Defendants do not address it in their opposition either, because they are so confident in the Chief of Staff's learned, thorough, and well-reasoned disposition of the First Amendment issue.

Superintendent submits to recommend the separation of a midshipman, and the Memorandum the Assistant Secretary of the Navy for Manpower & Reserve Affairs issues with his separation decision, historically and uniformly suffer from the same deficiencies. The notion that this Court should defer to the Chief of Staff's disposition or to such a process generally in the face the strict scrutiny Supreme Court precedent demands is specious.

i.      **MIDN Standage's Speech Does Not Constitute a Clear and Present Danger to His Standing as a Midshipman or As a Future Officer.**

Defendants claim that "[b]ecause Plaintiff's speech poses a clear and present danger that his speech will, in dishonoring or disgracing him personally, seriously compromise his standing as an officer, the Article 133 violation easily passes constitutional scrutiny." Opp. at 17. Defendants do not, and obviously cannot, explain how this assertion squares with their assertion that it is merely the "manner" of MIDN Standage's tweets, not the content, that led to the separation decision. Regardless, the Defendants' assertion that there is no basis for this Court to scrutinize the basis for their finding of an Article 133 violation does not hold water.

To begin with, the officer who found MIDN Standage guilty of the conduct unbecoming offense – the Deputy Commandant -- made no such finding of a clear and present danger that MIDN Standage's tweets "seriously compromise his standing as an officer." *See* Def. Opp., Ex. F. Instead, as alleged in the Amended Complaint, the Deputy Commandant repeatedly took issue with the *content* of MIDN Standage's speech, and made clear that only his Command-endorsed views will satisfy his unwritten standard of acceptable conduct by a midshipman.

- As to MIDN Standage's tweets concerning Breonna Taylor, for example, the Deputy Commandant declared that the officers who shot Breonna Taylor were guilty (which

proved to be wrong).[9]  When MIDN Standage was asked why he would think otherwise, MIDN Standage said he had viewed the situation through the eyes of his parents.  The Deputy Commandant then said, "Why would your parents shoot an innocent person?"[10]  Evidently one must share the Deputy Commandant's and the Command's views on an extremely fraught issue of social and criminal justice to be fit to serve; any contrary views *ipso facto* are dishonorable and warrant discharge.

- As to MIDN Standage's tweets concerning domestic terrorists, the Deputy Commandant challenged the assertion that any of the protestors were domestic terrorists or that anyone had declared them as such (which also proved to be wrong, as reflected by, among other things, Tweets by the President pre-dating MIDN Standage's tweets).[11]  The Deputy Commandant is not entitled to his own facts, and is not empowered to impose his personal views on matters that are not distinctively within the province of the military on all midshipmen under the guise of enforcing standards of conduct.

- And with respect to MIDN Standage's single comment about the Navy football team, the Deputy Commandant went on a ten-minute rant about the team in an effort to demonstrate how wrong the *content* of MIDN Standage's speech was on the subject.[12]  Evidently being critical of a football team has now become a clear and present threat to once's ability to lead as a Naval officer.

In all respects relevant to the issues before this Court, the Deputy Commandant was not acting as a military officer on issues uniquely within the province of the military, but was acting as

---

[9] Declaration of Chase Robert Standage ("Standage Decl."), ¶ 34, attached as Exhibit F.

[10] *Id.*

[11] *Id.*, ¶ 36; President's tweets, Exhibit G.

[12] Standage Decl., ¶ 38.

thought police, judge, jury and executioner. The Chief of Staff's disposition of the appeal does nothing to change that result. The statement, "Midshipman First Class Standage has lost my confidence in his ability to make sound decisions and to uphold the core values expected from an officer in the Navy," Def. Opp. at 17 says nothing about a clear and present danger to MIDN Standage's standing as an officer. In fact, it is boilerplate, as reflected in other separation recommendations that had nothing to do with a conduct unbecoming charge. S*ee* Exs. H and I.

