**EXHIBIT L**

Oct 16

**Kolbi**
@Kill4_k

#JordanMcNair ArrestBreonnaTaylor'sKillers #SayHerName
#BlackLivesMatter

◎ Onna Block Wit It YUHHH   ◎ Born March 17   🗓 Joined June 2014

**963** Following   **1,074** Followers

Not followed by anyone you're following

Tweets       Tweets & replies       Media       Likes

# EXHIBIT M



↻ Kolbi Retweeted

**The Great and Terrible** @... · 9h ⌄
I hope They burn down the entire
city of Louisville 🤍

💬 7      ↻ 468      ♡ 720      ⬆

**EXHIBIT N**

in the body of the investigation.

(2) NCIS investigations. NCIS investigations consist of the report of investigation (ROI), the narrative summary portion, and enclosures. ROIs shall not be included in administrative investigation reports. Unless a local NCIS office indicates to the contrary, clearance is not required for inclusion of enclosures to the ROI in an administrative investigative report. Neither polygraph reports nor their results may be included in the investigative report; however, the fact that a polygraph examination occurred and the location of the file maintained by the investigative agency administering the polygraph examination may be noted. Comments regarding an individual's refusal to undergo a polygraph examination shall not be included in any administrative investigative reports. If necessary for a full understanding of the incident, the location of the ROI should be cross-referenced in the administrative investigative report.

h. Signatures

(1) The investigating officer or senior member, or in the senior member's absence, the next senior member, respectively, must sign the investigative report. Dissents may be written and, if written, must be attached to the report.

(2) Signatures of board members or of the investigating officer(s) on an investigative report shall be sufficient to authenticate all enclosures.

## PART D -- THREE TYPES OF ADMINISTRATIVE INVESTIGATIONS

### 0209  TYPE ONE: COMMAND INVESTIGATIONS

a. Purpose. A command investigation functions as a tool to gather, analyze, and record relevant information about an incident or event of primary interest to the command. Most investigations will be of this nature. Command investigations may, for example, be used to inquire into:

(1) significant property loss or destruction (minor property losses in most cases will be adequately documented through other means);

(2) aviation mishaps, groundings, floodings, fires, and collisions not determined to be major incidents (see Appendix for guidance on investigating specific types of incidents);

(3) incidents in which a member of the naval service, as a result of possible misconduct, incurs a disease or injury that may result in a permanent disability or a physical inability to perform duty for a period exceeding 24 hours (distinguished from a period of hospitalization for evaluation or observation) (see Part E); and

(4) deaths of military personnel apparently caused by suicide or under other unusual circumstances, or deaths of civilian personnel accompanying military personnel in the field or killed as a result of military-related

activities (see part F for special considerations in death cases).

b. <u>Limitations</u>.  This type of investigation **should not** be used to inquire into incidents that have resulted or are likely to result in claims or civil litigation against the DON for damage to real or personal property or personal injury caused by Navy personnel acting within the scope of employment, or on behalf of the DON as an affirmative claim for damage caused to DON property by non-DON personnel or by DON personnel not acting in the performance of their duties.

c. <u>Convening order</u>.  See section 0206.

d. <u>Investigatory approach</u>

(1) The investigating officer will comply with the guidance in section 0207 in conducting the investigation.  Because a command investigation does not involve hearings, evidence will be collected through personal interviews and statements, telephone inquiries, or written correspondence.

(2) A command investigation, if deemed necessary, may contain sworn statements.  In such cases, the investigating officer should consult with the cognizant judge advocate.  A person on active duty appointed to perform investigative functions for a command investigation is empowered to administer the following oaths in the performance of duties:

(a) For interpreters:  "Do you swear or affirm that you will faithfully perform the duties of interpreter for this proceeding (so help you God)?"; and

(b) For witnesses:  "Do you swear or affirm that the statement provided is truthful (so help you God)?"

e. <u>Command Investigation report</u>

(1) The report shall be prepared in accordance with the convening order and the guidance set forth in both section 0207 and this section (see also Appendix A-2-e).

(2) Unless directed by proper authority, an investigator shall not prefer charges or notify an accused of recommended charges.  For recommendations pertaining to the issuance of punitive and nonpunitive letters, see subsection (f)(2) below.

f. <u>CA action</u>.  Upon receiving a command investigation report from the investigating officer, the CA shall review the report or have the report reviewed.  The CA has 30 calendar days from receipt to act on the report, except in death cases where section 0225 requires CA review in 20 calendar days.  If the report is incomplete, the CA shall return it to the investigating officer for further investigation.  Once satisfied the report is complete, the CA shall either:

(1) determine that the investigation is of no interest to anyone outside the command, and, unless otherwise directed by superior authority, may

treat it as an internal report (see subsection h below for retention guidance), or

    (2) endorse the report in writing. In the endorsement, the CA will:

        (a) approve, disapprove, modify, or add to the findings of fact, opinions, and recommendations.  The CA may also comment on recommendations that the CA cannot implement at his or her level.

        (b) state opinions and make recommendations as appropriate.

        (c) indicate what corrective action, if any, is warranted and a timeline for implementation.

        (d) comment on whether punitive or nonpunitive action is warranted.  Whenever punitive or nonpunitive action is contemplated or taken as the result of the incident under inquiry, the action shall be noted in the endorsement of the convening or reviewing authority.  For example, the endorsement could read: "Punitive action is not warranted; however, appropriate corrective measures were taken in the case of ENS Smith."  Punitive letters, or copies of recommended drafts thereof, shall be included in the investigative report as enclosures.  Nonpunitive letters shall not be included as enclosures in the investigative report.  In instances involving senior officials and certain other employees depending on their official position, a comment on the specific nonpunitive accountability actions taken (such as the issuance of a nonpunitive letter of caution) may be included (but the actual letter shall not be included).  See section 0105(b)(4).

        (e) state where any original evidence is preserved and provide the name and telephone number of the responsible official.

    (3) The CA shall retain a copy of the report and forward the original, through the chain-of-command, including the Region Commander when appropriate, to the CA's GCMCA.

