## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHASE STANDAGE, Midshipman First
Class, United States Naval Academy,

                       *Plaintiff*,

    vs.

KENNETH J. BRAITHWAITE, Secretary of
the Navy; and SEAN S. BUCK, Vice Admiral,
Superintendent, United States Naval Academy;

                       *Defendants.*

Civil Action No. 1:20-cv-02830-ELH

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

### INTRODUCTION

Defendants' filings, communications, and course of conduct throughout this litigation have served only to illuminate, confirm, and underscore the disturbing truth that gave rise to this case in the first instance:  their contempt and disdain for the rule of law.   The Superintendent seeks, *ex post facto,* to criminalize the content of MIDN Standage's speech under a vague, undefined, constantly-shifting standard of conduct which, at bottom, amounts to, "The standard of conduct for social media content is what I say it is."  He reserves unto himself the sole right and "discretion" to determine what speech is or is not "offensive," what speech is or is not "unprofessional," and what speech is or is not consistent with "Navy core values."

While Defendants repeatedly try to sidestep the core issue, there is no genuine dispute that MIDN Standage is being punished because of the content of his speech, while midshipmen who post statements such as, 'F*** the police" and "I hope they burn down the entire city of Louisville" go unpunished.  No midshipmen could possibly divine, let alone have notice of, any clear, unambiguous standard of conduct emerging from such hypocrisy.  To the contrary, any midshipman who may share MIDN Standage's point of view is chilled from commenting on any topic (including the Navy football team) out of fear that the Superintendent, the Chief of Staff, the Commandant, or the Deputy Commandant might punish a tweet with termination, or decide that hyperbole warrants a UCMJ charge. In the context of the irreparable harm that it already has caused, which is on-going, the Defendants' contention that this Court does not have jurisdiction is ludicrous; no governmental agency, not even the Navy, can claim the right to violate the Constitution while evading judicial scrutiny.

Defendants' challenge to the Court's jurisdiction is even more troubling given the due process issues raised in the Second Amended Complaint.  The deprivation of due process here could not be more clear or egregious:  MIDN Standage had no notice of the criminality of his conduct and was deprived of fundamental fairness for all of the reasons articulated in his pleadings and motions.  In a calculated effort to minimize MIDN Standage's due process protections, the Command chose to handle MIDN Standage's "adjudications" and punishment administratively.  That in and of itself constitutes final agency action, which submitted MIDN Standage to an arbitrary and capricious process that presumes guilt, and leaves few if any fingerprints.  MIDN Standage's efforts to defend himself, to retain counsel, to insist on sufficiency of the evidence that met cognizable legal standards, were not only ignored by the Command, but ridiculed and used against him.   The entire process was designed to satisfy the

mob calling for MIDN Standage's head, a mob that included the Command Master Chief, the Senior Enlisted Leader of the football team, and the Commandant's own daughter.   These tactics are remarkably and disquietingly akin to a Stalin-era show trial, except that here they were conducted behind the protected gates of the United States Naval Academy.

The Defendants have bristled under this Court's examination and questioning of their conduct, which carries over into their jurisdictional challenge in the motion to dismiss.   In a letter to undersigned counsel rejecting his proposed modifications to the Court's Order of October 1, 2020, counsel for the Defendants advised that "[t]he ASN(M&RA) does not recognize this Court's jurisdiction to hear this case."[1]   In furtherance of that position, Defendants sought, without any legal precedent or authority, to withdraw their consent to that Order.  Clearly the Navy does not appreciate being second-guessed by the Court, but the conduct at issue here cannot evade judicial scrutiny.

Nor is there any reason to delay justice for MIDN Standage any further; Defendants have given every indication they intend to use more "process" only to further the injury MIDN Standage is already sustaining because of their constitutional violations.  Consider, for example, how Defendants grossly mischaracterize the Superintendent's actions prior to the date MIDN Standage first filed suit in their efforts to argue that no "final" agency action had occurred. Specifically, they claim that the Superintendent told MIDN Standage on September 23 only that he "might recommend" separation.  That characterization is utterly belied by three incontrovertible facts.

---

[1] A copy of the letter is attached as Exhibit A.

First, the final entry into the Midshipman Information Data System (MIDS) for MIDN Standage's conduct case reads, in pertinent part, "ON 23 SEP SUPERINTENDENT CHOSE TO BEGIN SEPARATION PROCESS FOR MIDN STANDAGE."[2]

Second, and in furtherance of that "choice," MIDN Standage was pulled out of class the very next day, ordered immediately to begin out-processing, and instructed that he had until mid-day on Wednesday, September 30, to complete that out-processing and leave the Academy. Were it not for the suit and this Court's order, MIDN Standage would have suffered further irreparable harm by being sent home on "separation leave," unable to go to class and finish his final semester of undergraduate coursework while he awaited the inevitable decision of the ASN(M&RA) to separate him under a *de minimis* "reasonable and well founded" standard of review and to bury the travesty that led to it.

Third, undersigned counsel was advised in the early afternoon of September 30 by the Superintendent's Staff Judge Advocate that the Superintendent had signed his Memorandum Report that morning; counsel for Defendants made the same report to the Court on the emergency call that afternoon. Given the decision reflected in the MIDS entry, there can be no doubt that the Memorandum Report signed on or before September 30 recommend separation. There also can be no doubt that the Superintendent scrapped his already-signed Memorandum Report and issued a re-written Report in an effort to fix, after the fact, some of the glaring deficiencies identified in MIDN Standage's court filings and by the Court itself during the hearing on October 30. As further discussed below, that revisionist history fails to further Defendants' position, because it confirms the futility of any further administrative "process."

---

[2] A copy of a screen shot of the MIDS entries is attached as Exhibit B.