The second major failing of the Government's argument is the lack of any objective evidence tending to show that MIDN Standage's speech will seriously compromise his standing as an officer. Three character witnesses, including the head of the Academy's aerospace engineering department and MIDN Standage's black roommate, testified to the contrary at each level of adjudication. *See* Def. Opp., Ex. F, at 3. While it is true that certain current and former midshipmen have branded MIDN Standage a "racist" who should be "kicked out," physically assaulted, and killed, any such statements could not possibly constitute evidence of any diminution in MIDN Standage's standing, because all such statements are the product of the very discrimination at issue in this case. It is simply unfair, for example, to allow the Commandant's own daughter and wife to use social media to call for MIDN Standage's head on a platter, and then to say "Look, he cannot possibly be fit to serve." Social media can be, and in this instance has proven to be, extremely pernicious, potentially putting MIDN Standage's life at risk, not to mention his education and career as an officer in the Navy. He has trained essentially his whole life to serve his country, and by all objective accounts is a superlative midshipman. Defendants are certainly free to adduce objective evidence in support of their position at trial, but thus far they have failed to do so.

Under the fundamental due process principle of notice, courts recognize that, with respect to the criminalization of conduct under Article 133, "to pass constitutional muster, [the accused] must have reasonably known, based on service customs or standards of conduct, that [the] acts [at issue] were punishable. That custom or standard too must stand on its own without regard to whether the conduct also amounts to any specific offense [under the UCMJ]." *United States v. Livingstone*, 78 M.J. 619, 626 (USCGCCA, 2018). Defendants did not address this essential element of a conduct unbecoming violation, let alone point to any evidence that MIDN Standage reasonably knew that speaking on the subjects of national concern at issue here was punishable. In fact, the allegations in the Amended Complaint and other evidence overwhelmingly demonstrate that MIDN Standage reasonably believed that the standard of conduct relevant to his speech conformed to standards set by the President and those of his peers, standards implicitly endorsed by the Superintendent and Commandant.

Indeed, the social media environment in which MIDN Standage was making posts related to 1) deeming certain protestors to be "domestic terrorists"[13] and 2) stating that the use of military force against such terrorists might be necessary and appropriate, embraced "service customs or standards of conduct" that were set by the Commander-in-Chief as well as a high-profile United States Senator. Copies of tweets by the President and Senator Tom Cotton that pre-date or are contemporaneous with MIDN Standage's posts on these subjects are attached as Exhibits G and J. Defendants cannot possibly prove that MIDN Standage reasonably knew that

---

[13] Defendants deliberately mischaracterize MIDN Standage's tweets on this subject as calling for military action against "civilians." MIDN Standage never used the word "civilians;" he consistently used the word "terrorists." Standage Decl., ¶ 18; Am. Compl., Exhibit A.

his speech on these subjects breached a standard of conduct that mirrored the social media standard established by the Commander-in-Chief and emulated by a U.S. Senator.

With respect to the shooting of Breonna Taylor, MIDN Standage, like many other Americans, believed that the use of deadly force by the police that resulted in Ms. Taylor's death was justified.[14] While Defendants single out his tweet about Ms. Taylor "receive[ing] her justice," they fail to point out that MIDN Standage posted another tweet expressing his belief that Ms. Taylor was not, in fact, innocent; (*see* Am. Compl., Ex. A, page 29); a view once again and contemporaneously shared by others, including the black conservative commentator Candace Owens. A copy of such social media posts is attached as Exhibit K. Again, while the emotions surrounding Ms. Taylor's death ran high and the timing of MIDN Standage's tweets was unfortunate, coming as they did while his police officer parents themselves were at risk during the 2020 Los Angeles riots, there was no directive issued by the Naval Academy ordering midshipmen to refrain from commenting, much less indicating that only tweets opposing the conduct of the police and calling for their arrest would be acceptable.[15]

As for MIDN Standage's peers, it simply cannot be contended, given the tenor, vulgarity, aggressiveness, and animus pervading the world of midshipman social media, that MIDN Standage should be held to, or should have been aware of, a standard of constitutionally-protected discourse that materially differs from that applicable to those peers. To cite just one example, when the Kentucky attorney general announced the decision of the grand jury as to the

---

[14] Like the Deputy Commandant's insistence that the officers who shot Breonna Taylor are "guilty," Defendants continue to insist that Ms. Taylor was killed in a "no-knock police raid." Opp. at 3. Both assertions are at least debatable and illustrate, yet again, Defendants' insistence that they are in possession of the "one truth" with respect to such matters.

[15] One such "acceptable" post by a current midshipman is attached as Exhibit L.

police officers involved in the Breonna Taylor shooting, one midshipman, a black female junior, retweeted, "I hope They burn down the entire city of Louisville."[16]

Defendants cannot now be heard to say that MIDN Standage violated a standard of conduct concerning social media comments far more stringent than the one the Naval Academy itself not only allowed, but actively encouraged and continues to encourage, on issues of otherwise protected First Amendment speech in which the Naval Academy has no unique military insights or interest.