        (a) One complete copy of the investigation shall be forwarded with the original for each intermediate reviewing authority.  The GCMCA may direct subordinate commands to use specific forwarding requirements for investigations into certain categories or types of incidents.  The CA shall also provide copies of the report to other commands that may have an interest, such as the Naval Safety Center.  If one command conducted an investigation upon the request of another, then a copy of the report should be sent to the requesting command.

        (b) If an investigation involves a claim under Article 139, UCMJ, see Chapter IV of this Manual.

        (c) For cases involving injury or death of Naval personnel or material damage to ship, submarine, or other Government property not involving claims, the CA shall forward an advance copy of the record or report of investigation as soon as practical to: Commander, Naval Safety Center, Naval Air Station, Norfolk, VA 23511-5796.  Reviewing authorities shall also forward advance copies of their endorsements as above.  In cases of aviation mishaps,

CAs and reviewing authorities will only forward advance copies of investigation reports to the Commander, Naval Safety Center upon his or her request.

(d) See section 0232 for special routing requirements in death cases.

g.  Review

(1) A GCMCA superior to the CA must review every command investigation unless a command investigation meets the criteria under section 0209(f)(1) above.  Thus, if the first reviewer is not a GCMCA, the investigation will require additional review.  Superior commanders may, by regulation or on an *ad hoc* basis, provide direction concerning review and forwarding of investigations consistent with this chapter.  The subject matter will dictate the routing of the report for additional review.  All investigations are considered final when the last reviewing authority determines that further endorsement is not necessary.

(2) As a general rule, intermediate reviewing authorities should complete their review and forward the investigation within 30 calendar days. In death cases, reviewing authorities shall complete this review within 20 calendar days; see section 0225.

(3) Investigations that involve loss, compromise, or possible compromise of classified information shall be routed per SECNAV M-5510.36.

(4) Copies of the investigation should be made available to all superior commanders who have a direct official interest in the recorded facts. Region Commanders or designated subordinate commanders have a direct official interest in incidents that affect their command responsibility or occur in their geographic area.

(5) For every command investigation conducted pursuant to this Chapter that is subject to review under this section, the final reviewing authority shall collect and maintain information concerning action(s), if any, taken by every command with an interest in the investigation.

(6) In their endorsements, the CA and intermediate reviewing authorities shall comment on the report and state concurrence or non-concurrence with the findings of fact, opinions, and recommendations.  If non-concurring, the endorsement shall provide an explanation and shall state, as appropriate, alternate findings of facts, opinions, and recommendations. Additionally, in their endorsements, the CA and intermediate reviewing authorities, as appropriate, shall report to the final reviewing authority, through the chain of command, action they consider is warranted or that has already been taken.  If action is taken after their endorsement has been forwarded, the CA or intermediate reviewing authorities, as appropriate, shall report such action taken by them to the final reviewing authority, through the chain of command.

(7) Commands, outside the CA's chain of command, receiving copies of investigative reports may provide comments and recommendations.  However,

these comments do not become part of the investigative report unless a
reviewing authority expressly incorporates them.

h. Forwarding and retention policies

(1) Generally, copies of investigations are not forwarded to the Chief
of Naval Operations or to the Commandant of the Marine Corps.  However, copies
of investigations into the following types of incidents shall be forwarded to
the following codes:

(a) incidents that may result in extensive media exposure (N09C or
CMC(JA));

(b) training incidents causing death or serious injury (Naval
Safety Center or CMC(JA));

(c) operational incidents causing death or serious injury (N3/5 or
CMC(JA));

(d) incidents involving significant fraud, waste, abuse, or
significant shortages of public property or funds (N09G or CMC(JA));

(e) incidents involving lost, missing, damaged, or destroyed
property of significant value (N09G or CMC (JA));

(f) incidents involving officer misconduct (N1 or CMC(JAM));

(g) incidents that are required to be reported to Headquarters by
other directives or regulations, as appropriate;

(h) incidents or investigations that may require action by CNO or
CMC, as appropriate; and

(i) cases involving significant postal losses or offenses (N4 or
CMC (MHP-50)).

(2) All command investigations shall be retained by the CA, GCMCA,
or by the last commander to whom they are routed for a period of 2 years
from the time that they are received.  After 2 years, the entire command
investigation shall be sent to the Office of the Judge Advocate General
(Code 15), Investigations Branch, 1322 Patterson Avenue SE, Suite 3000,
Washington Navy Yard, DC 20374-5066 for archiving consistent with the DON
Records Management Manual, SECNAV M-5210.1.

(3) If the CA or GCMCA receives a request for an investigative report
after it has been sent, that command shall submit a request for the
investigation to the Investigations Branch (Code 15).  The Investigations
Branch will return the investigation to the requesting command as the
originator of the report and the responsive party to the request for action.
Once the command has responded to the inquiry, the command shall return the
investigation to Code 15 for storage.  See section 0207 on storing and
protecting original evidence.

i. <u>Release of command investigations</u>.  Release of investigation reports outside DON is governed by SECNAVINST 5720.42 (series), FOIA Program, and SECNAVINST 5211.5 (series), Privacy Act Program, and HIPAA.

(1) As a general rule, no investigative report, evidence, or documents compiled by investigating officials may be released until the report is final.

(2) The Chief of Naval Operations (N09N) is the release authority for investigations involving actual or possible loss or compromise of classified information.

(3) For command investigations, other than those dealing with possible compromise of classified information, the GCMCA to whom the report is forwarded is ultimately the release authority.

## 0210   TYPE TWO: LITIGATION-REPORT INVESTIGATIONS

a. <u>Purpose</u>.  A litigation-report investigation is used to investigate an incident or event that may potentially result in claims or civil litigation against the DON for damage to real or personal property, personal injury or death caused by Navy personnel acting within the scope of their employment, or on behalf of the DON as an affirmative claim for damage caused to DON property by non-DON personnel or DON personnel not acting in the performance of their duties.  The primary purpose of a litigation report is to document facts and gather evidence to protect the legal interests of the DON and the United States.

(1) Litigation-report investigations **will not** be conducted in any incident where either an active-duty death has occurred or when a civilian has died when accompanying military personnel in the field or as a result of military-related actions.