Defendants now contend that the aborted effort physically to remove MIDN Standage from the Academy, which violated the Academy's own regulations and threatened MIDN Standage with additional immediate and irreparable harm, as well as the Stalinesque process that led to it, is unreviewable because there has not been any "final agency action." The argument is without merit. As further discussed below, the findings of guilt as to the two conduct charges that lie at the core of this litigation became final agency actions the moment the Chief of Staff denied MIDN Standage's appeal. From that point forward, the only remaining "agency" action concerned the question of whether MIDN Standage would be separated or retained. Neither the Superintendent nor the ASN(M&RA) has the statutory or regulatory authority vacate or overturn the findings of guilt. Those findings are thus squarely before this Court as final agency actions and are ripe for review.

Moreover, a litigant who has suffered the kind of irreparable harm recognized by the Supreme Court in *Elrod v. Burns*, by the Fourth Circuit in *Legend Night Club v. Miller*, and by this Court in *Thomson v. Belton* does not have to wait around for "final agency action" while he or she continues to suffer irreparable harm. It is precisely for this same reason that Plaintiff's Motion for Preliminary Injunction is ripe for review and does not necessitate any further exhaustion of administrative remedies. Neither ASN(M&RA) nor the Board for Correction of Naval Records (BCNR) can remedy the irreparable harm MIDN Standage has already suffered and continues to suffer.

And there can be no doubt that MIDN Standage continues to suffer irreparable harm. Only a few days ago, MIDN Standage was advised by his chain of command that he would not be permitted to participate in service selection, the process by which first class midshipman (seniors) submit, in order of priority, their desired warfare specialty (e.g., aviation, nuclear

propulsion, Marine Corps, cyber warfare) and are advised of which such specialty they have been chosen.  Defendants have thus now stripped MIDN Standage of his lifelong dream to be a Naval aviator, a clear indication that Defendants have every expectation that MIDN Standage will be separated, underscoring yet again the futility of any further exhaustion of administrative remedies.

As the Court itself noted, this is a case that "keeps judges up at night."  It is a case that cries out for immediate judicial review.  Defendants' unlawful criminalization of speech, the content of which they unilaterally, arbitrarily, capriciously, and hypocritically find unacceptable, and their promulgation of a standard of conduct through draconian, *ex post facto,* fundamentally unfair "adjudication" and punishment rather than fair notice, pose enormous and incalculable dangers to the Constitution, the Brigade of Midshipmen, the Navy, and to democracy itself.  If, as Defendants' contend, the Administrative Conduct System is a "learning tool," the only lesson it is currently teaching midshipmen is that if you use social media to comment on topics some may consider sensitive, you risk being ostracized, threatened with physical harm and death, and punished through a sham adjudicative process.  And if anyone in the chain of command concludes that, for example, a midshipman's "hyperbole" crossed an invisible line, which is what the Superintendent said supported his decision to separate MIDN Standage from the Academy in his final year, you risk being separated from the Naval Academy, losing your diploma and your lifelong dream of being a Navy or Marine Officer, and owing the Government a small fortune for the cost of your terminated education.

We respectfully submit that this Court should not allow any such "lesson" to continue.

**ARGUMENT**

## I.   PLAINTIFF'S CAUSES OF ACTION ARE WELL-PLEADED AND STATE LEGALLY COGNIZABLE CLAIMS.

### A.   Plaintiff Has Stated a Claim of Viewpoint Discrimination in Violation of the First Amendment.

We have established in our previous pleadings and motions a *prima facie* case of viewpoint discrimination.  We would pause only for a moment to add that, as part of that showing, the content of the tweets at issue here is, as a matter of law, speech protected under the First Amendment.  *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), (the First Amendment protects speech that is "uninhibited, robust, and wide-open, [and which] may well include vehement, caustic, and sometimes unpleasantly sharp attacks"); *Watts v. United States*, 394 U.S. 705, 708 (1969) (remarks amounting to "political hyperbole" are protected); *United States v. Ogren*, 54 M.J. 481, 484 (C.A.A.F. 2001) (same); *United States v. Wilcox*, 66 M.J. at 446-47 (expression of ideas on matters of social and political concern is at "core of what the First Amendment is designed to protect").

The burden then shifts to the Government to demonstrate that the speech is not, as a matter of law, protected.  Any such showing is subject to strict scrutiny.  *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015).  The Government seeks to meet that burden by asserting that the content of the tweets is not protected because it constituted conduct unbecoming in violation of a criminal statute, Article 113 of the UCMJ, 10 U.S.C. § 933.  Any such proposed criminalization of speech further invokes the need for the most exacting scrutiny.  *See Watts*, 394 U.S. at 707 ("[A] statute . . . which makes criminal a form of pure speech must be interpreted with the commands of the First Amendment clearly in mind."); *United States v. Brinson*, 49 M.J. 360, 361 (1998) ("When the Government makes speech a crime, the judges on

appeal must use an exacting ruler."); *U.S. v. Schelin*, 15 M.J. 218, 220 (C.M.A. 1983) ("[C]riminal statutes must be strictly construed.") (*quoting U.S. v. Enmons*, 410 U.S. 396, 411 (1973)).

Not even the Government's current attempt at defining such a standard, expressed through the Superintendent's Memorandum Report (Defendant's Motion to Dismiss the SAC, ECF 27, Exhibit A), withstands such scrutiny.

1.    **The Purported Standard of Conduct Governing the Criminalization of Plaintiff's Speech Neither Existed nor Was Known to Plaintiff at the Time of His Social Media Posts.**

Over the course of the hearing on October 30, it became glaringly apparent that there existed no legally cognizable standard of criminal conduct governing the speech at issue here. The Government espoused several theories, each of which the Court rejected.