## 2.    Plaintiff Will Succeed on His Due Process Claim.

That a midshipman is entitled to due process protections in administrative conduct proceedings has long since been settled.  In *Hagopian v. Knowlton*, 346 F.Supp. 29 (S.D.N.Y. 1972), the Court held that a West Point cadet challenging his expulsion had a right to due process under the Fifth Amendment and that the cadet had been deprived of a "fair and impartial hearing" because, among other reasons, the prosecutorial and judicial function had been merged and that such merger did "not satisfy due process or the simple needs of natural justice, where, as here, a cadet will also be subject to a substantial forfeiture and irreparable damage, in the nature of expulsion." *Id.* at 32.

That is precisely what happened in this case.  The investigation of MIDN Standage's tweets did not begin under the auspices of the Administrative Conduct System; it began as a "JAGMAN" investigation.[17]  JAGMAN Section 0209 sets forth the requirements for a "Command Investigation," which is what the instant investigation purported to be.[18]  A

---

[16] A copy of this tweet is attached as Exhibit M.

[17] The JAGMAN is the Manual of the Judge Advocate General of the Department of the Navy.  Investigations are governed by Chapter II, Part C of the JAGMAN.

[18] A copy of JAGMAN Section 0209 is attached as Exhibit N.

Preliminary Inquiry Officer (PIO) conducted an investigation into MIDN Standage's tweets and reported the results of her investigation to the Superintendent in a Preliminary Inquiry Report (PIR) dated June 26, 2020.[19] On July 16, 2020, the Superintendent signed a Final Endorsement on the PIR, closed the investigation, and forwarded the matter to the Deputy Commandant "for action as he deems appropriate."[20]

The action the Deputy Commandant "deemed appropriate" was to direct the Commandant's Conduct Officer to put MIDN Standage into the Administrative Conduct System. That act made the Deputy Commandant himself MIDN Standage's *de facto* accuser. In violation of the very due process precept identified by the court in *Hagopian*, the Deputy Commandant then proceeded to shift from his prosecutorial function to his judicial function. At the adjudication, the Deputy Commandant accused MIDN Standage of being a racist, accused him of being a liar, scoffed at the notion that the Commander-in-Chief set the standard of conduct for social media activity, and asked why MIDN Standage's parents would shoot an innocent person. These are not the acts of an adjudicator in search of the truth; they are the acts of a prosecutor who had already made up his mind as to MIDN Standage's guilt and used the adjudication to prove it. He then found MIDN Standage guilty of both charges, imposed the maximum punishments allowable, and forwarded him for separation. The Deputy Commandant's overwhelmingly clear conflict of interest, and his bias, denied MIDN Standage a fair and impartial hearing and deprived him of his right to due process under the Fifth Amendment.

---

[19] A copy of the PIR (except for MIDN Standage's tweets, which are attached to the Amended Complaint as Exhibit A) is attached as Exhibit O.

[20] *Id.*, final two pages.

We have already discussed above the due process violations surrounding the Chief of Staff's disposition of MIDN Standage's appeal. The appeal was decided on the papers with no opportunity to be heard.

For his own part, the Superintendent only added to the due process violations when MIDN Standage appeared before him. Of particular note, the Superintendent criticized MIDN Standage's decision to retain counsel, tried to invade the attorney/client privilege by asking MIDN Standage what his counsel had "told him to say," suggesting that MIDN Standage was being disingenuous on advice of counsel, and stated that, in his "professional judgment," MIDN Standage's decision to take an appeal from the Deputy Commandant's findings and punishments was the "wrong move."[21] These kinds of comments typify the Naval Academy's view of midshipmen who retain counsel and try to defend themselves. Many midshipmen undersigned counsel has represented have been told by their chains of command that the reason the officers were recommending separation versus retention was because the midshipmen had retained counsel and were not "owning it." The Superintendent's comments in this case make all too clear that a material part of his decision calculus was MIDN Standage's assertion of his rights.