(2) Litigation-report investigations **will not** be used to investigate major incidents (as defined in Appendix A-2-a); **may not** have designated parties; and **will not** involve hearings.

b. <u>General</u>

(1) The directions and guidance contained in this Chapter are designed to ensure that litigation reports are protected from disclosure under the attorney work product and attorney-client privileges.  In order to maintain these privileges, the litigation-report investigation must be conducted under the direction and supervision of a supervisory judge advocate (see definition of "Supervisory Judge Advocate" in Appendix A-2-a), protected from disclosure to anyone without an official need to know, and otherwise handled in strict compliance with this section.  Failure to do so may result in waiver of the privilege.

(2) The CA must contact a judge advocate or OJAG Code 15 before convening a litigation-report investigation to ensure that it is the

**EXHIBIT O**

26 Jun 20

From:  LT Kelsey Lee, USN, Preliminary Inquiry Officer
To:    Superintendent, U.S. Naval Academy SSB 7/16/2020

Subj:  PRELIMINARY INQUIRY INTO TWEETS MADE BY MIDN 1/C CHASE
       STANDAGE, USN

Ref:   (a) JAGMAN, Chapter II
       (b) COMDTMIDNINST 1610.2J

Encl:  (1) Result of Interview with Capt Laith Shannon, USMC of 17 Jun 20
       (2) Result of Interview Chief Jessica Booth, USN of 17 Jun 20
       (3) Result of Interview with Professor Rob Niewoehner, CAPT (ret.), USN of 19 Jun 20
       (4) Result of Interview with MIDN 1/C Jakub Hill, USN of 18 Jun 20
       (5) Result of Interview with MIDN 1/C Tom Savarese, USN of 18 Jun 20
       (6) Result of Interview with MIDN 1/C Jacob Kinnear, USN of 18 Jun 20
       (7) Result of Interview with MIDN 1/C Dallas Elliston, USN of 18 Jun 20
       (8) Result of Interview with MIDN 1/C Marcus Wiggins, USN of 18 Jun 20
       (9) Result of Interview with MIDN 1/C Cledo Davis, USN of 19 Jun 20
       (10) Result of Interview with MIDN 1/C Destiny Wong, USN of 18 Jun 20
       (11) Result of Interview with MIDN 1/C Anthony Chase-Hill, USN of 18 Jun 20
       (12) SITREP 16JUN20
       (13) Tweets concerning Breonna Taylor
       (14) Tweets concerning African American work ethic
       (15) Tweets concerning use of force against civilians
       (16) Tweets concerning Navy football
       (17) Additional Tweets

1.  This report is the completion of a preliminary inquiry conducted in accordance with reference
(a) into tweets made by MIDN 1/C Chase Standage between 7 June 2020 and 15 June 2020. Per
reference (b), I was verbally appointed as the preliminary inquiry officer by the Commandant of
Midshipmen on 16 June 2020 after reports of the tweets were received.  I was directed to submit
my report to the Superintendent, U.S. Naval Academy.

2.  In preparing this report, MIDN Standage invoked his right to remain silent. To garner
background information on MIDN Standage, I interviewed the Company Officer and the Senior
Enlisted Leader and five (5) midshipmen who have daily interactions with this midshipman
including his chain of command and roommates.

3.  Materials reviewed:

    a. Screen shots from tweets posted by MIDN Standage from 7 June 2020 to 15 June 2020.

Subj: PRELIMINARY INQUIRY ICO MIDN 1/C CHASE STANDAGE, USN

4. Summary of findings:

a. On Monday evening, 15 June, some of MIDN 1/C Chase Standage's tweets began to go viral via Facebook, Instagram, Twitter, and text message. MIDN Standage's CO/SEL, Commandant's Legal Advisor, and the Deputy Commandant were informed and an internal SITREP was released on 16 June. Over the course of the next few days, several midshipmen contacted their chain of command to report the tweets, including MIDN Anthony Chase-Hill and MIDN Destiny Wong who called the Command Managed Equal Opportunity (CMEO) office but did not file a formal complaint.

b. Over 40 tweets were captured via screenshot and sent in for the purpose of this investigation. The tweets can be placed in four categories: MIDN Standage's opinions concerning the death of Breonna Taylor, the work ethic of African Americans, the use of force to control civilian rioters, and the Navy football team.

c. There are two tweets (Encl (13)) that discussed the death of Breonna Taylor. For background, Breonna Taylor was killed in a no-knock raid of her apartment on March 13, 2020. Police had a search warrant because they believed a drug dealer was using her apartment to receive packages. After police officers entered her apartment, Breonna Taylor's boyfriend, Kenneth Walker, fired a gun at the police officers and they responded with their own gunfire, killing Breonna Taylor. On 14 June 20, MIDN Standage tweeted "Her justice was received on March 13, 2020" in response to a tweet asking why it was taking so long for Breonna Taylor to receive her justice. On or around 14 June 20, MIDN Standage posted another tweet referring to Breonna Taylor that stated "Yes, hopefully nobody in my family becomes a spoke of a wheel in a drug ring, and then attempts to fire upon Vice officers as they kick down the door."

d. There are two tweets (Encl (14)) that discuss MIDN Standage's opinions relating to the work ethic of African Americans. On 7 June 20, in response to a tweet about black people living with adversity because their forefathers were forced into labor to make white men rich, MIDN Standage posted "Splendid, then they should also have good work ethic and no need for welfare programs." On 11 June 20, in response to a tweet comparing the median wealth for a white family verses a black family, MIDN Standage responded "Amazing what you can do when you save your money and innovate."

e. There are six tweets (Encl (15)) that suggest the use of force against civilians. For additional context, these tweets were posted during a time of national discussion on the appropriateness of using the armed forces in support of civil authorities. On 11 June 20, MIDN Standage tweeted "This is why the AGM-114 was invented. I've never seen more incompetent handling of violent, radical insurgents." The AGM-114 is an air-to-surface missile. This tweet was in response to an article posted about the list of demands that civilians were making to the governor of Seattle, WA. On 9 June 20, in response to a tweet about an old man who was pushed by the police, MIDN Standage tweeted "He was paid by Antifa to gather SIGINT on the police. If someone gets paid by ISIS to make a phone call when troops step within the blast zone of an IED, they're terrorist, and become a target of opportunity to be eliminated. Why is it not the same here?" On 11 June 20, in response to a tweet advocating for reducing funding to the police, MIDN Standage wrote "Go ahead, cut funds to the police. Community policing by