The first was the two sentences in the Chief of Staff's disposition of MIDN Standage's appeal, which purported to articulate a standard of conduct based not on the content of speech, but the "manner" in which it is stated.  The Court found that standard hopelessly vague and subjective.

The second was refence to the last sentence of the third paragraph of COMDTMIDNNOTE 5720.  (Second Amended Complaint ("SAC"), Ex. K.)  The colloquy on that point began with the Court's focus on the first sentence of that paragraph, which provides, "Military personnel may generally express their views on public issues or political candidates via social media platforms such as Facebook, Twitter, or personal blogs, much the same as they would be permitted to write a letter to the editor of a newspaper."  The discussion then turned to whether any of the exceptions to that general principle -- references to sensitive information, showing contempt for public officials, or "unprofessional material that is prejudicial to good

8

order and discipline under the UCMJ – shed any light on the standard of conduct under Article 133. The Court observed that the first exception was inapplicable. In a subsequent filing,[3] we pointed out that the second exception, which is a reference to Article 88 of the UCMJ, was also inapplicable. We further pointed out at the hearing that the third exception was also inapplicable because it referred to Article 134 of the UCMJ, 10 U.S.C. § 934, not Article 133.

The Government's third effort at defining the applicable standard of conduct was to cite *Parker v. Levy*, 417 U.S. 733 (1974) and *United States v. Hartwig*, 39 M.J. 125 (C.A.A.F. 2019). We believe that the ensuing discussion of those cases at the hearing made clear that an Army doctor fomenting sedition among black enlisted troops and a lonely Army serviceman writing a sexually explicit letter to a 14-year old had nothing to do with the standard of conduct at issue here.[4]

Turning to the Memorandum Report, it is difficult to parse the vague, conclusory platitudes – expressions of the Superintendent's "professional opinion" -- interspersed throughout the Report to discern a clearly-articulated standard of conduct, let alone one that finds support in the law.

In Paragraph 8 of the Report, the Superintendent appears to conflate the Article 133 and 134 standards, opining that MIDN Standage's tweets were "unprofessional material that is prejudicial to good order and discipline" and that, as such, it "eroded public trust in our military officer's corps" and "compromised his standing as a midshipman and future officer." Beyond

---

[3] Plaintiff' Supplemental Submission in Support of Motion for Preliminary Injunction, ECF17. That submission also included an excerpt from the Manual for Courts-Martial that provided examples of conduct constituting conduct unbecoming. None of the examples could provide any notice to MIDN Standage as to the possibility criminality of his conduct.

[4] Defendants continue to assert that *Parker v. Levy* and *United States v. Hartwig* effectively immunize the military from a claim of viewpoint discrimination. (Mot. to Dismiss SAC, p. 6.) Once again, they stand for no such proposition.

the fact that these are conclusory restatements of the statutes themselves and shed no light on the applicable standard of conduct, it bears repeating that 1) MIDN Standage was never charged with a violation of Article 134 and 2) even if he had been, the charge is devoid of evidentiary support because MIDN Standage did not identify himself as a member of the military and did not direct a single one of his tweets at anyone in the military. *See Wilcox*, 66 M.J. at 449-50. To the extent the Superintendent is attempting to justify his separation recommendation on the violation of a statute with which MIDN Standage was never charged, the due process implications of such an effort speak for themselves.

Elsewhere, the Superintendent gives an extended version of the Chief of Staff's "it's not what you said, but how you said it" standard. In Paragraph 13, he states that MIDN Standage should have expressed his views in a "dignified or respectful manner," but chose instead to discuss the topics in a "crude, inflammatory manner." He asserts that MIDN Standage should have known such distinctions because of his "three years of training," another vague, undefined, and unspecified allusion to amorphous concepts untethered to any actual facts. These totally subjective, inevitably-personal value judgments simply cannot form the basis of a criminal standard of conduct. Moreover, none of these statements can possibly be credited in the face of the vile, racist, nihilistic, and seditious social media posts calling for the burning down of the city of Louisville; repeatedly using the word "f***;" associating the Commander-in-Chief with the Ku Klux Klan, Saddam Hussein, and Hitler; denigrating the police and comparing them to the Klan; calling for a national revolution, containing racist insults against Latinos, and calling for MIDN Standage's death. This is but a sampling of the weaponization of social media the Superintendent and his Command not only fail to punish, but implicitly, if not expressly, encourage and condone. While these and many other such posts, unlike MIDN Standage's

10

tweets, may well constitute violations of Articles 88, 133, and 134 of the UCMJ, they go unpunished. And despite the fact that these egregious moral and logical inconsistencies have been repeatedly presented to the Superintendent, his Memorandum Report is thunderously silent with respect to them.

No midshipmen could possibly divine, let alone have notice of, any clear, unambiguous standard of conduct emerging from such hypocrisy.

Finally, there is the Superintendent's assertion in Paragraph 7 that "Midshipman Standage should have known that the manner in which he was commenting on sensitive topics ***would be perceived as offensive and inflammatory***." (Emphasis added.) It is precisely in the face of such an assertion that the protections of the First Amendment, and the strict scrutiny that vindicates them, become paramount. The First Amendment intrinsically protects expression of ideas that others may find distasteful. "Necessarily, we must be sensitive to protection of 'the principle of free thought -- not free thought for those who agree with us but freedom for the thought that we hate.'" *United States v. Priest*, 45 C.M.R. 338, 344 (1972) (quoting *United States v Schwimmer*, 279 U.S. 644, 654-655 (1929)). Criminalizing speech because someone finds it offensive would invalidate the statute purporting to impose such a standard. *See Wilcox*, 66 M.J. at 449 (If "the entire universe of servicemember opinions, ideas, and speech would be held to the subjective standard of what some member of the public, or even many members of the public, would find offensive" were the "standard [used] to impose criminal sanctions under [the] UCMJ, [it] would surely be both vague and overbroad.")