In, *U.S. v. Carpenter*, the Court of Appeals for the Armed Forces noted,

> On several occasions, this Court has commented that it is improper for a prosecutor to ***ask the court members to infer guilt because an accused has exercised his constitutional rights***. *See United States v. Turner,* 39 MJ 259, 262 (CMA 1994) (improper to comment on appellant's refusal to consent to search); *United States v. Toro,* 37 MJ 313, 318 (CMA 1993) (improper to comment on exercise of right to remain silent); *United States v. Edwards,* 35 MJ 351, 355 (CMA 1992) (improper to comment on refusal to plead guilty); *United States v. Clifton,* 15 MJ 26, 29 (CMA 1983) (improper to argue that accused "asserted his rights" and "fought this every inch of the way"); *see also United States v. Causey,* 37 MJ 308, 311 (CMA 1993) (improper to urge members to reject innocent ingestion defense in drug cases in order to deter others from making similar claims).

---

[21] Standage Decl., ¶ 41.

51 M.J. 393 (C.A.A.F. 1999) (emphasis added). The Court's citation to *U.S. v. Clifton* is particularly apposite. In that case, the Court of Military Appeals held that, while certain errors by the Government's counsel, standing alone, may not have justified reversal of the defendant's conviction,

> *it was unconscionable for trial counsel repeatedly to emphasize appellant's assertion of his rights*. A servicemember may "assert his rights" without fear of exploitation. He is permitted, even encouraged, to "fight" a criminal charge "every inch of the way." He is not obligated to "admit to anything," upon being accused of wrongdoing. U.S. Const. Amend. V; Article 31, Uniform Code of Military Justice, 10 U.S.C. § 831. *He may seek representation of counsel without fear of retribution.* U.S. Const. Amend. VI. And he need apologize to no one for putting the Government to its burden; thus he may "talk for a long, long time about reasonable doubt." *See In Re Winship,* 397 U.S. 358, 361–64, 90 S.Ct. 1068, 1070–73, 25 L.Ed.2d 368 (1970), and the cases cited therein.
>
> What trial counsel may have intended to convey is unclear. What he in fact conveyed is clear: *An innocent man has nothing to hide, no reason to exercise his rights; the fact that appellant sought refuge behind his rights suggests he was not innocent.* United States v. Moore, 1 M.J. 390, 391 (C.M.A.1976).
>
> As indicated, a court-martial must render its verdict solely on the basis of the evidence properly before it. *United States v. Bouie, supra.* **The Government may not, either directly or by implication, attempt to sustain—or circumvent—its burden of proof by capitalizing on an accused's exercise of his rights.**

15 M.J. 26, 30 (C.M.A. 1983) (emphasis added). The Superintendent used MIDN Standage's assertion of his constitutional rights and his right to counsel against him, which constitute clear violations of procedural due process causing irreparable harm. Defendants do not, and indeed cannot, offer any good faith arguments to the contrary.

### B.    Plaintiff Has Already Suffered and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief.

MIDN Standage's opening brief cited binding precedent that the harm caused by First Amendment violations is irreparable *per se.* In *Elrod v. Burns*, 427 U.S. 347 (1976), noncivil

service employees of the Cook County, Illinois, sheriff's office brought a class action against so-called "patronage dismissals," alleging that they were fired or threatened with dismissal because they were not affiliated with or sponsored by the political party of the current county sheriff. The Court found that the dismissals *and threatened dismissals* violated the plaintiffs' rights of free assembly and free expression under the First Amendment. As to the question of whether the entry of a preliminary injunction was justified, even in the face of *prospective dismissal*, the Court held,

> At the time a preliminary injunction was sought in the District Court, one of the respondents was only threatened with discharge. In addition, many of the members of the class respondents were seeking to have certified prior to the dismissal of their complaint were threatened with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge. ***It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.*** *See New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Since such injury was both threatened and occurring at the time of respondents' motion and since respondents sufficiently demonstrated a probability of success on the merits, the Court of Appeals might properly have held that the District Court abused its discretion in denying preliminary injunctive relief. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963).

*Id.* at 373 (emphasis added). The case eliminates all doubt as to the question of whether MIDN Standage has already suffered irreparable harm. His speech has been chilled by the Administrative Conduct process. It has been chilled, and continues to be chilled, by multiple threats of physical harm and harassment by midshipmen, about which Defendants have done nothing.[22] It has been chilled, and continues to be chilled, by mandatory indoctrination in critical race theory that insists on a monolithic viewpoint with respect to issues of structural and institutional racism. This is not a case involving loss of income or reputational harm. As *Elrod*

---

[22] Standage Decl., ¶ 21; additional threats and one particularly inflammatory post are attached as Exhibit P.