Subj:   PRELIMINARY INQUIRY ICO MIDN 1/C CHASE STANDAGE, USN

building relations is expensive and timely, anyways. Bullets, on the other hand, are cheap and in ready supply." On 10 June, in response to the President's tweet advocating for law & order, MIDN Standage posted a picture of crosshairs and tweeted "Law and Order from 25,000 ft." On an unknow date that appears to be around the same timeframe, MIDN Standage responded to a tweet talking about antifa extremists in Seattle with a tweet saying "All it takes is one drone strike…" On 13 June, in response to a tweet that said "Do you remember letting police officers kill unarmed people" referring to the shooting at Pulse night club, MIDN Standage responded with "If he let them do that, these riots would've been over a whole lot quicker."

f.  There is one tweet (Encl 16) about the Navy Football program. In response to an article about deceased Navy football player David Forney and a tweet about USNA prioritizing prepping for the NFL vice prepping to lead Sailors, on 15 June 20, MIDN Standage posted "Leadership qualities and general competence come secondary to your ability to throw a ball."

g.  At the time that MIDN Standage posted the majority of his tweets, his parents, who are both members of L.A. Police Department, were involved in the LAPD's response to various incidents as a result of the social upheaval as a result of the death of George Floyd. Witnesses who know MIDN Standage note that he was experiencing significant stress during the timeframe of the tweets. MIDN Standage elected not to speak with me at this time for the purposes of this investigation.

h.  Since his tweets went viral, MIDN Standage has deleted his Twitter account. According to one witness with firsthand knowledge of MIDN Standage's Twitter account, MIDN Standage did not have a disclaimer on his Twitter page. Although it is unclear on whether or not his Twitter account associated him with the Navy, his Instagram page (which had the same handle but has since been deleted), stated that he was a midshipman studying Aerospace Engineering at USNA. Commandant of Midshipman Notice 5720, dated 21 Aug 19, requires midshipman to "clearly and prominently state that the views expressed are those of the individual only and not of the Department of Defense" on their social media accounts when they are otherwise identified as military members.

i.  Since his tweets have gone viral, MIDN Standage has received significant backlash including hate mail and alleged death threats. He has changed his phone number and his parents are working with the L.A. PD to investigate the death threats.

5. Opinions. MIDN Standage violated COMDTMIDNOTE 5720 and engaged in online conduct that is contrary to Navy Core Values and good order and discipline. As a midshipman, MIDN Standage should have been aware of COMDTMIDNOTE 5720: Political Activities of Midshipmen. This instruction was re-sent out by the Commandant during the first week of June. Based on his position as a 1/C midshipman, MIDN Standage has a duty to obey this instruction. The instruction permits him to express his personal views on social media platforms as long as they do not show contempt for public officials, release sensitive information, or post unprofessional material that is prejudicial to good order and discipline under the UCMJ. Based on the content, some of MIDN Standage's tweets cross the threshold of being unprofessional and prejudicial to good order and discipline.

Subj:   PRELIMINARY INQUIRY ICO MIDN 1/C CHASE STANDAGE, USN

a. When MIDN Standage tweeted "her justice was received on March 13, 2020," he demonstrated a total lack of empathy for the loss of innocent life. This was a very callous and insensitive statement based on the circumstances surrounding her death.

b. When he tweeted "amazing what you can do when you save your money and innovate," MIDN Standage implied that the reason for a wealth gap between black and white families is that African Americans did not save their money or innovate. Regardless of what his intent may have been, that comment was insensitive and would leave a reasonable person with the impression that he is biased against people of color.

c. When he tweeted "splendid, then they should also have good work ethic and no need for welfare programs," MIDN Standage seemingly implied that if African Americans worked harder, they would not need to be on welfare.

d. When MIDN Standage posted tweets such as "this is why the AGM-114 was invented" and "all it takes is one drone strike," MIDN Standage appeared to suggest the use of military weapons systems against the civilian population. This is highly inappropriate based on his trusted position as a member of the armed forces and future naval officer who could be called upon to support civil authorities.

e. Additionally, it does not appear that MIDN Standage had a disclaimer on his Twitter page. Although it is unclear whether or not his Twitter account associated him with the Navy, his Instagram page (which had the same handle) said he was a midshipman studying Aerospace Engineering. However, it is clear that several members of the Brigade and public understood his affiliation with the Navy and USNA; therefore, it is a reasonable inference that this account associated him with the Navy.

6. I recommend MIDN Standage be held appropriately accountable for his online conduct.

7. My investigation is complete.

K. E.  LEE

4

RESULTS OF INTERVIEW - CAPT LAITH SHANNON FROM 17 JUN 2020 AT 1200

1. Capt Laith Shannon is MIDN Standage's company officer. He is a new company officer and had not met MIDN Standage at the time of the incident.

2. Around 0001 on 16 JUN, Capt Shannon was notified that MIDN Standage's tweets were going viral. Capt Shanon happened to be the OOW and called LT O'Brien for advice. Based on the tweets they had at that point, LT O'Brien thought the tweets looked inappropriate but did not cross the line of racial slurs and could wait until the morning. Capt Shannon spoke with LT Das (acting Battalion Officer), informed the Deputy, and sent out a SITREP.

3. Since his tweets went viral around 16 JUN, MIDN Standage has deleted his twitter account. He has reported receiving significant backlash including two death threats and has changed his phone number. Capt Shannon had spoken to him twice at the point of the interview and plans on continuing to check up on him.

RESULTS OF INTERVIEW - CHIEF JESSICA BOOTH FROM 17 JUN 2020 AT 1422

1. Chief Jessica Booth has been MIDN Standage's SEL for the past year. She has had several one-on-one meetings with him over the course of the year. At the time of the incident, he was the Academics Officer. As the Commandant's Academic Advisor, she has been working closely with MIDN Standage to ensure he effectively executes his job.

2. Prior to the incident, Chief Booth believes that MIDN Standage never indicated that he had any racist ideals; he gets along well with others. She had no inclination to believe he would be involved in anything having to do with racism. This is the first time she has had any problems with him.