This Court has expressed its substantial concerns regarding the chilling effect MIDN Standage's physical removal, as well as his separation, from the Naval Academy would have not only on his own speech but on the speech of the Brigade of Midshipmen generally. We

respectfully submit that nothing contained in the Government's current Motion to Dismiss or the Superintendent's Memorandum Report should alleviate those concerns.

**B.     Plaintiff Has Stated a Claim Under the *Ex Post Facto* Clause.**

Here the Government – specifically, the Superintendent – purports to announce a new standard of *criminal conduct* to be retroactively applied, not only to MIDN Standage, but potentially to any other midshipman who may have posted "offensive" social media prior to November 12, the date of the Superintendent's revised Memorandum Report.  The attempted promulgation of such a previously unknown and unknowable standard violates the Constitution's *Ex Post Facto* clause, irrespective of whether the Government chooses to charge a respondent under a criminal statute in a non-criminal setting.  The danger of a newly established standard of criminal conduct is neither diminished nor extinguished simply because, in this particular case, the standard of proof and potential punishments differ from those applicable to a criminal proceeding. As we emphasized at the October 30 hearing, the ***elements*** of an offense under Article 133 remain the same irrespective of the forum in which the charge is brought.  That means that any future midshipman who runs afoul of the Superintendent's new "I-know-it-when-I-see-it" standard risks criminal prosecution and imprisonment.

"The [*Ex Post Facto*] Clause ensures that individuals have fair warning of applicable laws." *Peugh v. United States*, 569 U.S. 530, 544 (2013). "Critical to relief under the Ex Post Facto Clause ***is not an individual's right to less punishment, but the lack of fair notice***." *Weaver v. Graham*, 450 U.S. 24, 30 (1981) (emphasis added). "[T]he principle on which the Clause is based - the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties - is fundamental to our concept of individual liberty." *Marks v. United States*, 430 U.S. 188, 191, 97 S. Ct. 990, 992-93 (1977)**.**  "[T]here inheres in ex post

facto doctrine some idea of actual or constructive notice to the criminal before commission of the offense of the penalty for the transgression." *Garner v. Jones*, 529 U.S. 244, 253 (2000).

Ex post facto concern arises when elements of a crime are altered, the legal definition of the offense is changed, or preexisting defense is removed.  *See, e.g., Stogner v. California*, 539 U.S. 607, 653, 123 S. Ct. 2446, 2471 (2003) (impermissibly ex post facto to "alter the government's burden to establish the elements of the crime"); *Collins v. Youngblood*, 497 U.S. 37, 42 (1990) (clause violated where "legal rules of evidence" are changed to allow for "less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." (citation omitted)); *Beazell v. Ohio*, 269 U.S. 167, 169, 46 S. Ct. 68, 68 (1925) (ex post facto problem where change in law "deprives one charged with crime of any defense available according to law at the time when the act was committed").  Those principles apply directly to the standard of conduct the Government seeks to impose here, such as obviating the need for proof of prejudice to good order and discipline and criminalizing speech that is "insensitive," "callous," or "undignified."

 "There can be no doubt that a deprivation of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie v. Columbia*, 378 U.S. 347, 352 (1964).  This Court should therefore reject the Government's efforts to expand the criminalization of speech to the vague, subjective, opinion-driven "standards" proposed by the Superintendent in his orandum Report.

C.    **Plaintiff Has Stated a Claim Under the Due Process Clause of the Fifth Amendment.**

    1.    **Plaintiff Has Clear Liberty and Property Interests at Stake.**

> The service academies of the United States, including the Merchant Marine Academy, are not immune from the strictures of due process. *Wasson v. Trowbridge,* 382 F.2d 807 (2d Cir.1967); *Hagopian v. Knowlton,* 470 F.2d 201 (2d Cir.1972). Under the Fifth Amendment, individuals are protected against the deprivation of their liberty and property without due process of law.
>
>  To be entitled to the procedural protections afforded by the due process clause, plaintiff in this case must show that the government's action deprived him of a "liberty" or a "property" interest. *Horowitz, supra,* 435 U.S. at 82, 98 S.Ct. at 951. Whether or not Midshipman Lightsey has a "property" interest at stake here, he is certainly entitled to assert a "liberty" interest. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," the minimal requirements of the clause must be satisfied. *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971); *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975). Lightsey's good name, honor, reputation and integrity were impaired by Lt. Gay's formally accusing him of cheating before members of the Academy's staff and fellow midshipmen, including those seated on the Academy's Honor Board, and they continue to be impaired as a result of the Academy's conduct following the Board's determination. *Bishop v. Wood,* 426 U.S. 341, 348–49, 96 S.Ct. 2074, 2079–2080, 48 L.Ed.2d 684 (1976); *Horowitz, supra* 435 U.S. at 83–84, 98 S.Ct. at 951–952.

*Lightsey v. King*, 567 F. Supp. 645, 648 (E.D.N.Y. 1983).  Further, there can be little doubt that MIDN Standage has a substantial property interest in not being separated, given that he faces potential recoupment for the cost of his education at close to $175,000.

The procedural due process case on which the Government principally relies, *Wimmer v Lehman,* 705 F.2d 1402 (4th Cir. 1983) is in accord:  "Concededly, Wimmer could not be deprived of the opportunity to obtain his commission without procedural due process."  *Id.* at 1404.  Notably, the *Wimmer* court went on to observe, "It is a commonplace that, except in

14

certain standard situations, due process is flexible and calls for such procedural protections as the particular situation demands." *Id*., (*citing Morrissey v. Brewer,* 408 U.S. 471, 481 (1972)).