*v. Burns* makes clear, this is a case involving chilling, irreparable harm to MIDN Standage and the Defendants' continuing violations of a Presidential Directive and Executive Order that continue to chill free speech at the Naval Academy.

Given Plaintiff's overwhelming showing of a First Amendment violation, the irreparable harm prong of the preliminary injunction standard is easily satisfied here.

### C. The Balance of Hardships and the Public Interest Support a Preliminary Injunction.

In his Executive Order of September 22, 2020, the President clearly and compellingly articulated the public interest at stake here:

> *[O]ur Uniformed Services should not teach our heroic men and women in uniform the lie that the country for which they are willing to die is fundamentally racist. Such teachings could directly threaten the cohesion and effectiveness of our Uniformed Services.*[23]

Defendants' assertion that the issuance of a preliminary injunction could interfere with processes "critical to the United States' ability to maintain a ready and lethal fighting force;" Def. Opp. at 13; is completely undermined by the directives of the President. The Executive Order could not make more clear that the Superintendent's indoctrination of the Brigade of Midshipman in critical race theory, the on-going viewpoint discrimination that flows from it, and an Administrative Conduct System rigged to ensure such discrimination, are *existential threats* to the Country's ability to maintain a ready and lethal fighting force.

This public interest at stake here is not about chilling command decisions. It is about enjoining command *violations* of Presidential directives and the discriminatory practices that flow from them. It is clearly in the public interest that the Defendants obey the lawful orders of the Commander-in-Chief and cease and desist from engaging in discriminatory practices that

---

[23] Am. Compl., Ex. M (emphasis added).

continue to deprive midshipmen, including MIDN Standage, of their First Amendment rights. It is also clearly in the public interest that the Naval Academy's implementation of its Administrative Conduct System should be exposed for what it is, a procedural sham that routinely violates the Fifth Amendment rights of midshipmen, violates its own governing regulations, and ignores substantive law.

## II.     THIS COURT HAS JURISDICTION.

Turning to Defendant's Motion to Dismiss, it is plainly evident that Defendants want to avoid any judicial scrutiny. To this end, Defendants sweep the fundamental viewpoint discrimination issues and due process issues raised by MIDN Standage under the rug. In short, Defendants seek dismissal on the false factual assertion that their punishment of MIDN Standage is a mere matter of "professional judgment." The First and Fifth Amendments cannot be so cavalierly dismissed, and - respectfully - the Court's prior comments about the troubling nature of the Defendant's conduct at a minimum should weigh against any premature summary disposition.

In determining whether a justiciable controversy exists, the Court must accept as true all material allegations in the plaintiff's complaint. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). The Court may also consider additional particularized allegations of fact submitted by affidavit or exhibit. *Id.*

### A.     The Government is Not Immune from Suit.

Defendants' sovereign immunity claim may be quickly disposed of. In *Wasson v. Trowbridge*, 382 F.2d 807 (2d Cir. 1967), a midshipman at the U. S. Merchant Marine Academy challenged his dismissal from the Academy on constitutional grounds; specifically, a deprivation of due process. The Government asserted that sovereign immunity barred the suit. The Second

Circuit disagreed, citing Supreme Court case law in support of its holding that "[i]ndisputably the District Court had jurisdiction to determine whether the procedure applied to Wasson was constitutionally sufficient." *Id.* at 811 (citing cases). *Accord Krawez v. Stans*, 306 F.Supp. 1230, 1232-33 (following *Wasson* and noting that the APA constitutes a waiver of sovereign immunity concerning those claims that come within its scope). A claim of sovereign immunity here would render the reviewability of agency actions under Section 706 of the APA meaningless.

**B.      Plaintiff is Not Required to Exhaust His Administrative Remedies.**

Defendants' reliance on *Williams v. Wilson*, 762 F.2d 357 (4th Cir. 1985), *Guerra v. Scruggs*, 942 F.2d 270 (4th Cir. 1991), and *Nationsbank Corp. v. Herman*, 174 F.3d 424 (4th Cir. 1999) for the proposition that Plaintiff is required to exhaust his administrative remedies is unavailing.[24] None of those cases involved the *per se* irreparable harm flowing from the First Amendment violations recognized by the Supreme Court in *Elrod v. Burns*. It is, rather, the reasoning of the Second Circuit in *Able v. U.S.*, 88 F.3d 1280 (2d Cir. 1996) that controls the exhaustion question in this case.