3. Chief Booth was made aware of the tweets late at night on Monday 15 June when she received a phone call from one of her midshipmen.

4. Since his tweets went viral, she has checked in on him several times to make sure he's doing okay.

5. When it comes to assessing MIDN Standage as a midshipman, she believes he is salvageable. He is an Aerospace Engineer who has been selected for VGEP. He has had no conduct issues prior to this point. She knows that both of his parents are policemen and implied that it has been a difficult time for him.

RESULTS OF INTERVIEW - PROFESSOR ROB NIEWOEHNER (CAPT, RET) FROM 19 JUN 2020 AT 1630

1. Professor Niewoehner has known MIDN Chase Standage for over a year. During the fall, MIDN Stangage approached Prof Niewoehner about being his advisor for a wind tunnel group project. MIDN Standage lead the group of a team of about 5 midshipmen. During the spring semester, Prof Niewoehner taught MIDN Standage Flight Test Engineering class. MIDN Standage did not meet the prerequisite for the class and was one of three 2/C permitted to take the class of mostly 1/C and he received the 2nd highest grade. During the course of the class, Prof Niewoehner flew in a plane with MIDN Standage. Currently, Prof Niewoehner is teaching MIDN Standage in the course Engineering Leadership.

2. Approximately 3 weeks ago, Prof Niewoehner facilitated a conversation with his class regarding the current state of social upheaval in the United States. During this time, MIDN Standage expressed the stress he was experiencing due to the fact that both of his parents are L.A. police officers and that they were in imminent danger.

3. Prof Niewoehner became aware of MIDN Standage's tweets going viral on Tuesday when MIDN Standage texted his professor to make him aware that he had said some reckless things on twitter. MIDN Standage explained to Prof Niewoehner that at the time that he posted the majority of his tweets, both his parents were locked in the police station and could not leave due to the circumstances. He explained that when posting the tweets he was trying to defend his parents. He also stated that he was shocked that anyone would call him racist as anyone who knows him knows that one of his best friends and roommates since plebe year is black.

4. At the time of the interview, Prof Niewoehner had not read any of the tweets but stated that based on MIDN Standage's curiosity and thoughtfulness, apart from this episode, he would love to have him in his ready room.

5. Prior to and since this event, Prof Niewoehner has noticed no indication that MIDN Standage holds racist ideals. Based on his observation, MIDN Standage functions extremely well in small teams and teams benefit significantly from having him in them.

**Enclosure (3)**

RESULTS OF INTERVIEW - MIDN 1/C JAKUB HILL  FROM 18 JUN 2020 AT 1130

1. MIDN Jakub Hill has been in the same company as MIDN Standage since plebe summer. They become roommates during 3/C year and have been roommates ever since. They are pretty good friends and usually hang out on the weekends.

2. MIDN Hill has seen some of MIDN Standage's tweets on other midshipmen's instagram/facebook pages and has spoken to MIDN Standage about his tweets.

3. When asked about his thoughts on the tweets he read, he believes MIDN Standage was insensitive to the topics being discussed. He thought the tweet about Breonna Taylor was very inappropriate, especially given the context of her death. He thought the tweet about David Forney was insensitive. Concerning the tweets discussing the social economic factors that play into the livelihood of black communities, he believes they were ignorant and uneducated takes on much more complicated and complex topics that require more nuanced conversations. Regarding the tweets about looting and rioting, he believes they are ignorant and uneducated take on very complicated topics and that there are many more factors at play.

4. When asked if he has had any interactions that would lead him to believe that he held racist ideals, he responded that MIDN Standage has very opinionated points of view and has some hard line conservative ideals, however he has never seen or heard him say any discriminatory comments due to a person's race/gender/sexual orientation.

5. MIDN Stadage asked MIDN Hill to read a statement he was preparing to explain his tweets. MDIN Stadage explained that the statement discussed the fact that both of his parents are police officers with the LA PD with ~60 years of service between them. MIDN Standage heard/saw people calling for the death of police and promoting things like ACAB (All Cops Are Bastards). It is a very dangerous time for his parents. Also, with the promotion of "defund the police," his parents may lose their job. This really scared him. As a result, he had a very poor lapse of judgment and let his feelings get the better of him and let himself express opinions on things he wasn't well educated on or had the full context on. He felt as if a mob of people were threatening his parents and their livelihood. In his mind, there seems to be a disconnect when it seems acceptable for people to call for the death of cops but not okay to promote control over people destroying things.

6. MIDN Hill thinks it is wrong for the Capital Gazette to say they asked MIDN Standage for comment when they did not actually ask him for a statement. And for people to blast him on social media and make death threats. He believes this is hypocritical. He thinks that things like

this need to be brought to light however there is a professional way to do it. MIDN Standage's reputation is forever tarnished.

RESULTS OF INTERVIEW - MIDN 1/C TOM SAVARESE FROM 18 JUN 2020 AT 0930

1. MIDN Tom Savarese knows MIDN Standage because they were roommates over plebe summer and have been roommates from youngster year on. They are pretty good friends and hang out outside the hall almost every weekend. He is currently MIDN Standage's squad leader.

2. At the time of the interview, MIDN Savarese had only read the tweet about Breonna Taylor. He has spoken to MIDN Standage since his tweets went viral and has been trying to support him.

3. MIDN Savarese has never had an interaction with MIDN Standage that would lead him to believe that he is racist. Both of his parents work for the L.A. PD. His mom is a Sergeant and worked 150 hours one of these past weeks. It has been a really rough time for him and really affected him. His parents have been getting threats. MIDN Standage told MIDN Savarese that his tweets were more pro police rather than racists. He sent the tweet about Breonna Taylor in response to death threats against the police who did the raid.

RESULTS OF INTERVIEW - MIDN 1/C JACOB KINNEAR FROM 18 JUN 2020 AT 1100

1. MIDN 1/C Jacob Kinnear is in the same company as MDIN 1/C Chase Standage. MIDN Kinnear is currently MIDN Standage's Platoon Commander. He stated that they are decently acquainted as they have been in the same company for the past three years however they are not super close friends.

2. When asked if he followed MIDN Standage on twitter, he explained that he did not have a twitter account however he received screenshots of MIDN Standage's tweets from another Platoon Commander in the company.