The "situation" in *Wimmer* involved his violation of an acknowledgement he had signed as a Naval Academy midshipman promising not to use illegal drugs.  The conduct charge was purely administrative, and the only due process claim at issue was the right to counsel at the conduct adjudications.  Wimmer raised no other procedural process claim, and conceded that he had received fair notice of the charges and an otherwise fair adjudication process.  The case did not involve the criminalization of speech, did not involve the Academy's deliberate decision to pursue an otherwise criminal charge administratively, thus depriving Wimmer of right to counsel.  The case thus bears no resemblance to the due process deprivations at issue here.  To be clear, the question presented here is far less about what additional due process protections may have been warranted, and far more about the utter lack of the most fundamental due process protections even the *Wimmer* court would have recognized twenty-seven years ago.

### 2.      Plaintiff Received No Fair Notice of the Conduct Unbecoming Charge.

The Court of Appeals for the Armed Forces, like the Supreme Court and the Constitution itself, requires that military rules "provide sufficient notice so that a service-member can reasonably understand that his conduct is proscribed." *U.S. v. Pope*, 63 M.J. 68, 73 (C.A.A.F. 2006).

We have already discussed above why MIDN Standage could not possibly have been on notice in June 2020 that the content of his tweets violated a criminal standard of conduct. Moreover, the Preliminary Inquiry Report (Plaintiff's Reply in Support of Motion for Preliminary Injunction, ECF 12, Ex. O) neither discussed nor recommended a violation of Article 133.  The only notice MIDN Standage received that he was being charged with that

offense was an entry in the Midshipman Information Data System (MIDS) which provided no discussion of the applicable standard of conduct of the evidence purportedly meeting that standard.[5]  MIDN Standage thus had no idea what the basis of the Article 133 charge was, let alone how to defend himself against it.

3.       **The Proceedings Against Plaintiff Have Been Devoid of Fundamental Fairness.**

The Government's new Motion to Dismiss spends pages on the sole issue of whether MIDN Standage had a right to counsel at the adjudications themselves, relying heavily on *WImmer* under circumstances not present here.  We would simply respond further by making two points.

First, MIDN Standage was charged under a criminal statute that would normally entitle him to a right to counsel at hearings and trial.  The Government should be estopped from asserting that MIDN Standage now has no such right because the Government chose to pursue the charge administratively rather than through the military justice system.

 Second, the leading federal circuit on issues of due process in collegiate disciplinary proceedings, the Sixth Circuit, has held that student-respondents in such proceedings are entitled to a right to counsel if 1) the issues before the tribunal are unusually complex or 2) the tribunal is represented by counsel.  *See, e.g., Flaim v. Medical Coll. of Ohio*, 418 F.3d 629, 640 (2005) (*citing Jaksa v. Regents of Univ. of Mich.,* 597 F. Supp. 1245, 1252 (E.D.Mich.1984), *aff'd,* 787

---

[5] *See* Exhibit E.  Even the short summary of the facts entered into the system tellingly illuminates the viewpoint discrimination at issue in this case.  The entry refers to the "***unjustified*** police ***killing*** of Breonna Taylor and the resulting nationwide protests against ***systemic racism***."  The choice of those inflammatory words was deliberate and exposes the pernicious bias that has infected every aspect of MIDN Standage's adjudications.  Indeed, the use of the term "unjustified" to refer to an historical event about which there exist a range of varying public opinions across numerous segments of the nation's populace is as blatant a violation of the core principle enshrined by the First Amendment as can be imagined.  "Under [that] Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch*, 418 U.S. 323, 339–40 (1974).

16

F.2d 590 (6th Cir.1986).  The Deputy Commandant, Chief of Staff, and Superintendent all had their counsel present at their adjudications, while MIDN Standage was left to fend for himself.

As for MIDN Standage's remaining due process claims, the Government has little if anything to say about them in rebuttal.  Both the Government's new Motion to Dismiss and the Superintendent's Memorandum Report say nothing in response to MIDN Standage's lengthy discussion in his Reply in Support of his Motion for Preliminary Injunction as to how his retention of counsel, his efforts to defend himself, his assertion of his rights, and his decision to appeal from the Deputy Commandant's findings of guilt, were used against him and were derided and ridiculed.

As this Court recognized at the hearing on October 30, the Preliminary Inquiry Officer, LT Kelsey Lee, improperly inserted her personal opinions into the PIR.  We raised this due process violation at every stage of the adjudication process, and it was uniformly ignored.

The Government's protestations notwithstanding, the Deputy Commandant conflated the roles of accuser and adjudicator.  It was the Deputy Commandant who decided MIDN Standage should be charged with a violation of Article 133 despite the fact that the PIR neither analyzed or recommended such a charge.

The SAC and our motions have made repeatedly clear that the Command was under enormous pressure from the football team and other BLM/Anti-Racist factions within the Academy to punish and separate MIDN Standage.  The Academy's Command Master Chief commended a midshipman for creating a hashtag called #chaseunity (i.e., unify against Chase).  The Senior Enlisted Advisor of the football team contacted MIDN Standage in June 2020 while MIDN Standage was still at home in California and told MIDN Standage he would never make it

back to the Academy.[6]  He also assured the football team that he would personally see to it that

MIDN Standage was separated.[7]  Here is one message he ("Big Will") posted in that regard:



At a Commandant's call on 14 August 2020, the Commandant stated, "We have evidence that

there are pockets of midshipmen that don't have good belief structures here... We need to

educate ourselves about racism... we need to move from 'not' to 'anti.' 'Not racist' is passive. To

be anti-racist, we must take the offensive and confront others."  When a midshipman asked the

Commandant if his statement referred to MIDN Standage, the Commandant replied that that was

what he was referring to and that the Brigade needed to "engage."[8]  From that point forward, it

was open season on MIDN Standage.  The Commandant's own daughter called for MIDN

Standage's head, along with posting vile and vulgar tweets or retweets that said "All Cops Are

---

[6] Declaration of Chase Robert Standage, ECF 12, Exhibit A, ¶ 19.