In *Able*, gay and lesbian servicemembers sued the United States and the Secretaries of Defense and Transportation to challenge the constitutionality of a section of the National Defense Authorization Act (NDAA) governing military service by gays and lesbians. Among other causes of action, the plaintiffs claimed that the NDAA section violated their free speech rights under the First Amendment. Defendants argued that the plaintiffs had "failed to show an irreparable injury that would obviate the need for exhaustion and that the exhaustion doctrine applie[d] to the consideration of the constitutional questions raised in this case." *Id.* at 1288.

---

[24] *Nationsbank* is also inapposite because there is no statute at issue here by which Congress intended to require exhaustion prior to any judicial challenge.

The Second Circuit disagreed:

> The plaintiffs here are alleging violations of their First Amendment right to free speech. Both the Supreme Court and this court have held that even minimal impairments on this right create irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991) (same). The government attempts to distinguish these precedents on the ground that the First Amendment has a "different and substantially less stringent application in the military than it does in civilian life." Brief for the Appellants/Cross–Appellees at 15. This argument, however, places the cart before the horse. As we note herein, the First Amendment is indeed considerably less restrictive on government action in the military than in other spheres. But, in conducting our "irreparable injury" inquiry, we must assume, *arguendo,* unconstitutional government action and, under this assumption, the violation of the First Amendment is no less harmful to a military plaintiff than a civilian one.

*Id.* at 1288-89.

That reasoning applies with equal force to the Fourth Circuit's position on this "irreparable injury exception." As we noted in our opening brief, the Fourth Circuit quoted the holding in *Elrod v. Burns* at it appears in the parenthetical above in *Legend Night Club v. Miller,* 637 F.3d 291, 302 (4th Cir. 2011). Given the Fourth Circuit's recognition of the "irreparable harm exception" at issue in *Able,* *Williams v. Wilson* does not control the exhaustion requirement of this case.

A Superintendent who violated the regulation concerning MIDN Standage's out-processing, who continues to violate the President's executive order and OMB directive on critical race theory indoctrination at taxpayers' expense, and a Secretary of the Navy who has not ordered the Superintendent to stop doing so, now ask this Court to defer to the integrity of their administrative and military processes. The law of federal subject matter jurisdiction requires no such deference.

**C.** **Even if the Four-Part Justiciability Test in *Williams* is Apposite, Plaintiff's Claims Are Plainly Justiciable.**

Defendants' assert that the application of the facts here to the four-part justiciability test set forth in *Williams* renders this case non-justiciable. That assertion is without merit.

As an initial matter, here, as elsewhere, Defendants attempt to reframe the present controversy to bring it within the ambit of non-justiciable claims. They assert that the issue before the Court is one of "fitness for duty," and then argue that such determinations are solely committed to the military and not subject to judicial review.

The Superintendent is not authorized to make a "fitness for duty" determination based on misconduct in the absence of adjudicated findings of guilt as to specific conduct offenses, the elements of which must meet applicable legal standards and must be supported by a preponderance of the evidence, all of which is set forth in the instruction governing the Administrative Performance and Conduct System.[25] It is ***those adjudicated findings****,* that have, in the first instance, violated MIDN Standage's right to free speech, because the findings are the product of viewpoint discrimination. Indeed, the First Amendment violations began on June 15, when MIDN Standage was ordered to cease any further expression of his views on social media under threat of punishment – punishment that ultimately came to pass – while other midshipman continued, with impunity, to go on social media to disparage the President, call for revolution and violence against the police, and harass MIDN Standage. Moreover, and as *Elrod v. Burns* makes clear, the Superintendent's determination to forward MIDN Standage to ASN(M&RA) for separation has already caused irreparable harm as well, because the prospect of such separation

---

[25] Def. Opp. Ex. H.

continues to have a chilling effect on the exercise of MIDN Standage's free speech. Those facts satisfy the first two parts of the *Williams* test. The nature and strength of Plaintiff's challenge, and the potential injury to him if review is refused, are rooted in the irreparable harm principles of *Elrod.*

As to the type and degree of anticipated interference with the military function, we have already addressed that issue in the balance-of-harms and public interest discussion in Part I.C. above. The "military function" at issue here is Defendants' on-going violation of MIDN Standage's First and Fifth Amendment rights and the President's Directive and Executive Order. That MIDN Standage seeks to "interfere" with those violations carries no weight in a *Williams* analysis.