3. When asked what his thoughts were on the tweets he saw he expressed that he was pretty shocked and disappointed. He believes the tweets caused a lot of anger and did not paint a pretty picture of MIDN Standage. From his perspective, he interpreted some tweets as advocating for lethal force on U.S. civilians (for example, one tweet discussed using missiles in Seattle). Another tweet he saw talked about Breonna Taylor and that justice was serviced when she was killed. He also saw concerning tweets concerning wealth inequality between the races, implying that black people don't save their money and innovate. From his perspective, it is difficult to not interpret that as racists.

4. MDIN Kinnear has never had any interactions with MIDN Standage that would lead him to believe that MIDN Standage held racist ideals. He knows he is politically conservative and has law enforcement family members. These tweets were not what he expected but not too big of a stretch for him to imagine.

5. Overall, MIDN Kinnear was severely shocked by the tweets and believes they don't reflect USNA well. If nothing else, he believes it reflects a severe lack of judgment and wonders if MIDN Standage will be able to lead sailors impartially.

RESULTS OF INTERVIEW - MIDN 1/C DALLAS ELLISTON FROM 18 JUN 2020 AT 1200

1. MIDN Dallas Elliston has been in the same company as MIDN Standage since I-Day. He is currently the Company Commander of 14th company. He describes their relationship as acquaintances. They don't go out on liberty together but would talk if he ran into him.

2. MIDN Elliston has seen some of the tweets and has spoken to MIDN Standage about his situation. MIDN Elliston believes MIDN Standage was going through a lot of emotional stress at home based on the current state of the nation and the fact that both of his parents are L.A. police officers. He believes MIDN Standage used twitter as an outlet for his emotions. He believes MIDN Standage had tunnel vision in trying to push back against anti-police rhetoric and believes his tweets can be interpreted as more drastic than his intent. When asked if he believed the tweets were racists, he said they were controversial and insensitive but he didn't recall seeing any racist slurs.

3. MIDN Elliston has never had an interaction with MIDN Standage that would lead him to believe that he held racist ideals. He explained that one of MIDN Standage's best friends is black.

4. In talking to MIDN Standage after his tweets went viral, he felt like he was talking to a beat dog. He expressed a lot of remorse already. He wanted to make a statement to the company but was advised that it was probably not a good idea while the investigation was occurring.

RESULTS OF INTERVIEW - MIDN 1/C MARCUS WIGGINS FROM 18 JUN 2020 AT 1500

1. MIDN Marcus Wiggins knows MIDN Standage because they are company mates. They have had several conversations and he would consider them acquaintances. He is currently the CMEO in 14th company and has been informed of MIDN Standage's tweets.

2. When asked what he thought of the tweets, he found them highly offensive. Regarding the tweet about Breonna Taylor receiving her justice on 13 March 2020, he believes that MIDN Standage has no respect for the dead and has disregard for this woman's life; she didn't do anything wrong, how could she get justice? He believes that it is not even a matter of racism in this case, just total disrespect. The tweet about black people needing to innovate really bothered him. He believes it was flat out racist and ignorant. MIDN Wiggins believes MIDN Standage has no idea what's going on and that it is way more complex than that. Regarding the tweet about the spoke of a drug ring, MIDN Wiggins thinks that MIDN Standage believes that Breonna Taylor must be part of the drug ring (by association) and therefore deserve to die.

4. When asked if he has had any interactions with MIDN Standage that would lead him to believe that MIDN Standage holds racist ideals, he remembers that when they were 3/C, MIDN Standage would make comments to the plebes about how they would soon "learn to hate them" (referring to guys on the football team). He was not sure if he was just referring to black football players or the football team in general.

Enclosure (8)

RESULTS OF INTERVIEW - MIDN 1/C CLEDO DAVIS  FROM 19 JUN 2020 AT 0930

1. MIDN 1/C Cledo Davis knows MIDN Standage because they had their youngster cruise together. He is also very close friends with MIDN Standage's roommate. He would consider them close acquaintances.

2. MIDN Davis found out about MIDN Standage's tweets when someone sent screenshots to him.

3. When asked about his thought on the tweets, he understands how they could be interpreted as racist/bigoted. That being said, after speaking with MIDN Standage on 16 Jun, he believes the tweets to be much more tackless/insensitive as opposed to racist. From what he saw, he did not see MIDN Standage qualify any violence/ill will/prejudice towards a particular group based on an immutable characteristic. When questioned about the tweets regarding MIDN Standage's response to the wealth gap between the races, he believes it was a terse and unqualified opinion, similar to someone running their mouth (and for this, MIDN Standage appears remorseful). However, he does not think it is explicitly racist because his tweets were addressing those affected by disparity, not black black people in general. When questioned about his thoughts regarding the tweets that advocated violence against civilians, MIDN Standage viewed them as unqualified opinions and thinks those thoughts expressed on a public forum while in the military can be dangerous. When questioned about the tweets involving Breonna Taylor, he believes the tweets were irreverent and while on the service seem overtly racist, he believes it is moreso an unqualified opinion. Based on speaking with MIDN Standage, MIDN Standage's sentiments behind the tweet were based on his belief that any person of any race in her particular legal circumstance would be justiced to be killed in a no knock raid. When asked about the tweet about David Forney, MIDN Davis believes it was a "stick it to the man" statement poking at the stigma against varsity athletes and the perception that they are held to a different standard at USNA.

4. When asked if he has any interactions with MIDN Standage that would lead him to believe that he has racist ideals, he said no and that MIDN Standage has always been a considerate, cordial person who is on the quiet side. Based on his observations, he has always been respectful without exception to other ethnic/racial groups.

5. MIDN Davis explained that he called MIDN Standage to get his side of the story. He stressed that there is more to the story than the tweets at face value. While this case certainly involves errors of judgment, he does not believe it should be placed in the same bucket as other events going on in the world. He believes accountability is important, but thinks we need to be very careful in what precedent we are set when it comes to this case.