[7] *Id.*

[8] Second Declaration of Chase Robert Standage, ¶ 3, attached as Exhibit C.

18

Bastards," praised ANTIFA, and agreed that the President should go f*** himself.  In the midst of this out-of-control, mob mentality, a mentality the Command not only failed to quell but in fact encouraged, MIDN Standage could not possibly have received a fair hearing at any stage of the adjudicative process.  Outside of the Academy, newspapers such as the *Capital Gazette* and *The Baltimore Sun,* have consistently run articles and editorials libelously insisting that MIDN Standage's tweets were "racist."[9]

This kind of mob pressure was squarely at issue in *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016).  There, the Second Circuit reversed the trial court's dismissal, at the pleading stage, of a male student's complaint that campus sexual misconduct charges were the product of a public backlash against Columbia for being too lenient in such cases.  The Court held, in pertinent part,

> The Complaint alleges that having been severely criticized in the student body and in the public press for toleration of sexual assault of female students, Columbia was motivated in this instance to accept the female's accusation of sexual assault and reject the male's claim of consent, so as to show the student body and the public that the University is serious about protecting female students from sexual assault by male students-- especially varsity athletes. There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticism that Columbia turned a blind eye to such assaults.

*Id.* at 58.  That is precisely the kind of fundamental unfairness at issue in this case.

---

[9] *See, e.g.,*  https://www.capitalgazette.com/education/naval-academy/ac-cn-naval-academy-chase-standage-20200924-vk67o6x7j5be5punpssjsu44vu-story.html;  https://www.baltimoresun.com/education/ac-cn-racism-naval-academy-buck-20200617-fj3khfkvdvdtdg3dve64pu4snq-story.html;  https://www.military.com/daily-news/2020/06/18/naval-academy-opens-investigation-racist-tweets-midshipmans-account.html.

## II.     THIS COURT HAS JURISDICTION.

### A.     Further Administrative Action Cannot Resolve the Constitutional Questions Presented Here.

With respect to the issue of exhaustion of administrative remedies, we incorporate by reference our arguments concerning that issue in our original Opposition to Defendant's Motion to Dismiss (ECF 12.)  We would only add here the well-settled point that neither ASN(M&RA) nor the BCNR has the power to resolve or remedy the constitutional violations and irreparable harm at issue in this case, underscoring the futility and undue burden of further exhaustion.  *See, e.g., Singh v. Reno*, 182 F.3d 504, 510 (7th Cir. 1999) ("Administrative agencies, although they may consider constitutional claims, lack the authority to deal with them dispositively; the final say on constitutional matters rests with the courts"; citations omitted); *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976) ("Generally, federal administrative agencies are without power or expertise to pass upon the constitutionality of administrative or legislative action") (citations omitted).

### B.     The Disposition of MIDN Standage's Appeal from the Deputy Commandant's Findings of Guilt Are Final Agency Actions That Lie at the Core of This Case.

In the Prayer for Relief contained in the Second Amended Complaint, Plaintiff seeks, among other relief, a declaration "that MIDN Standage's social media posts did not violate COMDTMIDNNOTE 5720 and did not constitute conduct unbecoming a midshipman." (SAC, Prayer for Relief, d.  *See also* SAC, ¶ 14 ("Through this Complaint, MIDN Standage seeks . . . a declaration that the findings of guilt in the case against him have no basis in applicable law and must be overturned.))

Those findings of guilt were made by the Deputy Commandant at the adjudication before

him on August 6, 2020.  Pursuant to Section 3.4 of the Academy's Administrative Performance and Conduct System instruction (Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction and Motion to Dismiss (ECF 8), Ex. H), an appeal may be taken from an "Adjudicating Authority" to a "Reviewing Authority."  In this case, the Adjudicating Authority was the Deputy Commandant, and the Reviewing Authority was the Chief of Staff.  That is the only avenue of appeal from the Adjudicating Authority's findings of guilt.  Neither SECNAVINST 1531.4A nor 10 U.S.C. § 8462 authorize the Secretary of the Navy or his or her delegate to vacate or overturn the findings of guilt at the Adjudicating Authority level.  Thus, even if the Chief of Staff or the Superintendent had determined to retain MIDN Standage, or if ASN(M&RA) were to reject the Superintendent's separation recommendation and directed the Superintendent to retain him, the findings of guilt, and the irreparable harm caused by them, would remain untouched, unremedied, and a permanent part of MIDN Standage's record.

The Chief of Staff's denial of MIDN Standage's appeal on September 2, 2020 thus constituted final agency action which is now ripe for review by this Court.  There is no tentativeness, contingency, or provisional nature of the disposition of the appeal.[10]  As all of the pleadings and motions in this case make clear, the issues before the Court as to whether the findings of guilt should be vacated are purely questions of law that do not require further factual development.  *See Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983) ("The inquiry into the protected status of speech is one of law, not fact"); *Dennis v. United States*, 341 U.S. 494, 513 (1950) ("When facts are found that establish the violation of a statute, the protection against conviction afforded by the First Amendment is a matter of law. The doctrine that there must be a clear and present danger of a substantive evil that Congress has a right to prevent is a judicial

---

[10] *See* our discussion of *Rell v. Rumsfeld* below.

rule to be applied as a matter of law by the courts"); *Shiel v. United States*, 515 A.2d 405, 409 (D.C. Cir. 1986) ("Where the crucial underlying facts are undisputed, questions of law such as [whether the First Amendment was infringed] are appropriately within the trial court's domain") (citations omitted)).