Finally, with respect to the "military expertise or discretion" prong of the *Williams* test, Defendants' baldly assert that the fact-specific determination of whether Plaintiff did, in fact, violate Article 133 of the UCMJ is nonjusticiable. The argument is specious. Had MIDN Standage been criminally charged with conduct unbecoming in violation of Article 133 of the UCMJ, the charge would have been subject to judicial review by military courts at both the trial and appellate level. Defendants' citations to *Parker v. Levy* and *U.S. v. Hartwig* make that clear. That the Superintendent and Deputy Commandant chose to charge MIDN Standage with a violation of Article 133 under the Administrative Conduct System does not suddenly render as non-justiciable the question of whether that charge violated MIDN Standage's constitutional rights.

### D. Plaintiff's Request for Preliminary Relief is Ripe for Review.

The discussion above demonstrates that MIDN Standage has already been irreparably harmed. That harm continues each day MIDN Standage sits under Defendants' Sword of

Damocles, irrespective of the possibility that ASN(M&RA) might reject the Superintendent's separation recommendation.[26]  Courts in this Circuit have found First Amendment claims ripe for review under precisely these circumstances.

For example, in *Allen, Allen, Allen & Allen v. Williams*, 254 F.Supp.2d 614 (E.D.Va. 2003), a law firm challenged a Virginia bar ethics rule as violative of the firm's First Amendment rights with respect to ads it was running on television and sought a preliminary injunction enjoining any further efforts by the Virginia bar counsel to enforce the ethics rule.  At the time of the litigation, the bar counsel had issued an advisory opinion finding that the ads violated the ethics rule, and represented to the court that the bar intended to submit the opinion to the Supreme Court of Virginia for review, stating, "[i]t is true that the Supreme Court of Virginia will have the final word on this issue and could adopt a position different from that taken by Council."  *Id*. at 622.

Given that possibility, the defendant bar counsel argued that the case was not ripe for review.  Applying the two-part test of 1) fitness of the issues for judicial decision and the 2) the hardship to the parties of withholding court consideration; *Virginia Soc'y for Human Life v. Fed. Election Comm.*, 263 F.3d 379, 390 (4th Cir. 2001); the court disagreed.  It began its analysis by noting that a claim arising in a First Amendment context is subject to a relaxed ripeness requirement and that "[t]he ultimate test of reviewability is not to be found in an overrefined technique."  *Id*. at 626 (quoting *Action for Children's Television v. FCC*, 59 F.3d 1249, 1258 (D.C. Cir. 1995)).[27]  Turning to the fitness prong of the test, the court noted that "the possibility

---

[26] We are not aware of a single instance in which that has occurred, and Defendants provide no evidence to the contrary.

[27] *See also Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2014) (ripeness considerations are relaxed in First Amendment cases because chilling may result in irreparable loss).

that the agency's actions might [] run afoul of the First Amendment demands prompt judicial scrutiny." *Id.* (quoting *Action for Children's Television*). It held that the issue before the court was purely legal and that additional factual development was not necessary to a decision on the merits. As for the balance for hardships, the court cited *Elrod v. Burns* to conclude that the First Amendment harm was an irreparable injury, readily tipping the balance of hardships in favor of the plaintiff. The court held that the matter was ripe for review and granted the motion for preliminary injunction.

*Allen* is on all fours here. The question before the Court is purely legal: whether the actions of Defendants have violated MIDN Standage's rights under the First Amendment. No further factual development is required. Indeed, had MIDN Standage not filed this suit, the record would have promptly been transmitted by the Superintendent to ASN(M&RA), where no further factual development occurs. And the balance of hardships clearly tilts in MIDN Standage's favor given the irreparable injury that has already occurred and continues to occur. Whether ASN(M&RA) might ultimately decide not to separate MIDN Standage is immaterial to the analysis.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Dismiss should be denied, and Plaintiff's Motion for Preliminary Injunction should be granted.

Dated: October 20, 2020         Respectfully submitted,

_____/s/_____
Jeffrey E. McFadden
(D. Md. Bar No. 08738)
LAW OFFICES OF JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD  21638
(410) 490-1163

*Counsel for Plaintiff*

24

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2020, I caused a copy of this Reply in Support of Plaintiff's Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss to be served on counsel for Defendants through the Court's CM/ECF system.

_____/s/_____<br>
Jeffrey E. McFadden