**Enclosure (9)**

RESULTS OF INTERVIEW - MIDN 1/C DESTINY WONG  FROM 18 JUN 2020 AT 1800

1. MIDN Destiny Wong does not know MIDN Standage personally.

2. MIDN Wong does not follow MIDN Standage on twitter however someone she followed on instagram put screenshots of his tweets on their story. Once she saw them, she decided to look more into it and googled his twitter account. From there she came across many extremely crass and disrespectful tweets. She remembers seeing tweets about David Forney (who was in her company) which she viewed as very disrespectful. She viewed the tweets about Breonna Taylor as super crass and disrespectful. The tweets concerning MIDN Standage's response to the wealth gap between black and white people she interpreted as racist. She believes MIDN Standage was super careless with what he said and displayed an overt bias against African Americans. In regards to the tweets about using tear gas at an unarmed man and shooting american "terrorists," she thinks this is a political stance that is unprofessional. From her point of view, MIDN Standage appears to instigate conflict on social media and displays no empathy or capacity to understand what other people are going through. She wonders how he could lead sailors in a year.  When asked if MIDN Standage has a disclaimer on his tweets, she does not remember seeing one. She also does not remember if his account showed that he had a connection with the military.

RESULTS OF INTERVIEW - MIDN 1/C ANTHONY CHASE-HILL  FROM 18 JUN 2020 AT 1430

1. MIDN Anthony Chase-Hill does not know MIDN Standage. He found out about him when people started retweeting his tweets. He has a twitter account but did not follow MIDN Standage; he follows other midshipmen who retweeted MIDN Standage's tweets.

2. MIDN Chase-Hill believes that everyone is entitled to their opinion and that MIDN Standage's opinions are clearly far right. That being said, he believes that some of his tweets clearly crossed the line. More specifically, the tweet about Breonna Taylor receiving her justice on 13 March and the tweet about the wealth gap between white and black families seem unexceptable. In regards to the tweet about it being amazing what you can do if you innovate (aka not lazy), he believes you can play the ignorance card to a certain extent (like not understanding that black families were not able to acquire property for decades) however to look at being black as less than, he believes you cannot fix that ideology.



Kelsey Lee <klee@usna.edu>

---

## Request SITREP

**Laith Shannon** <lshannon@usna.edu>
To: Kelsey Lee <klee@usna.edu>

Wed, Jun 17, 2020 at 2:27 PM

16JUN20
From:  Captain Laith Shannon, USMC, 14th Company Officer
To:    3d Battalion Officer, USN

Subj:  INITIAL SITREP MIDN 1/C CHASE STANDAGE 216384/14

| Who: | MIDN 1/C CHASE STANDAGE 216384/14 |
|---|---|
| Company: | 14 |
| What: | Concerning social media presence on Twitter |
| When: | 0001 16 June 2020 |
| Where: | Twitter |
| Alcohol Involved: | No |
| Family notified: | No |
| Flag Condition: | N/A |

**Narrative:**

I was notified through multiple sources around 0001 on 16 June 2020 that MIDN 1/C Standage had taken to Twitter to release some concerning social media posts.  Being the OOW and his Company Officer, I immediately forwarded the Tweets in question to LT Jason O'Brien (JAG) and LT Dyuti Das (3d BattO) to gain counsel on immediacy of notification to the Deputy Commandant of Midshipmen.  JAG's initial determination was that the social media posts were not of a nature to warrant immediate action/notification.  LT Das Das and I crafted an email to the Dep Dant to make him aware of the situation.

At around 0600 on 16 June 2020, MIDN Chain of Command notified me that they had made contact with 1/C Standage.  They reported that both of his parents are police officers, causing his family to be subject to scrutiny in light of the social unrest in America.  He also claimed to have received two (2) death threats. (Both of which were not reported by 1/C Standage sooner).

SITREP CLOSED:          YES          X NO

Very Respectfully,

L. D. SHANNON
Capt, USMC

[Quoted text hidden]
--
v/r

Laith Shannon
Captain, USMC
14th Company Officer, USNA
OREP, Midshipmen Black Studies Club
(W) 410-293-7314
(C) 301-219-3105

"Success is inevitable, because failure is not an option"

## U.S. NAVAL ACADEMY ACKNOWLEDGMENT AND WAIVER OF MIDSHIPMAN SUSPECT'S RIGHTS

I, MIDN Chase Standage, 216384, 14th Company, certify and acknowledge by my signature and initials set forth below that I have been advised by LT Kelsey Lee that I am suspected of:

| Offense Code / Level | Offense Description |
|---|---|
| 02.04 Variable | Violation of a local instruction, regulation, or notice |
| 04.10 Variable | Harassment of a non-sexual nature |
| 02.09 Variable | Failure to use good judgment |

I have also been advised that:

_CRS_ (1) I have the right to remain silent and to make no statement at all;

_CRS_ (2) Any statement I do make can be used against me in a trial by court-martial, an adjudication under the conduct system, or other judicial or administrative hearings;

_CRS_ (3) I have the right to consult with a lawyer prior to any questioning. This lawyer may be a civilian lawyer retained by me at no cost to the United States, a personal representation military lawyer (PERSREP) at no cost to me, a military lawyer who has been detailed to act as my counsel (if applicable) at no cost to me, or any combination thereof;

_CRS_ (4) I may terminate this interview at any time, for any reason.

_CRS_ I have been provided contact information for local military defense counsel.

_CRS_ I understand my rights as related to me and as set forth above. With that understanding, I have decided that:

_CRS_ I (do)/ do not desire to remain silent.

_CRS_ I (do)/ do not desire to consult with a lawyer prior to answering questions.

_CRS_ I make this decision freely and voluntarily. No threats or promises have been made to me, nor has any pressure or coercion been used against me.

Signature: _[signature]_   Witnessed by: _Kelsey E. Lee_

Printed Name: CHASE R. STANDAGE   Printed Name: LT Kelsey Lee

Date and Time: 19 JUN 20  1045 EST   Date and Time: 19 JUN 20 1045 EST

**NOTIFICATION OF POTENTIAL REIMBURSEMENT FOR ADVANCED EDUCATION**

19 Jun 20

From: Legal Advisor to the Commandant of Midshipmen
To: Midshipman Chase Standage, 216384, 14th company

Subj: NOTIFICATION OF POTENTIAL REIMBURSEMENT FOR ADVANCED EDUCATION

Ref: (a) 10 U.S.C. 2005

1. All Midshipmen are required to complete the educational requirements specified in the agreement they signed prior to or on Induction Day and, when applicable, reaffirmed prior to commencement of their second class year.