Moreover, the Court's disposition of the underlying conduct charges would dispose of the entire case.  As we have previously noted, there would be no separation decision pending before ASN(M&RA) in the absence of the underlying charges.  This Court is free not only to retain jurisdiction of this case, but to move forward with its consideration of Plaintiff's Motion for Preliminary Injunction, irrespective of whether and when ASN(M&RA) issues its decision on the Memorandum Report.[11]

### C.     The Irreparable Harm to Plaintiff Caused by Defendants' Viewpoint Discrimination is an Exception to the Final Agency Action Requirement.

As set forth in the Introduction above, the Government goes to great lengths (and badly overreaches) to convince the court of the "tentative, provisional" nature of the Superintendent's separation recommendation.  We showed that, in fact, there is absolutely no question that the Superintendent affirmatively decided to separate MIDN Standage and took improper steps to remove him and has every expectation that MIDN Standage will, in fact, be separated, given his chain of command's refusal to award MIDN Standage his service selection.  Simply stated, MIDN Standage's separation is, as far as the Government is concerned, a foregone conclusion, and yet they insist that MIDN Standage's suit should be dismissed pending the final consummation of that conclusion.

We have already shown above why the Chief of Staff's denial of MIDN Standage's

---

[11] In that regard, we note that MIDN Standage timely submitted his Show Cause Statement to the Superintendent on Thursday, November 19.  We attach a copy of the Show Cause Statement, but not its exhibits, which are primarily filings in this Court, as Exhibit D.

appeal was a final agency action.  Moreover, irrespective of the transparent and ephemeral nature

of any further "agency action" at the ASN(M&RA) level, it cannot possibly be disputed that

MIDN Standage has suffered irreparable harm and continues to do so.  The service selection

denial is only the latest example.  At the hearing on October 30, we described for the Court all of

the additional, irreparable harm MIDN Standage will suffer if 1) he is removed from the Naval

Academy and 2) he has to wait 18 months to 2 years for a BCNR decision that lacks the statutory

authority to remedy his constitutional violations.

No such waiting for further "agency action" is justified.

In *Rell v. Rumsfeld*, 389 F. Supp.2d 395 (D. Conn. 2005), the Secretary of Defense

recommended to the Base Realignment and Closure Commission (BRAC) that aircraft belonging

to the Connecticut Air National Guard be relocated to another state.  Connecticut's governor, its

two U.S. Senators, and one of its U.S. Representatives sued in federal court, claiming that the

recommendation violated various statutory provisions.  They also moved for a preliminary

injunction.  The Secretary of Defense raised numerous arguments against the PI motion,

including the argument that the BRAC recommendation was not a final agency action because

the BRAC had not yet acted on it.

The court disagreed, holding,

> An order may be final though it is not the very last step in the
> administrative process, but it is not final if remains tentative, provisional,
> or contingent, subject to recall, revision, or reconsideration by the issuing
> agency." *Mountain States Tel. & Tel. Co. v. F.C.C.,* 939 F.2d 1021, 1027
> (D.C.Cir.1991). Although the Commission's recommendation is not the
> final action that will be taken with respect to the recommendation to
> strip the 103rd of its aircraft, it is the last action taken by the Commission and
> is not "subject to recall, revision, or reconsideration by the issuing
> agency." *Mountain States,* 939 F.2d at 1027. Accordingly, the agency
> action challenged here is sufficiently final to be subject to judicial review.

*Id.* at 400.  Central to the Court's decision was that the plaintiffs would suffer irreparable harm

were they required to await a final decision by the BRAC. *Id.* at 400-401.

In like manner, the Superintendent's Memorandum Report is not tentative, provisional, or contingent, and is not subject to recall, revision, or reconsideration by the Superintendent or the Naval Academy. And MIDN Standage has suffered, and will continue to suffer irreparable pending further agency action.

Just recently, a three-judge panel of this District, including this Court, reached a similar result in *Useche v. Trump*, 2020 WL 6545886 (D. Md., Nov. 6. 2020), in which "the plaintiffs contend[ed] that the Presidential Memorandum [titled 'Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census,' 85 Fed. Reg. 44,676 (July 23, 2020)] was unlawful because it violated (1) The Fourteenth Amendment's requirement that apportionment be based on the whole number of persons in each state; (2) Article I's requirement that the apportionment be based on an 'actual Enumeration' taken every ten years in the manner Congress directs; (3) the relevant census- and apportionment-related statutes . . . ; and (4) 5 U.S.C. 706(2) of the Administrative Procedure Act. The amended complaint also alleged that the Memorandum discriminates against Hispanic communities and immigrant communities of color in violation of the Fifth Amendment's Due Process clause." 2020 WL 6545886, p. 4. The Court reasoned,

> We begin with the government's contention that plaintiffs lack standing and, relatedly, that their claims are not ripe for adjudication. The government asserts that it is not yet clear how the Memorandum will be implemented or even whether it will be implemented at all. This is because, according to the government, '[t]he extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second tabulation' wholly excluding undocumented immigrants from the apportionment base 'is, at this point, unknown.' Defs.' App'n at 7. Thus, says the government, any apportionment injury is too speculative to constitute the requisite 'injury in fact' for standing purposes. And because '[a]nalyzing ripeness is similar to determining whether a party has standing,' *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006), the

government argues that the plaintiffs' claims are not ripe for the same reasons. . . .  We disagree.