2. This notice informs you that, per reference (a), if you fail to complete those education requirements, you may either be directed to serve on active duty for the period specified or be required to remit monetary reimbursement for the educational benefits you received at the Academy, an indebtedness that could amount to between $0 and over $200,000. Further, should you fail to complete any directed period of active duty, either voluntarily or due to misconduct, you may also be required to remit monetary reimbursement to the Government.

3. This notification is given for your benefit before you make any decisions regarding any proposed disciplinary action that could result in your disenrollment. This advice supplements the prior notices concerning your obligation to the government (active duty service or financial recoupment of the costs of education) that were provided to you prior to your induction to the Naval Academy and upon commencement of your second-class academic year.

Acknowledged: _____ Date: _19 JUN 20_



**DEPARTMENT OF THE NAVY**
UNITED STATES NAVAL ACADEMY
121 BLAKE ROAD
ANNAPOLIS MARYLAND 21402-1300

5830
Ser 28/446
16 Jul 20

FINAL ENDORSEMENT on LT Lee, USN ltr of 26 Jun 20

From: Superintendent, U.S. Naval Academy
To:    File

Subj: PRELIMINARY INQUIRY INTO TWEETS MADE BY MIDN 1/C CHASE
      STANDAGE

1. I have reviewed the subject investigation.

2. This investigation is closed, and the matter has been forwarded to the Deputy Commandant
for action as he deems appropriate.

S. S. BUCK

Copy to:
Deputy Commandant of Midshipmen

5

BRIEFING SHEET

| ROUTING | | | |
|---|---|---|---|
| | ORDER | INITIALS | DATE |
| Chief of Staff | | | |
| Executive Director for Strategy | | | |
| Flag Secretary | | | |
| CMC | | | |
| Protocol | | | |
| Speech Writer | | | |
| Flag Supply | | | |
| Flag Aide | | | |
| Flag Writer | | | |
| SJA | | | |
| OGC | | | |
| Administrative Officer | | | |
| Director, Special Events | | | |
| Diversity Office | | | |
| PAO | | | |
| SAPR PM | | | |
| Personnel Officer | | | |
| Command Evaluation | | | |
| Alumni Hall Manager | | | |
| Director, Institutional Research | | | |
| Architect of the Naval Academy | | | |
| Command Climate Specialist | | | |
| Commandant of Midshipmen | | | |
| Deputy Commandant | | | |
| Director, Professional Dev | | | |
| Dir, Character Develop & Training | | | |
| Dir, Leadership Ed & Development | | | |
| Senior Chaplain | | | |
| Midshipman Supply Officer | | | |
| Brigade Ops | | | |
| Music Director | | | |
| Academic Dean and Provost | | | |
| Vice Academic Dean | | | |
| Assoc. Dean for Fin & Mil Affairs | | | |
| Associate Dean Academic Affairs | | | |
| Director, Research | | | |
| ExecAsst, AD&P | | | |
| Dir, International Programs Office | | | |
| Dir, Div of Engineering and Wpns | | | |
| Dir, Div of Humanities / Social Sci | | | |
| Dir, Div of Math & Science | | | |
| Librarian | | | |
| Archivist | | | |
| Registrar | | | |
| Dir, USNA Museum | | | |
| Center for Regional Studies | | | |
| Center for Cyber Security Studies | | | |
| Deputy for Finance & CFO | | | |
| Comptroller | | | |
| Dir, USNA Business Services Div | | | |
| Dir, Human Resources Division | | | |
| Dir of Athletics | | | |
| Dean of Admissions | | | |
| Director of Admissions | | | |
| Nominations & Appointments | | | |
| Candidate Guidance Officer | | | |
| Dir, VADM James B Stockdale Center for Ethical Leadership | | | |
| Deputy for IT and CIO | | | |
| CO Naval Support Activity | | | |
| CO Naval Health Clinic | | | |
| Public Works Officer | | | |

NAME & PHONE NUMBER OF ORIGINATOR.

## LCDR Carlson

ADDRESSEE(S):
Superintendent

OFFICE: SJA

SSIC.

SUBJECT Endorsement ICO MIDN Standage Tweets Investigation

BRIEFING: Provide background, discussion, and recommendation

Admiral,

Respectfully request your signature on the enclosed endorsement of the MIDN Standage investigation.  The endorsement forwards the matter to the Deputy Commandant for action as he deems appropriate.

V/R,

LCDR Carlson

Reference USNAINST 5216.1 for Additional Instructions

USNA 5216/3 (Rev 9/2015)

| Originating Office | Date |
|---|---|
| SJA | 4 May 16 |
| | |
| | |

**EXHIBIT P**

12:44 ⏚                                     ⏚⏚⏚ LTE ▬ ·

‹                          **Tweet**


**3**
@CKIII_

The Naval Academy has to make an example out of this kid. I won't stand for anything less.

20:56 · 6/15/20 · Twitter Web App

**29** Retweets  **160** Likes

  🗨        ⟲        ♡        ⬆

 **Peter Cauble** @PeterCauble · 6/16/20
Replying to @CKIII_
**What happened??**

  🗨        ⟲        ♡ 2       ⬆

**LK**💜 @lk_lakayla · 6/15/20
Replying to @CKIII_ and @MJmyles83
**That's my president**

  🗨        ⟲        ♡ 6       ⬆

**Polk Fiction** @denzel_polk · 6/15/20
Replying to @CKIII_
**Him and nick novak**

  🗨        ⟲        ♡        ⬆

**Tweet your reply**

  🏠⚬        🔍        🔔③        ✉



← Tweet

**Peyton Seago**
@peyton_seago

Are we gonna have to kick out Chase Standage ourselves? Just give us the word and he'll be gone tomorrow.

6:17 PM · Sep 14, 2020 · Twitter for iPhone

1 Like



**brooo whats your name**
@MJmyles83

# They traded in the bed sheets for police badges

04:43 · 6/19/20 · Twitter for iPhone

**3** Likes