2020 WL 6545886, pp. 5-6.

Although the opinion does not specifically rule on APA "finality,"[12] the context is clear, and supports this Court's jurisdiction to address MIDN Standage's constitutional claims, even absent "final" agency action:

> Simply stated, the plaintiffs have shown the requisite 'substantial risk' that the Presidential Memorandum will be implemented as intended, causing the intended apportionment harms.  If any evidence exists that the Census Bureau or Secretary will not or cannot comply fully with the Memorandum, the government has yet to share such evidence with us. . . .  Any speculative or theoretical possibility that the agency may fall short in its efforts to carry out the Memorandum's announced policy does not negate the plaintiffs' showing that of 'substantial risk' sufficient to confer standing. . . .  For reasons similar to those previously discussed, the plaintiffs face a substantial risk of a direct and imminent apportionment injury, and thus their claims are ripe for adjudication. . . .  In urging us to find the claims unfit for adjudication, the government puts forward the same who-knows-what-will-happen argument, and we likewise reject it here.

2020 WL 6545886, p. 9.

Thus, the genuineness of the Government's "who-knows-what-will-happen" argument here notwithstanding, this case is ripe for review, and no further agency action is necessary to confer jurisdiction.

---

[12] Notably, the Government did raise the "final agency action" argument in its Opposition to Plaintiff's Partial Motion for Summary Judgment or Preliminary Injunction; *see Useche*, ECF 36, which the November 6 decision implicitly rejected.

### D.    Plaintiff Has Standing to Bring Counts IV and V, and This Court Has Subject Matter Jurisdiction Over Those Claims.

#### 1.    Plaintiff Has Standing to Assert Violations of the OMB Directive and Executive Order.

It cannot plausibly be contended that MIDN Standage has not suffered injury in fact as a direct result of the Command's repeated violations of the OMB Directive and Executive Order. In addition to the myriad examples of those violations we have already provided in our pleadings and motions, two additional examples bear emphasis.  The first is an email dated 17 September 2020 sent to MIDN Standage and his fellow members of 14th Company inviting them to participate in the latest installment of RIDE training.[13]  RIDE stands for "Racial Injustice and Diversity Education."  Embedded in the e-mail is a quote by Angela Davis that states, "In a racist society, it is not enough to be non-racist.  We must be anti-racist."  On its face, the quote violates the OMB Directive and the Executive Order.  Moreover, the person quoted is an avowed Marxist, former domestic terrorist, and member of the Communist Party of America.

The second example is the following photograph of MIDN Standage's company officer, CAPT Laith Shannon, USMC, taken at noon meal formation in Bancroft Hall on November 6 2020.[14]  CAPT Shannon is on duty, out of uniform, and is wearing a T-shirt that says, "TRY ME – Malcolm X."  Perhaps the greatest irony of this incident is that, at that same noon meal formation, CAPT Shannon cautioned his midshipmen about the dangers of posting partisan social media in the wake of the election.  As with so many other aspects of the hypocrisy that pervades the Command's social media guidance, one can only wonder what message MIDN

---

[13] We attach a copy of this email as Exhibit E.

[14] As set forth below, this incident occurred two days after the Secretary of the Navy issued an all-Navy ("ALNAV") message directing that all diversity training cease immediately in order to bring all such training into compliance with the President's Executive Order.

Standage and his company-mates were supposed to take away from their companys officer's words and actions.



The notion that a Naval Academy midshipman who has sworn to support and defend the U.S. Constitution against all enemies, foreign and domestic, would quote Angela Davis, an avowed Marxist, former domestic terrorist, and long-time member of the Communist Party of America, and that MIDN Standage's own company officer would wear a T-shirt while on duty quoting a Black Nationalist, is simply astonishing. And yet this is precisely the command climate created by the Superintendent and the Commandant, the same command climate that 1) ensured MIDN Standage would not get a fair hearing and 2) chilled not only MIDN Standage's speech, but the speech of countless other members of the Brigade of Midshipmen.

MIDN Standage clearly has standing to complain of the chilling effect the Command's violations of the OMB Directive and Executive Order have had on him.

### 2.     The Violations at Issue are Immediately Reviewable.

The Government baldly asserts that the Naval Academy has not implemented a diversity training program that runs afoul of the Presidential Directive, and further asserts that any such training is prospective, by picking and choosing a few verbs stated in the future tense. But the

27

Government fails to disclose that, and fails to explain why, on November 4, 2020, the Secretary of the Navy issued an "ALNAV" entitled, "Implementation of Executive Oder on Combatting Race and Sex Stereotyping."   It directs that all Department of the Navy diversity and inclusion training, including that being conducted at the Naval Academy, be immediately suspended and that the resumption of such training can only occur after it has been reviewed by the Acting Undersecretary of the Navy for compliance with the President's Executive Order.[15]  The issuance of the ALNAV dispenses with any argument as to the compelling state interest in conducting such training and confirms the holding in *Parker v. Levy* that "[t]he military establishment is subject to the control of the civilian Commander in Chief and the civilian department heads under him, and its function is to carry out the policies made by those civilian superiors."  417 U.S. at 751.[16]

In addition to the overwhelming evidence already cited by Plaintiff in his pleadings and motions, the issuance of the ALNAV presents compelling evidence that violations of the OMB Directive and Executive Order had, in fact occurred and were on-going, rendering any irreparable injury caused by such training ripe for review.

---

[15] A copy of the ALNAV is attached as Exhibit F.

[16] The issuance of the ALNAV also renders as moot, at least for the present, Plaintiff's Prayer for Relief that this Court enjoin the training.

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Dismiss should be denied, and

Plaintiff's Motion for Preliminary Injunction should be granted.


Dated: November 20, 2020                 Respectfully submitted,

                                         _____/s/_____
                                         Jeffrey E. McFadden
                                         (D. Md. Bar No. 08738)
                                         LAW OFFICES OF JEFFREY E. MCFADDEN, LLC
                                         312 Prospect Bay Drive East
                                         Grasonville, MD  21638
                                         (410) 490-1163

                                         *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2020, I caused a copy of this Opposition to Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint to be served on counsel for Defendants through the Court's CM/ECF system.

_____/s/_____
Jeffrey E. McFadden
