IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHASE STANDAGE,

*Plaintiff*,

v.

KENNETH BRAITHWAITE *et al*.,

*Defendants*.

Civil Action No. ELH-20-2830

**MEMORANDUM OPINION**

This case arises from efforts of the United States Naval Academy ("USNA," "Naval Academy" or "Academy") to discharge and disenroll plaintiff Chase Standage, a twenty-one year old midshipman first class in his senior year at the Academy, because of "tweets" that he published in June 2020 via Twitter, "a social networking platform that allows a person to post and read short messages called 'tweets.'" *United States v. Loughry*, ___ F.3d ___, 2020 WL 7483758, at *2 (4th Cir. Dec. 21, 2020).[1] Plaintiff's tweets concerned topics such as race, racial injustice, police brutality, the social ferment related to those issues, and the government's response to protests that gripped the nation after the tragic deaths of Breonna Taylor and George Floyd in March and May 2020, respectively.

At the time of the tweets, Standage was at his home near Los Angeles, California. In general, the Academy does not prohibit the use of social media by midshipmen, so long as the user does not indicate an association with the Navy. With respect to his tweets, plaintiff did not identify himself as a member of the USNA.

___

[1] The parties and exhibits sometimes refer to the designation of midshipman first class as "MIDN."

The tweets led to an on-campus disciplinary proceeding. Officials at the USNA regarded some of the tweets as racially insensitive, offensive, or inappropriate. In particular, Academy officials found that plaintiff's tweets constituted "conduct unbecoming an officer," in violation of Article 133 of the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. § 933, and Commandant of Midshipmen Notice 5720, titled "Political Activities of Midshipmen" ("Notice 5720"). Thereafter, Vice Admiral Sean Buck, Superintendent of the Naval Academy, determined that plaintiff's tweets constituted "unsatisfactory conduct" under 10 U.S.C. § 8462, for which he has recommended plaintiff's discharge.[2]

Section 8462 of 10 U.S.C. establishes the process by which a midshipman may be separated from the Academy. The statute requires the Superintendent to "submit to the Secretary of the Navy . . . a full report of the facts . . . whenever the Superintendent determines that the conduct of a midshipman is unsatisfactory." Further, § 8462 grants the Secretary of the Navy ("Secretary") the authority to discharge a midshipman, if he believes the Superintendent's determination to be "reasonable and well founded."

As discussed, *infra*, the Secretary has delegated his authority under § 8462 to the Assistant Secretary of the Navy (Manpower & Reserve Affairs) ("ASN (M&RA)" or "Assistant Secretary").[3] However, to my knowledge, no decision has yet been rendered by the Assistant Secretary.

---

[2] The statute was previously codified at 10 U.S.C. § 6962. I shall use the terms "separation," "discharge," and "disenrollment" interchangeably. All three terms are used either by the parties or in materials they have submitted or cited. For example, 10 U.S.C. § 8462 speaks in terms of "discharge," but the parties primarily use the term "separation."

[3] The Court may take judicial notice of "adjudicative fact[s]," pursuant to Fed. R. Evid. § 201(a). The official website of the Navy identifies the ASN (M&RA) as Catherine Kessmeier. *See Catherine Kessmeier, Assistant Secretary of the Navy (Manpower and Reserve Affairs)*, NAVY

-2-

On September 30, 2020, Standage initiated suit against Secretary Kenneth Braithwaite and Superintendent Buck, defendants. ECF 1. In his Complaint for Declaratory and Injunctive Relief, plaintiff alleged, *inter alia*, content and viewpoint discrimination, in violation of his rights under the First Amendment, and deprivation of due process, in violation of his rights under the Fifth Amendment.

Standage also moved for a preliminary injunction (ECF 2, "PI Motion"), supported by exhibits. He asserts that his tweets, which were "expressly directed to non-military members of the general public," constitute protected speech. ECF 2-1 at 10.[4] Further, Standage seeks to enjoin the Superintendent and the Secretary from separating him from the Naval Academy "and from otherwise interfering with his good standing . . . at the Naval Academy solely because of his exercise of protected speech under the First Amendment." ECF 2-1 at 14. He claims that, absent an injunction, he will suffer irreparable harm from the loss of his First Amendment freedoms, the end to "his bright future . . . as a Navy pilot," and reputation damage. *Id.* at 11.

Upon notice of the filing of the suit and the PI Motion, the Court held an emergency telephone conference with counsel for plaintiff and the government, at which a briefing and hearing schedule was set. ECF 4. Thereafter, on October 1, 2020, with the consent of the government, and pending disposition of the PI Motion, the Court issued an Order precluding defendants "from taking any further steps to separate" Standage from the Academy, including issuance of the Memorandum Report recommending his separation to the Assistant Secretary.

---

https://www.navy.mil/Leadership/Biographies/BioDisplay/Article/2236516/catherine-kessmeier/ (last accessed December 11, 2020).

[4] Throughout the opinion, the Court cites to the electronic pagination, which does not always correspond to the pagination on the actual document.

ECF 5.  The Order also precluded defendants from "interfering with Plaintiff's ability to continue attending his academic classes and military obligations," pending disposition of the PI Motion.  *Id.*

In accordance with the Scheduling Order (ECF 4), defendants filed a combined opposition to the PI Motion and a motion to dismiss for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1).  ECF 8.  They assert sovereign immunity, ripeness, and failure to exhaust administrative remedies, and argue that plaintiff's claims present a nonjusticiable military controversy.  *Id.* at 4-11.  In the alternative, defendants contend that, even if Standage's claims are reviewable, his Motion fails on the merits.  *Id.* at 14-21.

Plaintiff subsequently filed an Amended Complaint for Declaratory and Injunctive Relief (ECF 11), with exhibits.  ECF 11-1 to ECF 11-5.   He also filed a combined reply to defendants' opposition and opposition to defendants' motion to dismiss (ECF 12), along with additional exhibits.  *See* ECF 12-1 to ECF 12-4.  And, he later filed a supplemental reply.  ECF 17.

The Court held a lengthy hearing on October 30, 2020, at which oral argument was presented.  ECF 16.[5]  Thereafter, with the government's consent (ECF 20), and with leave of Court (ECF 21), Standage filed a Second Amended Complaint for Declaratory and Injunctive Relief.  ECF 22 ("Second Amended Complaint").  He challenges the disciplinary proceedings and again asserts violations of his rights under the First Amendment and the Fifth Amendment, as well as a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*

Count 1 of the Second Amended Complaint asserts "Content and Viewpoint Discrimination in Violation of the APA and the First Amendment to the U.S. Constitution."  *Id.* at

---

[5]  In light of the global coronavirus pandemic, the hearing was conducted by videoconference.

26.  Count 2 alleges "Promulgation of a Standard of Conduct Through Punishment in Violation of the APA and the Ex Post Facto Clause of the U.S. Constitution." *Id.* at 29.  Count 3 claims "Deprivation of Procedural Due Process in Violation of the APA and the Fifth Amendment to the U.S. Constitution." *Id.* at 30.  Count 4 asserts "Race Stereotyping and Conformity of Viewpoint in Violation of the APA and the President's OMB Directive." *Id.* at 31.  And, Count 5 lodges a claim for "Race Stereotyping and Conformity of Viewpoint in Violation of the APA and the President's Executive Order." *Id.* at 32.

The parties then engaged in supplemental briefing, pursuant to an Order of November 4, 2020.  ECF 19.  Defendants submitted a supplemental motion to dismiss (ECF 27), which incorporates defendants' earlier arguments regarding reviewability and subject matter jurisdiction. *Id.* at 5.  In addition, defendants assert that plaintiff has failed to state a claim and that all five counts warrant dismissal under Fed. R. Civ. P. 12(b)(6).  *Id.* at 3.  Superintendent Buck's Memorandum Report of November 12, 2020, is appended as an exhibit.  ECF 27-1.  I shall refer collectively to ECF 27 and to the prior the motion to dismiss (ECF 8) as the "Motion to Dismiss."

In response, plaintiff filed a supplemental opposition (ECF 29), along with exhibits.  ECF 29-1 to ECF 29-12.  The exhibits included his Show Cause Statement to the ASN (M&RA), dated November 19, 2020, filed in response to the Superintendent's Memorandum Report.  *See* ECF 29-8.  Defendants have replied.  ECF 30.

The parties' exhibits also include screenshots of various tweets, including some published by Standage and some that prompted his tweets, as well as others in response.  *See* ECF 11-1 at 2-36; *see also id.* at 36-52; ECF 11-2; ECF 11-3.  In addition, Standage has submitted two declarations.  *See* ECF 12-2 at 31-43; ECF 29-6.

The matter has been fully briefed.  An additional hearing is not necessary.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion to Dismiss, without prejudice, because the suit is premature; there is no final agency action and the suit is not ripe.  Accordingly, I shall deny the PI Motion, without prejudice.

## I.  Background

## A.  Factual Background[6]

1.

Standage is a twenty-one year old White male.  ECF 22, ¶¶ 2, 21.  He is in his fourth and final year as a student at the Academy.  *Id.* ¶ 2.

In high school, Standage excelled in his studies, graduating fourth in a class of almost 500 students.  ECF 12-2 at 32, ¶ 6.  Standage aspired to become a Navy pilot, and he gained experience with aviation at a young age, earning a "Private Pilot's License" by the age of seventeen.  *Id.* ¶¶ 4-5; *see* ECF 22, ¶ 23. Consistent with his goals, Standage turned down his admission to MIT and matriculated into the Naval Academy with 24 credits.  ECF 12-2 at 33, ¶ 8.

At the Academy, plaintiff has excelled academically.  He is an Aerospace Engineering major with "a 3.8 grade point average."  ECF 22, ¶ 24.  Moreover, plaintiff was on track to begin

---

[6]  The facts are taken from the allegations in the Second Amended Complaint and from the parties' submissions, including exhibits.

Consideration of inadmissible hearsay evidence is not barred on review of a motion for preliminary injunction.  "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), vacated on other grounds, ____U.S. ___, 137 S. Ct. 1239 (2017)); *see Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 753 (D. Md. 2020).

graduate-level education beginning in January 2021, *i.e.*, the spring semester of his senior year. *See id.*; ECF 12-2 at 33, ¶ 8.  He has also engaged in extracurricular activities related to aviation. *Id.* at 34, ¶ 10.  Until now, he has had no issues with respect to his character or conduct.  *See, e.g.,* ECF 12-2 at 33-34, ¶¶ 8-10; ECF 29-8 at 1.

In June 2020, Standage was "living at home" in California "and taking a USNA summer school class remotely."  ECF 12-2 at 35, ¶ 14; *see* ECF 22, ¶ 27.  Both of his parents have long served as police officers in the Los Angeles Police Department ("LAPD").  ECF 22, ¶ 21.  At the time, his parents were involved in the LAPD's response to what plaintiff terms "the 2020 Los Angeles Riots."  *Id.* ¶¶ 25-26.  Plaintiff alleges that during early June 2020, his parents responded to looting, vandalism, and rioting that was prompted by social unrest in connection with alleged police brutality towards persons of color.  Standage believed that his parents worked at great personal risk, as protestors "threatened to overtake a police station," made "plans to raid officers' homes," and attacked police officers "with rocks, bottles, bricks, urine and other means."  *Id.*

Los Angeles was not alone in experiencing unrest during the summer of 2020.  Many American cities were sites of protests and other forms of turmoil in the weeks following the horrifying death of George Floyd on May 25, 2020, at the hands of a Minneapolis police officer. *See, e.g.*, *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 821 (9th Cir. 2020).[7]  Floyd's death sparked widespread outcry against police killings of Black people, including

---

[7] The Ninth Circuit recently recounted: "On May 25, 2020, George Floyd was killed by a Minneapolis police officer while being arrested.  Bystanders on the sidewalk recorded videos of a police officer kneeling on Floyd's neck for several minutes while Floyd begged for his life.  A video showing the last minutes of Floyd's life . . . ignited protests across the country in support of the Black Lives Matter movement."  *Index Newspapers LLC*, 977 F.3d at 821; *see also United States v. Curry*, 965 F.3d 313, 346 (4th Cir. 2020) (Wilkinson, J., dissenting) ("The deaths of

Breonna Taylor in Louisville, Kentucky on March 13, 2020.  Although the outcry led to many

peaceful demonstrations, it also sparked various forms of lawlessness and property destruction.[8]

The Naval Academy expressly permits its members to "express their personal views on

public issues . . . via social media platforms, such as Facebook, Twitter, or personal blogs . . . ."

Notice 5720, ECF 11-3 at 35.  However, the midshipmen are instructed that, if a person is identified

by a social media site as a military member, he or she must indicate that "the views expressed are

those of the individual and not those of the Department of Defense . . . ."  *Id.*  Moreover, no post

or comment may violate the UCMJ or a "service regulation," nor may it be "prejudicial to good

order and discipline under the UCMJ."  *Id.*

During the period of social unrest in Los Angeles in June 2020, Standage was active on

Twitter.  *Id.* ¶¶ 28-39; ECF 8 at 3.[9]  Between June 7 and June 15, 2020, plaintiff published tweets

George Floyd, Eric Garner, and far too many others have been heartbreaking. They are crimes not
only against law but against humanity.")

[8] *See, e.g.*, Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, NEW YORK TIMES
(July 10, 2020), https://www.nytimes.com/article/george-floyd-protests-timeline.html (last visited
Dec. 5, 2020); Mike Brest & Zachary Halaschak, *George Floyd protests culminate in massive DC
assembly on Trump's doorstep*, WASHINGTON EXAMINER (Jun. 6, 2020),
https://washex.am/2zZwXc8 (last visited Dec. 5, 2020).

[9] In *Loughry*, 2020 WL 7483758 at *2, the Fourth Circuit provided a concise explanation
of Twitter:

Twitter is a social networking platform that allows a person to post and read short
messages called "tweets."  Tweets can be up to 280 characters long and can include
links to websites and other resources.  A Twitter user can also "follow" other
Twitter users, electing for those users' tweets to appear on his or her "home
timeline" or "feed."  The Twitter user can reply to a tweet with a comment, indicate
that the user "liked" a tweet by tapping a heart icon, and republish a tweet to the
user's own followers by "retweeting" it or quoting it.  Twitter can thus be, and often
is, used to receive news, to follow leaders and celebrities, or simply to stay in touch
with family and friends.

-8-

that commented on topics and current events related to race, police, social unrest, and the government's response to that unrest.  ECF 27-1 at 2.  Screenshots of tweets submitted by the parties show that plaintiff used a Twitter moniker of "Cheese Sandwich, @ChaseStandage."  ECF 8-4; ECF 11-1.  Notably, neither plaintiff's Twitter profile nor his tweets identified him as a midshipman at the Naval Academy or otherwise indicated his association with the Navy.  *See* ECF 22, ¶¶ 30, 65(b); ECF 12-4 at 15.[10]

On June 10, 2020, President Donald Trump, the Commander in Chief, posted a tweet that stated: "Domestic Terrorists have taken over Seattle, run by Radical Left Democrats, of course. LAW & ORDER!".  ECF 11-1 at 4; ECF 8-4 at 4.  In response, plaintiff published a tweet on June 10, 2020, stating, "Law and Order from 25,000 ft.," accompanied by an image that contains a cross hairs from the view of an aerial camera.  ECF 11-1 at 4; ECF 8-4 at 4; *see* ECF 12-4 at 15.

On June 11, 2020, Standage tweeted: "This is why the AGM-114 was invented.  I've never seen a more incompetent handling of violent, radical insurgents."  ECF 11-1 at 5; ECF 8-4 at 1;

---

Further, the Court observed that information on Twitter "can be displayed instantly with but a touch of a finger," and its use in facilitating the dissemination of information constitutes a "new reality."  *Id.* at *5.

[10] Standage has submitted copies of numerous screenshots of his tweets.  *See* ECF 11-1. But, he alleges that someone else originally created the screenshots.  Plaintiff asserts: "The persons who created the screen shots deliberately cut and pasted them in a manner intended to frame the tweets in the most negative context possible."  ECF 11, ¶ 28.  According to plaintiff, the creators of the screenshots did not capture the full context of the Twitter conversations in which Standage was participating when he published the tweets at issue.  *Id.*

However, even if plaintiff is correct that *some* degree of context was omitted, it is not the case that *all* context was omitted.  Virtually all of the screenshots submitted display other Twitter users' tweets, to which plaintiff was replying.  *See* ECF 11-1 at 2-36.

I note that defendants have submitted identical copies of screenshots of some of Standage's tweets.  Where both sides have submitted evidence of a tweet, I sometimes cite to both exhibits.

*see* ECF 12-4 at 15.[11]  According to a record from the Naval Academy's investigation, this tweet was in response to an article about "demands that civilians were making" to elected officials in Seattle, Washington.  ECF 12-4 at 14.

Another tweet advocated for the reduction of funding for police departments.  ECF 11-1 at 3; ECF 8-4 at 3; *see* ECF 12-4 at 14-15.  In reply, Standage tweeted on June 11: "Go ahead, cut funds to the police.  Community policing is expensive and timely, anyways.  Bullets, on the other hand, are cheap and in ready supply."  ECF 11-1 at 3; ECF 8-4 at 3; *see* ECF 12-4 at 14-15.

Also, in June 2020, an unidentified individual posted the following tweet: "Why is it taking so long for Breonna Taylor to receive her justice?"  ECF 11-1 at 29; ECF 8-3; *see* ECF 12-4 at 14.  On June 14, 2020, Standage tweeted in response: "Her justice was received on March 13, 2020."  ECF 11-1 at 29; ECF 8-3; *see* ECF 12-4 at 14.  That corresponds to the date that twenty-six year old Taylor was tragically shot to death in her home by police in Louisville, Kentucky, who had entered the residence with a search warrant "to investigate a suspected drug dealer who was purportedly associated with the residence."  *United States v. Brinkley*, 980 F.3d 377, 391 n.8 (4th Cir. 2020).[12]

---

[11] Presumably, "AGM-114" refers to the "HELLFIRE" missiles used by the U.S. military.  *See* U.S. Army, HELLFIRE Family of Missiles, https://asc.army.mil/web/portfolio-item/hellfire-family-of-missiles/ (last accessed October 26, 2020); Fed. R. Evid. § 201(a).

[12] According to one account, a police officer was shot in the leg by Ms. Taylor's boyfriend, who apparently thought Ms. Taylor's ex-boyfriend was breaking in.  In response, the police officers executing the raid fired several shots, striking Ms. Taylor multiple times.  *See* Richard A. Oppel Jr. et al., *What to Know About Breonna Taylor's Death*, THE NEW YORK TIMES (Oct. 30, 2020), https://www.nytimes.com/article/breonna-taylor-police.html (last accessed Dec. 11, 2020).

No drugs were found in the residence.  Nor was the suspect at the residence.  *Brinkley*, 980 F.3d at 391 n.8.

Another twitter user posted the following: "#antifa extremists have occupied the Capital Hill area in Seattle . . . ." ECF 11-1 at 6; ECF 8-4 at 5.  In response, Standage tweeted: "All it takes is one drone strike…"  ECF 11-1 at 6; ECF 8-4 at 5.  The exact date on which Standage published this tweet is unclear, but it is undisputed that it fell within the one-week time period of his other tweets.  And, a tweet from another individual, directed to the Mayor of Los Angeles, stated: "Do you remember letting police officers kill unarmed people?"  ECF 11-1 at 7; ECF 8-4 at 6; *see* ECF 12-4 at 15.  On June 13, Standage responded: "If he let them do that, these riots would've been over a whole lot quicker."  ECF 11-1 at 7; ECF 8-4 at 6; *see* ECF 12-4 at 15.

Other tweets by plaintiff responded to characterizations of the experiences of Black Americans.  For example, an individual posted a tweet stating: "Black people have lived with NOTHING but adversity, when their forefathers were forced into labor to make white men rich, they must have amassed a whole lot of character."  ECF 11-1 at 32; *see* ECF 12-4 at 14.  On June 7, Standage tweeted in reply: "Splendid, then they should also have good work ethic and no need for welfare programs."  ECF 11-1 at 32; *see* ECF 12-4 at 14.  Another tweet from an unidentified individual referenced a gap of $123,000 between the "median wealth" of White families and Black families, stating it is not a result of "black people 'being lazy.'"  ECF 11-1 at 33; *see* ECF 12-4 at 14.  On June 11, Standage tweeted in response: "Amazing what you can do when you save your money and innovate."  ECF 11-1 at 33; *see* ECF 12-4 at 14.

On June 15, Standage also published a tweet critical of the special treatment that the Naval Academy allegedly accords its football team.  ECF 11 at 39; *see* ECF 12-4 at 15.  According to plaintiff, that tweet "caused certain members of the team to go on a crusade against [him] and triggered months of harassment."  ECF 12-2 at 36, ¶ 19.  Further, plaintiff asserts that a Naval

-11-

Academy Staff Sergeant associated with the football team "pledged to the team that [Standage] would not make it back to the Academy." *Id.*

2.

Naval Academy leadership promptly initiated an investigation into Standage's tweets. ECF 12-4 at 13.  The investigation and subsequent disciplinary proceedings apparently were governed by the requirements of the Administrative Performance and Conduct System Manual of the Naval Academy ("Conduct Manual").  ECF 8-8; *see* ECF 12-4 at 13; ECF 27 at 10.[13]

The Conduct Manual establishes rules of conduct for midshipmen at the Academy.  *See, e.g.*, *Turner v. Spencer*, 335 F. Supp. 3d 72, 75 (D.D.C. 2018); *Daniels v. United States*, 947 F. Supp. 2d 11, 13 (D.D.C. 2013).  The Conduct Manual appears to derive authority from statutes and Navy rules and regulations. Section § 1.1(a) states: "Authority. 10 U.S.C. § 8462; Article 2, UCMJ; Rule for Courts-Martial 306; JAGMAN §§ 102-104; USNAINST 1610.6 (series)."  And, Article 2 of the UCMJ, codified at 10 U.S.C. § 802, states that "midshipmen" are among the "persons . . . subject to [the UCMJ]."

---

[13] The copy of the Conduct Manual submitted by defendants is dated July 27, 2020, *i.e.*, after preparation of the preliminary inquiry report at issue here.  *See* ECF 8-8 at 1; ECF 12-4 at 13. But, plaintiff does not contend that a materially different version of the Conduct Manual was in effect at the relevant time.

However, plaintiff asserts: "The investigation of MIDN Standage's tweets did not begin under the auspices of the Administrative Conduct System; it began as a "JAGMAN" investigation. ECF 12 at 12.  JAGMAN, plaintiff explains, "is the Manual of the Judge Advocate General of the Department of the Navy. Investigations are governed by Chapter II, Part C of the JAGMAN."  *Id.* at 12, n.17.  Standage does not cite any evidence in support of the assertion.  Nor does he indicate the legal significance of his assertion.  And, he has not identified the distinctions between a JAGMAN investigation and a Conduct Manual investigation.

-12-

The current version of the Conduct Manual was authorized by Commandant of Midshipmen Instruction 1610.2K, dated July 27, 2020. *See* ECF 8-8 at 1.

Section 1.1(c) of the Conduct Manual, titled "Purpose," states:

(1) The Conduct [Manual] is intended to be remedial and educational, and provides the foundational and practical guide for expected midshipman behavior. . . . Each midshipman must have a strong moral conviction to uphold the highest standards and ideals of the Naval Academy . . . .

(2) Midshipmen are expected to comport their behavior with the expectations and spirit of the Conduct System . . . . The Conduct System will serve to hold midshipmen accountable to the standards set forth in the Uniform Code of Military Justice (UCMJ), Midshipmen Regulations (MIDREGS), other USNA instructions and regulations, U.S. Navy instructions and regulations, and federal, state, and local laws during their time at the Naval Academy. . . .

Section 1.2, "Standards of Performance," elaborates on these introductory themes. It states: "A midshipman's dedication, commitment to excellence, and exemplary standard of conduct apply both on and off duty, in personal behavior, and in relations with all others. Midshipmen must comply with the substance, spirit, and intent of all directives." *Id.* § 1.2.

Notably, as to various violations, the Conduct Manual provides for "non-punitive measures," including "extra military instruction (EMI), counseling, administrative withholding of privileges, and remediation." *Id.* § 1.1(d). Chapter 8 of the Conduct Manual addresses "Conduct Remediation." *Id.* at 57. Section 8.1 states that "midshipmen whose misconduct is attributed to a lack of compliance with governing regulations," including the UCMJ, Navy regulations, and Academy regulations, may receive "a tailored Conduct Remediation Program."

Section 8.4(a) explains: "Conduct remediation is not a sanction; it is an opportunity for a midshipman to receive additional guidance and mentorship to correct their deficiencies." Plaintiff was not afforded the opportunity for remediation, however.

-13-

According to § 8.4.2, conduct remediation involves at least four components: (a) an "initial counseling session"; (b) a "Midshipman Development Plan . . . to establish both personal and professional goals for the remediation; (c) a weekly meeting of the midshipman and the remediator; and (d) a final essay, "no less than four pages in length (double-spaced with 1-inch margins)."   In addition, "the remediator may require the midshipman to complete weekly assignments," such as "keep[ing] a weekly journal, writ[ing] essays, or read[ing] books or articles for further discussion.  *Id.*

As to the final essay, the Conduct Manual provides, *id.*:

The essay should document the progress the midshipman has made: where they started, everything they have learned, how they have changed, and their understanding post-remediation. It should relate to their duties as a midshipman and potential career as a future Naval or Marine Corps Officer. It should clearly show that the midshipman understands the concept of remediation and how it will relate to success in the future as an officer.

Violations regarded as serious may receive "disciplinary measures."  *Id.* § 1.1(d). Nevertheless, disciplinary measures under the Conduct Manual are "less serious than non-judicial punishment under Article 15, UCMJ [10 USC 815] or trial by courts-martial."  *Id.* at 6-7 (brackets in original).   Moreover, the Conduct Manual indicates that Naval Academy disciplinary proceedings conducted under its auspices are "purely administrative in nature." *Id.* at 7.

Chapter 2 of the Conduct Manual is titled "Specific Conduct Offenses."  *Id.* at 11.  Echoing § 1.1(c)(2), quoted above, § 04.21 incorporates the UCMJ and other Navy rules and regulations, as well as other generally applicable laws.  ECF 8-8 at 16.  That is, any violation of the "UCMJ, Navy Regulations, SECNAV and OPNAV 6K/Major Instructions, General Orders, federal, state, or local laws" constitutes an offense under the Conduct Manual.  *Id.*  The Conduct Manual

classifies a § 04.21 offense, violation of UCMJ, as "6K/Major." *Id.* But, conduct unbecoming a midshipman is found in 04.23. ECF 8-8 at 17.

In Chapter 3, the Conduct Manual addresses "Procedures for Reporting, Investigating, and Adjudicating Offenses." *Id.* at 21. Chapter 4 is titled "Disciplinary measures: Rules And Explanations." *Id.* at 34. Notably, it reflects that even for a 6K major offense, separation is not required. The Chapter provides: "Not every offense should necessarily result in the award of the maximum possible sanctions." *Id.* Indeed, it provides for "the lowest appropriate level consistent with good order and discipline." *Id.* However, § 4.7 provides that, "[o]n a case-by-case basis, the Commandant may recommend to the Superintendent that a midshipman found unsatisfactory in conduct be separated from the Naval Academy." *Id.* at 44.

Chapter 5 is titled "Duties and Responsibilities." It speaks to the roles of those involved in Academy adjudications and to the rights of the accused. *Id.* at 45.

The procedures for discharge of a midshipman from the Naval Academy are governed by statute and implemented through various Navy rules and regulations, as well as the Conduct Manual. Section 8462 of 10 U.S.C. provides, in part:

> (a) The Superintendent of the Naval Academy shall submit to the Secretary of the Navy in writing a full report of the facts—
>     (1) whenever the Superintendent determines that the conduct of a midshipman is unsatisfactory;
> \*\*\*
> (b) A midshipman upon whom a report is made under subsection (a) shall be given an opportunity to examine the report and submit a written statement thereon. If the Secretary believes, on the basis of the report and statement, that the determination of the Superintendent or of the Academic Board is reasonable and well founded, he may discharge the midshipman from the Naval Academy and from the naval service.

The parties refer to the "full report of the facts" submitted by the Superintendent as the "Memorandum Report." And, they refer to the "written statement" submitted by the midshipman as the "Show Cause Statement."

Thus, under § 8462, it appears that the Secretary of the Navy has the ultimate authority to determine whether to "discharge" plaintiff from the Naval Academy and the Navy. However, as defendants indicate, the Secretary of the Navy has delegated the § 8462 authority to the Assistant Secretary of the Navy (Manpower & Reserve Affairs). ECF 8 at 2, n.1; *see* ECF 8-1; ECF 8-2.

Section 8461 of 10 U.S.C. establishes similar, though distinct, requirements for "dismissal" when "the continued presence of any midshipman at the Academy is contrary to the best interests of the service." However, the defendants do not appear to rely on this provision.

The initial investigation into Standage's tweets was conducted under § 3.2 of the Conduct Manual. This section requires a "Preliminary Investigative Officer" ("PIO") tasked with investigating conduct offenses to prepare a "Preliminary Inquiry Report" ("PIR"). ECF 8-8 at 22. In preparing the PIR, the PIO must "interview all relevant witnesses, including the accused midshipman," and "collect all applicable documents." *Id.* at 22-23. The PIO must complete the investigation within five days "of assignment." *Id.* at 22. But, the "summary, synopsis, and statements of a PIO in a PIR are not evidence." *Id.* at 23.

Thomas Buchanan, Commandant of Midshipmen ("Commandant"), appointed Lieutenant Kelsey Lee as the "Preliminary Inquiry Officer." She was instructed to submit a report to Superintendent Buck. ECF 12-4 at 13. In the PIR (ECF 12-4 at 13-16), dated June 26, 2020, Lee recommended that Standage "be held appropriately accountable for his online conduct." *Id.* at 16.

The PIR states that on June 15, 2020, "some of . . . Standage's tweets began to go viral." *Id.* at 14. Over the following days, "several midshipmen contacted their chain of command to

report the tweets." *Id.* Further, the PIR provides: "Over 40 tweets were captured via screenshot and sent in for the purpose of" the PIR. *Id.* In preparing the PIR, Lee also conducted eleven interviews. *Id.* at 13; *see also id.* at 17-28 (interview summaries). Standage "invoked his right to remain silent." *Id.*

Several of Standage's tweets are included in the PIR. *Id.* at 14-15. With respect to the tweet about Breonna Taylor, the PIR stated that Standage "demonstrated a total lack of empathy for the loss of innocent life." *Id.* at 16. Moreover, Lee characterized Standage's comment as "callous and insensitive. . . ." *Id.* As to the tweets about the wealth gap between White and Black Americans, Lee reasoned: "Regardless of what [Standage's] intent may have been, that comment . . . would leave a reasonable person with the impression that he is biased against people of color." *Id.* And, with respect to the "AGM-114" and "drone strike" tweets, the PIR concluded: "Standage appeared to suggest the use of military weapons systems against the civilian population. This is highly inappropriate based on his trusted position as a member of the armed forces and future naval officer who could be called upon to support civil authorities." *Id.*

The PIR indicated, based on interviews, that plaintiff "was experiencing significant stress during the timeframe of the tweets." *Id.* at 15. Moreover, the PIR reported that, after the tweets went viral, plaintiff "received significant backlash including hate mail and alleged death threats," and he deleted his Twitter account. *Id.*

With respect to whether plaintiff's social media presence indicated an association with the Navy, the PIR stated, *id.* at 16:

> Additionally, it does not appear that MIDN Standage had a disclaimer on his Twitter page. Although it is unclear whether or not his Twitter account associated him with the Navy, his Instagram page (which had the same handle) said he was a midshipman studying Aerospace Engineering. However, it is clear that several members of the Brigade and public understood his affiliation with the Navy and

-17-

USNA; therefore, it is a reasonable inference that this account associated him with the Navy.

However, there is no indication in plaintiff's tweets that he referenced his association with the Navy.  Moreover, it is not clear why Lee was unable to determine whether plaintiff's Twitter account associated him with the Navy.  That Lee could not readily determine the answer seems to suggest that plaintiff did not identify himself with the Navy.

In addition, the PIR summarized takeaways from ten interviews with plaintiff's peers and professors at the Academy.  The summaries indicate that plaintiff had expressed that, at the time of his tweets, he was distressed because his parents, as police officers, faced physical danger from those opposed to the police or the loss of their livelihoods from calls to "defund the police."  *See* ECF 12-4 at 19-20.  The PIR also describes interviewees' reactions to or comments about Standage's tweets.  *See id.* at 24-38. Some interviewees stated that they did not believe that plaintiff "is racist," *id.* at 22, or that he "held racist ideals." *Id.* at 23-24, 26.

Standage was subsequently charged with violations of § 02.04 and § 04.21.  *See* ECF 8-6 at 1; *see also* ECF 8-7 at 1; ECF 29-4.  Section 02.04 makes it an offense to violate a "local instruction, regulation, or notice."  And, § 04.21 makes it an offense to violate the UCMJ.  The basis for the § 04.21 charge was plaintiff's alleged violation of Article 133 of the UCMJ, 10 U.S.C. § 933 ("Article 133").  *See* ECF 8-6 at 1.   And, he was also charged with a violation of Notice 5720.

As to § 04.21, and the alleged violation of Article 133 of the UCMJ, Article 133 states: "Any commissioned officer, cadet, or midshipman who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct."  Notably, plaintiff has not been subjected to a court martial.  Rather, the proceedings are administrative in nature.

Although plaintiff was charged under § 04.21, which encompasses UCMJ § 133, § 04.23 of the Conduct Manual specifically prohibits "[c]onduct unbecoming a midshipman."  ECF 8-8 at 17.[14]  It states:

> Conduct unbecoming a midshipman means action or behavior in an official capacity which, in dishonoring or disgracing the person as a midshipman, seriously compromises the midshipman's character, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the midshipman personally, seriously compromises the person's standing as a midshipman. There are certain moral attributes common to the ideal midshipman, a lack of which is indicated by acts of dishonesty, unfair dealing, indecency, indecorum, lawlessness, injustice, and cruelty. Not everyone is or can be expected to meet unrealistically high moral standards, but there is a limit of tolerance based on customs of the Service and military necessity below which the personal standards of a midshipman cannot fall without seriously compromising the person's standing as a midshipman.

As indicated, Standage was also charged with violating Notice 5720, which concerns the political activities of midshipmen.  ECF 11-3 at 35.[15]  Notice 5720 states that, pursuant to a Department of Defense ("DOD") directive, "active duty personnel may not engage in partisan political activities and should avoid the inference that their political activities imply DOD sponsorship, approval, or endorsement. . . ."  *Id.*  Attendance at political campaign events while in uniform is prohibited.  *Id.*

The Notice also contains a section about "Social media." In relevant part, it provides, *id.* (emphasis added):

> *Military personnel may generally express their personal views on public issues . . . via social media platforms, such as Facebook, Twitter, or personal blogs, much* the same as they would be permitted to write a letter to the editor of a newspaper. *If, however, personnel are identified by a social media site as military members, the*

---

[14] The parties have not drawn the Court's attention to § 04.23, nor have they explained why Standage was charged under § 04.21, rather than § 04.23.

[15] It appears from the exhibits that Notice 5720 was issued on August 21, 2019, and a virtually identical version was issued one year later, on August 26, 2020.  *See* ECF 11-3; ECF 8-5.

*posting must clearly and prominently state that the views expressed are those of the*
*individual and not of the Department of Defense. . . .* As always, *members of the*
*military must also be careful not to* comment, post, or link to material that violates
the . . . [UCMJ] or service regulation.  Examples include showing contempt for
public officials . . . or *posting unprofessional material that is prejudicial to good*
*order and discipline under the UCMJ.*

Through counsel, plaintiff responded at length to the charges.  ECF 22, ¶¶ 63-64; *see* ECF

12-2 at 6-29.   He advanced, *inter alia*, arguments regarding the constitutionality of the

proceedings.  ECF 12-2 at 23.  In addition, plaintiff expressed a "heartfelt apology" and indicated

that he "stands ready to issue a public apology if the Command deems it appropriate."  *Id.* at 21.

Moreover, Standage stated that he "stands ready to participate in the Respect and Dignity

Remediation Program."  *Id.*

On August 6, 2020, plaintiff appeared at a hearing before Deputy Commandant of

Midshipmen, Captain Robert Matthewson.  ECF 8 at 3; ECF 8-6; ECF 22, ¶¶ 5, 65-66.  At oral

argument on the PI Motion, the Court was advised that there is no recording or transcript of the

hearing, despite its importance.  But, defendants submitted an "Adjudication Script," a typed

document of prepared text, along with markings and handwritten notations.  ECF 8-6.  It appears

to contain at least some of what was said at the hearing.  *Id.* at 1-8.

The document shows that Standage pleaded not guilty to the charges under § 02.04 (6K)

and § 04.21(6K).  ECF 8-6 at 3.  As noted, § 02.04 charged, *inter alia*, violation of a notice.  *Id.* at

1.  And, § 04.21 charged, *inter alia*, violation of the UCMJ.  *Id.*  Plaintiff also made an opening

statement.  *See* ECF 8-6 at 3.  Although no attorney was allowed to appear with plaintiff, the

document reflects that plaintiff "read" from his attorney's submission.  *Id.*  Standage apologized

for his "posts" and explained that he was under a great deal of stress because his parents are police

-20-

officers.  *Id.*  He also stated that he never identified himself on Twitter; that he is concerned about "what divides" people; and that he has been bullied and threatened.  *Id.*

Three character witnesses appeared on plaintiff's behalf.  *Id.*  Two are professors.  They spoke of plaintiff's excellent academic performance, and one said he would "rather have Chase in ready room than any 2020 grad."  *Id.*  The other had known plaintiff for three years and described him as a mentor with a "solid character" and no prior evidence of any "racist behavior."  *Id.*

In a typed section summarizing plaintiff's "conduct offenses," the document states, *id.* at 1:

> Several of your posts went viral, garnering yourself and USNA significant negative attention, as it became clear through the use of your name on your account and other identifying information that you are a Midshipman.  The rest of your post history also came under scrutiny at that time, causing reactions among the Brigade of Midshipmen that were severely disruptive.

In the typed summary of "conduct offenses," the document references plaintiff's tweet concerning Breonna Taylor.  Moreover, it notes that the tweet referenced the date when Ms. Taylor was killed by police who were "mistakenly executing a no-knock warrant on the wrong home."[16]

---

[16] The death of Ms. Taylor was terribly tragic.  And, the raid may have been botched or based on inaccurate information.  Unfortunately, such mistakes are sometimes made, for various reasons.  *See*, *e.g.*, Maria Cramer, *Chicago Mayor Apologies to Social Worker Who Was Handcuffed Naked*, THE NEW YORK TIMES (Dec. 17, 2020), https://www.nytimes.com/2020/12/17/us/chicago-police-raid-anjanette-young.html (discussing forced entry based on erroneous information from a confidential informant).

But, it appears that the police had obtained a warrant to search Ms. Taylor's residence.  By stating that the police "mistakenly" executed the warrant for "the wrong home," it suggests that a representative of the USNA concluded, erroneously, that the entry itself was unauthorized.

The Deputy Commandant found Standage guilty of both charges.  ECF 8-6 at 5.  The "Sanctions Worksheet" indicates that plaintiff received 100 demerits, a "restriction" for sixty days, and a "loss of privileges."  *Id.* at 6.  It also states, *id.*: "FORWARD FOR SEPARATION."  Section 3.5(b)(4)(c) of the Conduct Manual provides that a "[r]ecommendation for separation" may follow a hearing regarding unsatisfactory conduct.  ECF 8-8 at 31-32.

Standage contends that the outcome of his adjudication was "predetermined."  ECF 12-2 at 42, ¶ 40.  According to plaintiff, Captain Matthewson twice referred to plaintiff's written response to the PIR as a "'funny little document.'"  *Id.* at 40-41, ¶¶ 32, 37.  And, among other things, plaintiff claims that Matthewson asserted that "any logical person would think that [plaintiff] is a racist."  *Id.* at 40, ¶ 35.  In addition, although Standage's tweets never mentioned his affiliation with the Navy, he asserts that at the hearing Matthewson stated: "[I]f someone on twitter had wanted, he or she could seek out and find [plaintiff's] private Instagram account, which has USNA material on it, and then reasonably deduce that [plaintiff's] statements are the official thoughts and opinions of the DOD."  ECF 12-2 at 40, ¶ 33.

Standage sought reconsideration.  ECF 8-7.  But, he asked Commandant Buchanan to recuse himself from that process.  *Id.*  Buchanan agreed to the recusal.

Plaintiff explains the basis for his recusal request.  Standage suggests that the Academy leadership harbored hostility and animus towards him based on their "embrace" of the Black Lives Matter movement.  *See* ECF 29-8 at 2.  In his view, this has led to a "pernicious assault" on the First Amendment.  *Id.* at 3.

Moreover, Standage points out that the Commandant's daughter and mother had expressed strong views on Twitter on the topics at the heart of Standage's tweets.  ECF 22, ¶¶ 41-48.  Plaintiff submitted screenshots showing the Twitter profile and individual tweets of the Commandant's

daughter.  *See* ECF 11-3 at 29.  One screenshot shows that the daughter's Twitter profile states: "acab and abolish ice."  *Id.*  Standage asserts that "acab" is an abbreviation for "All Cops Are Bastards" and that "ice" is the abbreviation for the U.S. Department of Immigration and Customs Enforcement.  ECF 22, ¶ 41; *see* ECF 29-8 at 2.  Another screenshot shows a tweet from Buchanan's daughter that reads: "I don't feel safe with boys like Chase Standage protecting this country.  Kick his ass out."  ECF 11-3 at 31.  In addition, Standage alleges that the Commandant's mother published a tweet that "endorsed her granddaughter's view that the Naval Academy should 'kick [MIDN Standage's] ass out.'"  ECF 22, ¶ 46 (brackets in Second Amended Complaint); *see* ECF 11-3 at 33.

Standage's request for reconsideration was reviewed by James Bates, the Deputy Superintendent and Chief of Staff.  *Id.  See Office of the Superintendent*, U.S. NAVAL ACADEMY, https://www.usna.edu/PAO/Superintendent/ (last visited December 4, 2020).  On September 2, 2020, Bates denied plaintiff's request for reconsideration.  ECF 8-7.

The Chief of Staff concluded that plaintiff was not subjected to "impermissible viewpoint discrimination. . . ."  *Id.*  Upon a review of the evidence, Bates said, *id.*:

> I do not find that your First Amendment rights were violated.  Midshipmen are encouraged to be engaged citizens and are permitted to express personal political opinions, as long as they do so in a professional and respectful manner. The issue with your social media comments was in the manner in which you expressed your opinions, not necessarily with your opinions themselves.  You are not being punished for your beliefs, but for the fact that you failed to express them in [a] way that is consistent with our Navy core values.

Then, on September 10, 2020, Chief of Staff Bates conducted a "personal interview" with Standage.  *See* ECF 8-9.  After the interview, the Chief of Staff issued a "Memorandum for the Superintendent," in which he recommended that "Standage be disenrolled from the Naval

Academy." *Id.* According to Standage, Bates's view of the case was also "predetermined." ECF 12-2 at 42, ¶ 40.

Thereafter, Superintendent Buck received materials pertaining to plaintiff's case, including the PIR, plaintiff's "record," submissions by plaintiff's counsel, character witness statements, and "inputs from the chain of command." ECF 27-1. The Superintendent interviewed plaintiff for approximately seventy-five minutes on September 23, 2020. ECF 22, ¶ 67; ECF 27-1 at 2. After the interview, Superintendent Buck decided to recommend to the ASN (M&RA) that Standage be separated from the Academy, pursuant to 10 U.S.C. § 8264. ECF 27-1 at 4.

On September 25, 2020, Standage was "pulled out of class . . . and was ordered to immediately start the checkout process." ECF 12-2 at 42, ¶ 44. Standage protested, noting that he had not received Superintendent Buck's Memorandum Report to the ASN (M&RA), as required by 10 U.S.C. § 8462. *See id.* at 43. In response, plaintiff was told: "They wanted the process to be accelerated and that [Standage] was to be removed from the Academy and [his] studies ASAP." *Id.* Defendants acknowledge that by September 30, 2020, Standage "had been orally notified that he would be processed for separation." ECF 8 at 1.

On November 12, 2020, the Superintendent issued his Memorandum Report. ECF 27-1. The document describes Standage's tweets, the prior disciplinary proceedings, and the Superintendent's interview of plaintiff. *Id.* It references "(a) . . . 1610.2J (Administrative Conduct System)"; "(b) . . . Note 5720 (Political Activities of Midshipmen)"; and "(c) 10 U.S.C. § 8462." *Id.* at 1. Of significance, Buck stated: "I have determined that MIDN Standage's conduct was

-24-

unsatisfactory and therefore recommend he be disenrolled in accordance with reference (c)." *Id.* at 2.[17]

The Superintendent recounted that Standage posted over 40 tweets between June 7 and June 15, 2020, which "contained crude, incendiary commentary" and were "picked up by civilian news outlets" when the tweets "began to go viral . . . ." *Id.* at 2.  Further, he stated, *id.* at 2-3: "Even when viewed in the light most favorable to MIDN Standage, the tweets were unprofessional, unbecoming an officer and a gentleman, and service discrediting.  As a first class midshipman at USNA who has had three years of training and instruction on Navy standards and leadership expectations, MIDN Standage should have known that the manner in which he was publicly commenting on sensitive topics would be perceived as offensive and inflammatory, seriously compromising his standing as a midshipman." *Id.* at 2-3.

Buck acknowledged that Standage "is permitted to express his viewpoints on public issues." *Id.* at 3.  But, Buck stated that Standage "is expected" to do so "in a professional manner in line with Navy Core Values." *Id.*  In his view, plaintiff's comments "could reasonably be interpreted as suggesting that Black Americans are lazy" and that "the military should indiscriminately use missile and drone strikes against American citizens," which "undermines good order" and "erodes public trust in our military's officer corps." *Id.*

The Superintendent recognized that plaintiff had been "an otherwise successful midshipman," and acknowledged that Standage's "jarring public statements" were out of character. *Id.*  Moreover, he recognized that plaintiff "was articulate, sincerely apologetic and did

---

[17] As indicated, reference (c), identified at the top of the Memorandum Report, refers to 10 U.S.C. § 8462.  *Id.* at 1.

not contest the unprofessional nature of his comments." *Id.* at 3. Indeed, plaintiff stated that he was "'deeply ashamed' of his actions" and knew that they were "wrong." *Id.*

In addition, the Superintendent recognized that Standage "was clearly under a great deal of stress when he made the statements in question." Nevertheless, the Superintendent found that plaintiff's "response to a stressful situation is deeply troubling." *Id.* He noted that an officer in the Navy or Marine Corps "is faced with countless stressful situations . . . ." *Id.* He added: "MIDN Standage, when faced with anxiety and pressure, forgot his three years of training on how to remain poised and professional under fire, and instead publicly lashed out with divisive, harmful rhetoric." *Id.* Buck stated: "I cannot in good faith risk placing MIDN Standage in more challenging situations, where, as an officer, the cost of his failure could be people's lives." *Id.*

Further, Buck found it "unsettling" that plaintiff's comments were "callous," reflecting a "disregard [for] the value of human life." *Id.* With respect to the tweets regarding the response to lawlessness and rioting, the Superintendent reasoned, *id.* at 3-4:

> MIDN Standage was not only advocating a flippant use of military weapons, but he was advocating for using them indiscriminately against civilians in a domestic context. . . . The American public trusts institutions such as USNA to only grant the privilege of commissioning officers to those individuals who appreciate the immense gravity of using lethal force. In my professional opinion, flippantly stating that such force should be used against fellow Americans erodes the public's trust in the military, and is disqualifying for a military officer.

According to Buck, plaintiff had explained that "his tweets regarding missile strikes and drone strikes against protesters were hyperbolic, and meant to simply express his displeasure that some protests had evolved into riots and looting." *Id.* at 4. The Superintendent reasoned: "While his viewpoint condemning violent riots is certainly something he is free to express, his choice to articulate it in the manner that he did – suggesting the use of lethal military force was an appropriate response – severely harms the public's trust in our military." *Id.*

In Buck's opinion, plaintiff "could have constructively discussed his views on race relations in America, [on] the role of the military in supporting law enforcement, and [on] disapproval of riots . . . ." *Id.*   Instead, plaintiff "chose to discuss these topics in a crude, inflammatory manner that reflected poorly on himself, USNA, and the Navy." *Id.* at 4.  Altogether, Buck concluded that plaintiff's "reckless public comments interfere with the orderly accomplishment of our mission at USNA and jeopardize discipline and morale within the Brigade of Midshipmen." *Id.*   Buck added: "I do not have confidence in his potential to lead sailors or Marines as a commissioned officer." *Id.*

Notably, Buck indicated that he had considered a rehabilitation program for plaintiff. *Id.* However, Buck "ultimately determined that if three years of training were insufficient to develop [plaintiff] as a leader of character, then additional remediation efforts would unlikely be successful." *Id.*   In this regard, Buck pointed out that the tweets were not the product of "a momentary lapse of judgment," because they took place during the course of a week. *Id.*[18]

In response, plaintiff's attorney filed a Show Cause Statement.  ECF 29-8.  In a fifteen-page, single spaced submission to the Assistant Secretary, counsel argues that the Memorandum Report is neither reasonable nor well founded, and he urges the Assistant Secretary to reject it "categorically . . . ." *Id.* at 1.

---

[18] Buck did not explain in his Memorandum Report why other midshipmen, who were also provided with Navy training, nonetheless were suitable for remediation for their transgressions. Moreover, given the posture of the case, no evidence has been presented as to the frequency with which the Superintendent seeks discharge of a midshipman, or the kinds of offenses that typically lead to such action.  In other words, there is nothing in the record to indicate whether the effort to discharge plaintiff is consistent or inconsistent with the penalties generally meted out at the Academy.

-27-

Among other things, the Show Cause Statement challenges the constitutionality of the adjudication process.  Plaintiff maintains that, as a matter of law, his speech did not violate either Notice 5720 or Article 133 of UCMJ.  As to Notice 5720, plaintiff contends that he did not reveal his association with the Navy in any of his tweets, per the instruction of Notice 5720.  ECF 29-8 at 5.  And, plaintiff maintains that his tweets did not breach Notice 5720's prohibition against speech that is "prejudicial to good order and discipline under the UCMJ."  *Id.*  In Standage's view, case law precludes the penalization of his speech because his tweets were not directed at military members or "intended to foment dissent within the ranks."  *Id.*

As to Article 133 of the UCMJ, plaintiff characterizes the application of the "conduct unbecoming" standard as "vague, undefined, [and] constantly-shifting."  *Id.* at 6.  In his view, Academy officials have unlawfully relied on Article 133 to penalize him because they disagreed with what he said.  *Id.* at 6-7.

 "Selection Day" was held at the Academy on November 19, 2020, a few days after Buck issued his Memorandum Report.  ECF 29-6 at 2.  That day, Standage "discovered" that he was "on the email list for those selected for Navy Pilot" and that he "had been scheduled for aviation medical exams."  *Id.*  However, he learned from his Company Officer that he had not received a "service selection due to [his] pending lawsuit and separation from the Naval Academy."  *Id.*

Through counsel, plaintiff submitted his Show Cause Statement to the ASN (M&RA) on November 19, 2020.  The Show Cause Statement presents substantially similar arguments to those plaintiff has advanced in this litigation.  *See id.* at 5-14.

To my knowledge, the matter is now pending before the Assistant Secretary.  If discharged from the Naval Academy, plaintiff will be obligated either to serve on active duty in the Navy for three years or to reimburse the Navy for the cost of his education at the Academy, valued at

approximately $174,000.  ECF 27-1 at 5.  Standage has indicated to Academy officials that, if discharged, he would choose the latter course.  *Id*. at 3.

3.

The Second Amended Complaint, like the Complaint and the Amended Complaint, includes allegations about developments at the Naval Academy and within the Naval Academy community that were not formally part of plaintiff's disciplinary proceedings.  The Second Amended Complaint repeatedly references the "monolithic" view of what constitutes racism, adopted by Naval Academy leadership and imposed on all students.  *See, e.g.*, ECF 22, ¶¶ 10, 12, 64, 68, 74.  Standage characterizes the leadership's views as "authoritarian, militantly intolerant pro-[Black Lives Matter] and pro-Anti-Racist."  *Id.* ¶ 68.  In support, plaintiff points not only to his own disciplinary process, but also to statements about racism, diversity, and inclusion that the leadership has made to the Academy community.  *See id.* ¶¶ 52-61.

To illustrate, plaintiff alleges: "The Superintendent has released a video and public statements that readily demonstrate the extent to which he is a true believer in the woke culture and its insistence that 'systemic' racism permeates the Naval Academy."  *Id*. ¶ 57.  Further, plaintiff avers that on September 17, 2020, Superintendent Buck told Academy officers involved in "recruitment and candidate vetting" that "they were 'the wrong color and the wrong sex' and that they had 'better do something about it.'"  *Id.* ¶ 59.  Standage adds that on September 9, 2020, the Superintendent issued a statement to the Academy community announcing a new initiative to "'investigate and address any practices at the Naval Academy that ***perpetuate systemic racism***.'"  *Id.* ¶ 60 (emphasis in original).  According to Standage, the statement was accompanied by a video "featuring various midshipmen" discussing "their allegiance to Black Lives Matter."  *Id.*

In addition, Standage notes that other midshipmen have expressed "[e]xtreme animosity towards police" over Twitter. *Id.* ¶ 40. He has submitted screenshots of tweets allegedly issued by midshipmen that evince such animosity. One such screenshot displays a tweet that states: "I hope [t]hey burn down the entire city of Louisville." ECF 12-4 at 4. According to plaintiff, this tweet was published in response to the Kentucky Attorney General's announcement on September 23, 2020, indicating that the officers who conducted the Breonna Taylor raid were justified in shooting into her apartment. ECF 12 at 11-12; *see also* Kevin Williams, *Kentucky grand jury declines to file homicide charges in death of Breonna Taylor*, THE WASHINGTON POST (September 23, 2020), https://www.washingtonpost.com/national/kentucky-grand-jury-declines-to-file-homicide-charges-in-death-of-breonna-taylor/2020/09/23/2472392a-fdb7-11ea-b555-4d71a9254f4b_story.html. Plaintiff asserts that the midshipman who posted this tweet, along with midshipman who posted others expressing similar sentiments, have not been met with sanctions. *See* ECF 11-1 at 38-45.

Plaintiff also maintains that he has been the victim of harassment on campus, but those who have engaged in such conduct have gone unpunished. ECF 12-2 at 38, ¶ 27. In his suit, plaintiff alleges that, in stark contrast to the treatment he received from officials at the Academy, "the Superintendent and his Command directly and implicitly condone the disgraceful, pernicious, racist, nihilistic, and seditious social media posts of other midshipmen." ECF 22, ¶ 75; *see id.*, ¶¶ 39-40. In his Declaration, plaintiff makes the troubling assertion about a double standard, claiming that, despite the vitriolic backlash he has faced, which he reported to the Academy chain of command, those on campus who have engaged in such conduct have faced "little to no repercussions." ECF 12-2 at 38, ¶ 27; *see also* ECF 29-8 at 9.

-30-

In addition, plaintiff contends that his speech was "criminalized" by the USNA.  ECF 29 at 1.  But, the evidentiary submissions establish that neither the charges nor the proceedings that followed were criminal in nature.  The charges were administrative, brought by Naval Academy officials pursuant to the framework outlined in the Conduct Manual.  Although plaintiff faces the draconian sanction of discharge, he has not alleged a loss of liberty as a result of these proceedings.

### B.  Additional Procedural Background

As noted, plaintiff has twice amended his Complaint.  The Amended Complaint did not materially change the allegations or alter the claims.  But, it referenced an Executive Order issued by President Trump on September 22, 2020, and a directive issued by the Director of the Office of Management and Budget ("OMB").  *See* ECF 11, ¶¶ 11, 14, 49-51, 53-60; *see* Executive Office of the President: Exec. Order No. 13950, "Combating Race and Sex Stereotyping," 85 Fed. Reg. 60,683 (Sept. 22, 2020) (the "Executive Order"); Off. Of Mgmt. & Budget, Exec. Off. Of the President, OMB Memorandum No. M-20-34, Training in the Federal Government (Sept. 4, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/09/M-20-34.pdf ("OMB Memorandum"). Among other things, the Amended Complaint alleged that Naval Academy leadership violated both  the Executive Order and the OMB Memorandum.  ECF 11, ¶ 73.

The Executive Order provides: "The United States Uniformed Services, including the United States Armed Forces, shall not teach, instruct, or train any member of the United States Uniformed Services, whether serving on active duty, serving on reserve duty, [or] attending a military service academy . . . to believe" certain "divisive concepts" as defined in the Executive Order.  85 Fed. Reg. 60,683, § 3.  The Executive Order defines "divisive concepts" as, *inter alia*, "the concepts that . . . the United States is fundamentally racist or sexist," and that "an individual, by virtue of his or her race . . . is inherently racist . . . ."  *Id.* § 2(a).  Moreover, the Executive Order

instructs: "No member of the United States Uniformed Services shall face any penalty or discrimination on account of his or her refusal to support, believe, endorse, embrace, confess, act upon, or otherwise assent to these concepts." *Id.* § 3.

The OMB Memorandum takes aim at trainings in the Executive Branch that teach "that there is racism embedded in the belief that America is the land of opportunity or the belief that the most qualified person should receive a job." OMB Memorandum, *supra*. The document characterizes such trainings as "divisive" and "anti-American." *Id.* Further, it directs "all agencies" to, *id*:

> begin to identify all contracts or other agency spending related to any training on "critical race theory," "white privilege," or any other training or propaganda effort that teaches or suggests either (1) that the United States is an inherently racist or evil country or (2) that any race or ethnicity is inherently racist or evil. In addition, all agencies should begin to identify all available avenues within the law to cancel any such contracts and/or to divert Federal dollars away from these un-American propaganda training sessions.

Ordinarily, an amended complaint supersedes a previously filed complaint. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 456 n.4 (2009). However, at the hearing held on October 30, 2020, it was agreed that the Motion to Dismiss would be deemed applicable to the Amended Complaint.[19]  And, the parties stipulated that the exhibits would be considered as evidence with regard to the PI Motion. ECF 16.

Notably, the Amended Complaint contained a reference in each of the two counts to § 706 of the APA, 5 U.S.C. § 706. *See* ECF 11, ¶¶ 77, 83. Therefore, at the hearing on the PI Motion, I

---

[19] The transcript of the hearing has not been prepared. Therefore, in regard to the hearing, I have relied on my notes and my memory.

inquired as to whether plaintiff had asserted an APA claim.   Plaintiff's counsel responded that he had intended to include an APA claim, and any failure to do so was a result of inartful drafting.

After the hearing, the Court also held telephone conferences with counsel on November 3 and November 4, 2020.   The Court discussed a proposed modification to ECF 5 as well as clarification of an APA claim.   ECF 19.

On November 6, 2020, the parties filed a "Consent Motion To File Second Amended Complaint."   ECF 20.   I approved that motion on the same date (ECF 21) and the Second Amended Complaint was docketed that day.   ECF 22.

As indicated, the Second Amended Complaint contains five counts.   Rather than add one, or even two, discrete APA claims, Standage added multiple counts and referenced the APA as a cause of action in each.   In addition, he asserted a claim under the Ex Post Facto Clause of the Constitution.

Thereafter, by an Amended Order of November 9, 2020 (ECF 23), I revised the Order of October 1, 2020 (ECF 5).   In particular, I authorized the issuance of the Superintendent's Memorandum Report to the ASN (M&RA), plaintiff's submission of a Show Cause Statement, and the issuance of a decision by the ASN (M&RA).   *See* ECF 23.   However, I maintained the stay as to plaintiff's separation, and prohibited interference with plaintiff's ability to continue his academic studies, pending disposition of the PI Motion.   Further, I stated: "[N]othing in this Order prevents defendants from continuing with their administrative review and consideration of Plaintiff's alleged misconduct . . . ."   *Id.* at 2.[20]   Buck's Memorandum Report followed on November 12, 2020.   ECF 27-1.

---

[20] In correspondence of November 10, 2020, defendants asked the Court to rescind the Amended Order of November 9, 2020 (ECF 23), and to maintain the original Order (ECF 5) or

As mentioned, the Court has not been advised of a decision by the ASN (M&RA).

## II. Discussion

### A.

Defendants move to dismiss for lack of subject matter jurisdiction. ECF 8 at 4; ECF 27 at 5. Fed. R. Civ. P. 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. *See Khoury v. Meserve*, 628 F. Supp. 2d 600, 606 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004). Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 196 (4th Cir. 2008). The court may properly grant a motion to dismiss for lack of subject matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005) (citing *Crosten v. Kamauf*, 932 F. Supp. 676, 679 (D. Md. 1996)).

---

provide alternative terms. They contended that the Amended Order constituted an improper temporary restraining order or an improper preliminary injunction. ECF 24 at 1. Under defendants' proposed alternative, they asked the Court to permit the Superintendent to submit the Memorandum Report to the ASN (M&RA), to allow plaintiff to remain at the Academy for ten days after the ASN (M&RA)'s decision, and to dismiss the suit, without prejudice to plaintiff's right to refile after the ASN (M&RA)'s decision. *Id.*

I responded at ECF 25, and denied the request. Among other things, I noted that the government had agreed to ECF 5, and ECF 9 is less restrictive than ECF 5, because it permitted issuance of the Memorandum Report to the Assistant Secretary. And, as noted, Buck promptly issued his Memorandum Report. *See* ECF 27-1.

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true.'" *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted) (alteration in original); *see also Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017).

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *accord Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 524 (D. Md. 2014). In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192. "Generally . . . the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't Of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Evans*, 166 F.3d at 647.

Defendants do not specify whether they bring a facial challenge or a factual challenge. They also do not directly challenge any of plaintiff's factual allegations directed toward jurisdiction. However, as noted, defendants have submitted exhibits as part of their Opposition, including records from plaintiff's disciplinary adjudications before Naval Academy officials. *See* ECF 8-6; ECF 8-7. Accordingly, I will construe the Motion to Dismiss as a facial challenge to jurisdiction. But, I will also consider evidence beyond the pleadings, as permitted under the case law. *See Velasco*, 370 F.3d at 398; *Evans*, 166 F.3d at 647.

-35-

**B.**

In support of defendants' Motion to Dismiss, defendants advance three arguments as to lack of subject matter jurisdiction.  In sum, the arguments concern the timing of the litigation.

First, defendants contend that plaintiff's claims are barred by sovereign immunity because no final agency action has occurred.  ECF 8 at 4; ECF 27 at 5; ECF 30 at 4.  Second, defendants assert that plaintiff's claims are not ripe.  ECF 8 at 9-10; ECF 27 at 5, 14.  And, defendants maintain that plaintiff has failed to exhaust administrative remedies.  ECF 8 at 10-11; ECF 27 at 5.  "'[W]hile courts often mingle the three doctrines [of finality, ripeness, and exhaustion], they are analytically distinct.'"  *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1274 (D.C. Cir. 2018), *cert. denied sub nom. Soundboard Ass'n v. F.T.C.*, 139 S. Ct. 1544 (2019) (quoting *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 745-46 (D.C. Cir. 1987) (Williams, J.)) (brackets in *Soundboard Ass'n*).

In addition, defendants contend that, timing aside, this suit is not justiciable; the suit is not reviewable by an Article III court.  ECF 8 at 11-14; ECF 27 at 5; ECF 30 at 5.  Defendants rely on *Mindes v. Seaman*, 453 F.2d 197, 201-02 (5th Cir. 1971), which established a multifactor test for determining when a challenge to a military action is justiciable in federal court.  The Fourth Circuit adopted the *Mindes* test in *Williams v. Wilson*, 762 F.2d 357, 359-60 (4th Cir. 1985), and continues to apply it.  *See Roe v. Dep't of Def.*, 947 F.3d 207, 218 (4th Cir. 2020); *Guerra v. Scruggs*, 942 F.2d 270, 276 (4th Cir. 1991).

"Under *Mindes*, a justiciable case challenging a military action must allege 'the deprivation of a constitutional right, or . . . that the military has acted in violation of applicable statutes or its own regulations.'"  *Roe*, 947 F.3d at 218 (citation omitted).  And, "the plaintiff must have exhausted the 'available intraservice corrective measures.'"  *Id.* (citation omitted).  If the threshold requirements are met, the Court must then apply a multifactor balancing test. *Id.*

In particular, a court must consider, *id.* (citation omitted):

1. The nature and strength of the plaintiff's challenge to the military determination. . . .

2. The potential injury to the plaintiff if review is refused.

3. The type and degree of anticipated interference with the military function. Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.

4. The extent to which the exercise of military expertise or discretion is involved.

To be sure, the *Mindes* test prevents unwarranted judicial interference in military affairs. However, the outcome of the analysis is not preordained; earlier this year, the Fourth Circuit upheld a district court's determination that APA and equal protection claims lodged against the Air Force were justiciable. *See Roe*, 947 F.3d at 219.

Under the first *Mindes* factor, consideration of the nature and strength of plaintiff's First Amendment claim implicates free speech in the military. In this regard, I am mindful that the Supreme Court has long recognized that "the military is, by necessity, a specialized society separate from civilian society. . . . 'governed by a separate discipline from that of the civilian.'" *Parker v. Levy*, 417 U.S. 733, 743 (1974) (citation omitted). The Supreme Court has said: "While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." *Id.* at 758; *see United States v. Wilcox*, 66 M.J. 442, 446 (C.A.A.F. 2008). Thus, "[s]peech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected." *Parker*, 417 U.S. at 759 (citation and quotation marks omitted); *see also Goldman v. Weinberger*,

475 U.S. 503, 507, (1986) ("Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society.").

To analyze a First Amendment challenge to a finding of a violation of the UCMJ, the Court proceeds in three steps. *Wilcox*, 66 M.J. at 447. First, the court determines whether the speech in issue falls into a category of expression that does not receive the protection of the First Amendment, "regardless of the military or civilian status of the speaker." *Id.* Such categories include "dangerous speech, obscenity, [and] fighting words." *Id.* Next, the court determines whether the elements of the offense were satisfied. *Id.*

With respect to Article 133, which plaintiff was found to have violated, the Court of Military Appeals has instructed: "When an alleged violation of Article 133 is based on an officer's private speech, the test is whether the officer's speech poses a 'clear and present danger' that the speech will, 'in dishonoring or disgracing the officer personally, seriously compromise[ ] the person's standing as an officer.'" *United States v. Hartwig*, 39 M.J. 125, 128 (C.M.A. 1994) (citation omitted) (brackets in *Hartwig*). The *Hartwig* Court added, *id.* at 129:

> Though [a violation of Article 133] need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents.

If the court concludes that the speech was protected and that the elements of the offense were satisfied, then the court proceeds to balance "'the essential needs of the armed services and the right to speak out as a free American.'" *Id.* (quoting *United States v. Priest*, 21 C.M.A. 564, 570, 45 C.M.R. 338, 344, (1972)). In this regard, the court must afford deference to military determinations, as noted. But, it is also relevant that the expression of "ideas on issues of social

and political concern . . . has been recognized as 'the core of what the First Amendment is designed to protect.'" *Wilcox*, 66 M.J. at 446-47 (quoting *Virginia v. Black*, 538 U.S. 343, 365 (2003)).

However, as discussed below, I conclude that, at present, I lack jurisdiction to review this suit and the PI Motion.  Accordingly, I need not address defendants' justiciability argument under *Mindes*, 453 F.2d at 201-02.

## C.

Defendants contend that the suit is premature because if Standage is discharged by the ASN (M&RA), he must pursue relief from the Board for Correction of Naval Records ("BCNR") before bringing his claims in federal court, pursuant to the doctrine of administrative, or intraservice, exhaustion.  *See* ECF 8 at 2, 10-11; ECF 30 at 5-7.  According to defendants, intraservice exhaustion is a threshold hurdle to reviewability that plaintiff fails to clear.

The Fourth Circuit has discussed the requirement to exhaust "'intraservice corrective measures'" in the context of a broader doctrine of justiciability applied to military controversies. *See Roe*, 947 F.3d at 218 (quoting *Mindes*, 453 F.2d at 201-02); *Williams*, 762 F.2d at 359-60. "To determine whether a case involving a military decision is justiciable, courts in this circuit apply the framework articulated in [*Mindes*]." *Roe*, 947 F.3d at 217 (citing *Guerra*, 942 F.2d at 276; *Williams*, 762 F.2d at 359-60).

The parties have not discussed *Darby v. Cisneros*, 509 U.S. 137 (1993), but it appears pertinent.  In *Darby*, the Supreme Court considered whether 5 U.S.C. § 704 establishes an exhaustion requirement.  The Court observed: "Whether courts are free to impose an exhaustion requirement as a matter of judicial discretion depends, at least in part, on whether Congress has provided otherwise." *Id.* at 144.  After analyzing the text and legislative history of § 704, the Court concluded that where "the APA applies, an appeal to 'superior agency authority' is a prerequisite

to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." *Id.* at 154 (emphasis in original).  Thus, the Supreme Court instructed that the APA incorporates exhaustion requirements established by statute or agency rule, but does not itself create or impose a standalone exhaustion requirement.  *See Volvo GM Heavy Truck Corp. v. U.S. Dep't of Labor*, 118 F.3d 205, 209 (4th Cir. 1997) (discussing *Darby*).

Here, plaintiff has asserted APA claims.  And, defendants have not identified any statute or agency rule specifying when claimants in the Navy *must* seek redress from the BCNR before filing suit in federal court.  Rather, citing 10 U.S.C. § 1552, defendants merely assert that the "BCNR has the authority to review Plaintiff's arguments."  ECF 8 at 11.  Moreover, a judge in the Eastern District of Virginia recently observed that § 1552's "language is purely permissive and does not evince a congressional intent to make appeal to the [Air Force Board for Correction of Military Records] a mandatory precursor to judicial review."  *Roe v. Shanahan*, 359 F. Supp. 3d 382, 402, n.20 (E.D. Va. 2019), *aff'd sub nom. Roe*, 947 F.3d 207.  Thus, the rule announced in *Darby*, 509 U.S. at 154, applies.

In their supplemental reply, defendants cite *Bowman v. Brownlee*, 333 F. Supp. 2d 554, 558 (W.D. Va. 2004), which resolved that, in light of the facts of the case, it was not necessary to consider "*Darby*'s impact (if any) on our rule requiring the exhaustion of military remedies." However, other courts have considered that issue and determined "that there is no 'military exception' to *Darby*."  *Brezler v. Mills*, 220 F. Supp. 3d 303, 323 (E.D.N.Y. 2016) (citing *Ostrow v. Sec'y of Air Force*, 48 F.3d 562 (D.C. Cir. 1995) (per curiam); *Crane v. Sec'y of Army*, 92 F.Supp.2d 155, 161 (W.D.N.Y. 2000) ("Almost without exception, federal courts throughout this country have also declined to create a military exception to the Court's decision in *Darby*.")).  *But*

-40-

*see Saad v. Dalton*, 846 F.Supp. 889, 891 (S.D. Cal. 1994) (concluding that "plaintiff may not pursue judicial review before petitioning the BCNR for relief" and distinguishing Darby because "[r]eview of military personnel . . . is a unique context with specialized rules limiting judicial review").

Therefore, neither the APA nor any other statute or agency rule that defendants have identified thus far requires plaintiff to seek redress from the BCNR before filing suit in federal court.[21]

## D.

Defendants also invoke the bar of sovereign immunity.  In particular, they contend that plaintiff cannot benefit from the APA's waiver of the government's sovereign immunity because there has been no final agency action in this case.  ECF 27 at 4-5; ECF 30 at 4-5.  Standage counters that his on-campus adjudication, which resulted in findings that his tweets had violated Notice 5720 and Article 133, constituted final agency action.  *See, e.g.*, ECF 29 at 2.[22]

---

[21] Some post-*Darby* case law in the Fourth Circuit suggests that courts may, at their discretion, apply well-settled, judge-made principles of administrative exhaustion to cases involving the military.  In *Roe*, 359 F. Supp. 3d 382, the plaintiffs asserted constitutional and APA claims and sought declaratory and injunctive relief against military officials. *Id.* at 391-92.  The defendants contended that the plaintiffs had failed to exhaust.  *Id.* at 401.  The district court recognized in a footnote that *Darby*, 509 U.S. at 154, applied to both the constitutional claims and the APA claims. *Id.* at 402, n.20.  And, as noted, the court determined that no statute or agency rule mandated intraservice exhaustion.  *Id.*

The court proceeded to apply the "judge-made doctrine" of exhaustion.  *Id.* at 401.  That doctrine, the court explained, involves a "highly fact-sensitive inquiry."  After a thorough analysis, the court concluded that the doctrine of exhaustion did not bar judicial review of the suit.  *Id.* at 404.  On appeal, defendants did not challenge the district court's conclusion as to exhaustion.  *See Roe*, 947 F.3d at 218.

[22] In the first round of briefing, defendants argued that plaintiff could not benefit from the APA's waiver of sovereign immunity because he had not asserted an APA claim.  *See* ECF 8 at 7-

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see United States v. Mitchell*, 463 U.S. 206, 212 (1983); *Dalehite v. United States*, 346 U.S. 15, 30 (1953). That is, the United States is "immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *see Mitchell*, 463 U.S. at 212 (observing that it is "axiomatic that the United States may not be sued without its consent"); *Ayala v. United States*, ___ F.3d ___, 2020 WL 705099, at *2 (4th Cir. Dec. 2, 2020) ("As a general rule, the United States is immune from claims for money damages in civil suits"). The sovereign immunity of the United States also generally extends to federal officers sued in their official capacity. *See Dugan v. Rank*, 372 U.S. 609, 620 (1963); *Portsmouth Redev. & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983). Therefore, defendants enjoy "a presumption of immunity," *Robinson v. U.S. Dep't of Educ.*, 917 F.3d 799, 801 (4th Cir. 2019), *cert. denied*, ___ U.S. ___, 140 S. Ct. 1440 (2020), and plaintiffs have the burden to demonstrate a waiver of the government's sovereign immunity. *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005).

A "waiver of sovereign immunity must be unequivocally expressed in statutory text," and be "clearly evident from the language of the statute." *FAA v. Cooper*, 566 U.S. 284, 290 (2012) (internal quotation marks omitted); *see Lane v. Pena*, 518 U.S. 187, 192 (1996) (observing that a waiver of sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied"). In other words, a waiver of sovereign immunity "cannot contain an ambiguity, which 'exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government.'" *Robinson*, 917 F.3d at 802 (quoting *Cooper*, 566 U.S. 290-91).

_____

9. However, plaintiff arguably had included a claim under the APA. *See* ECF 11, ¶¶ 77, 83. In any event, the Second Amended Complaint contains claims under the APA.

Moreover, waivers of sovereign immunity "must be 'strictly construed in favor of the sovereign.'" *Welch*, 409 F.3d at 650 (ellipses omitted) (quoting *Lane*, 518 U.S. at 192).  Simply put, sovereign immunity "can only be waived by statutory text that is unambiguous and unequivocal."  *Robinson*, 917 F.3d at 802.

Plaintiff does not seek monetary damages.  Rather, he seeks declaratory and injunctive relief.  Section 702 of the APA evinces a waiver of sovereign immunity for claims seeking declaratory or injunctive relief.  Entitled "Right of Review," 5 U.S.C. § 702 provides, in part:

> A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof.  An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

Read in isolation, this language would seem to thrust open the courthouse doors for plaintiff; the statute waives sovereign immunity for an action brought against agency officials if the action seeks "relief other than money damages."  This is such an action, as plaintiff seeks only injunctive and declaratory relief against defendants.  But, the APA's waiver of sovereign immunity is qualified.  Section 702 also provides, *id.*: "Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."

Even if Standage had not brought an APA claim, he may have benefited from § 702's waiver of sovereign immunity.  Case law makes clear that the § 702 waiver encompasses qualifying claims arising under non-APA authority.  In *Food Town Stores, Inc. v. E.E.O.C.*, 708 F.2d 920, 921-922 (4th Cir. 1983), the Fourth Circuit determined that § 702 waived the Equal Employment Opportunity Commission's sovereign immunity to a suit seeking to compel the

agency to issue a subpoena, pursuant to 29 U.S.C. § 161.  The Fourth Circuit stated, *id.* at 922: "Congress has waived sovereign immunity in 'nonstatutory review' cases wherein nonmonetary relief is sought."  Other circuits have endorsed the proposition that § 702 waives sovereign immunity for qualifying non-APA claims.  *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) (collecting cases and stating that § 702 applies to cases "involving constitutional challenges"); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) ("[I]f the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit"); *see also* Fallon et al., Hart and Wechsler, The Federal Courts and the Federal System at 902 (7th ed. 2015).

Nevertheless, to benefit from the waiver in § 702, a plaintiff's claim must still be judicially reviewable under 5 U.S.C. § 704.  Section 704 authorizes review of "final agency action for which there is no other adequate remedy in a court."  *See U.S. Army Corps. of Eng'rs v. Hawkes Co.*, ___ U.S. ___, 136 S. Ct. 1807, 1815 (2016); *see Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). In turn, the APA "defines 'agency action' to include 'the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.'" *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (quoting 5 U.S.C. § 551(13)).

The Fourth Circuit has explained that "this definition [of agency action] limits the scope of judicial review in two important respects."  *City of New York*, 913 F.3d at 431.  First, a plaintiff must "identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on the government's operations." *Id.* (quoting *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 62 (2004)).  Second, "a party must demonstrate that the challenged act had 'an immediate and practical impact.'"  *City of New York*, 913 F.3d at 431 (citation omitted).

Standage's suit targets "agency action" within the meaning of § 704. Plaintiff seeks relief from the findings of Naval Academy adjudicators that his tweets violated Notice 5720, *i.e.*, Naval Academy policy, as well as the standard of "conduct unbecoming" embodied in Article 133 of the UCMJ. In addition, Standage seeks relief from the efforts of the Superintendent and others at the Academy to separate him from the Academy and the Navy. As noted, those efforts culminated in Superintendent Buck's issuance of the Memorandum Report to the ASN (M&RA) on November 12, 2020. The on-campus disciplinary proceedings, the findings that they yielded, and the Superintendent's recommendation of separation are "specific and discrete" actions. *City of New York*, 913 F.3d at 431.

Moreover, it is self-evident that the disciplinary proceedings also had an "immediate and practical" impact on plaintiff. *Id.* The adjudicators found that that Standage was not within his rights as a midshipman to publish the tweets at issue. On a practical level, the disciplinary proceedings, along with the PIR, generated a factual record that Superintendent Buck considered and relied upon in formulating his recommendation of separation. *See* ECF 27-1. Further, in late September 2020, Naval Academy leadership sought to initiate the process of removing plaintiff from his studies and campus life, as the development of the Superintendent's Memorandum Report was underway. To that end, plaintiff did not receive a service selection because of this lawsuit and the pending separation proceeding. ECF 29-6 at 2.

As indicated, the APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also City of New York*, 913 F.3d at 430-31; *Clear Sky Car Wash LLC v. City of Chesapeake*, 743 F.3d 438, 445 (4th Cir. 2014); *Golden & Zimmerman LLC v. Domenech*, 599 F.3d 426, 432-33 (4th Cir. 2010). Thus, the remaining questions pertaining to the APA's waiver of sovereign immunity are whether the agency actions

at issue here were "final," and are actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

Under *Bennett v. Spear*, 520 U.S. 154 (1997), an agency action is final if it (1) "'mark[s] the consummation of the agency's decisionmaking process'" and (2) is an action "'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Hawkes*, 136 S. Ct. at 1813 (quoting *Bennett*, 520 U.S. at 177-78); *see also Jake's Fireworks Inc. v. United States Consumer Prod. Safety Comm'n*, PWG-19-cv-1161, 2020 WL 6383233, at *7 (D. Md. Oct. 30, 2020). Agency action has legal consequences if it "alters the legal regime[.]" *Bennett*, 520 U.S. at 178; *see Hawkes*, 136 S. Ct. 1814; *Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011).

"The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Massachusetts v. Franklin*, 505 U.S. 788, 797 (1992) (plurality opinion); s*ee Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 858 (4th Cir. 2002) ("[T]he critical issue is whether the [agency's action gives rise to legal consequences, rights, or obligations."). Courts take a "'pragmatic' approach . . . to finality." *Hawkes*, 136 S. Ct. at 1815 (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967)).

Defendants do not contend that plaintiff's suit fails under the "no other adequate remedy" requirement. But, they maintain that the agency action here is not final. In their view, the disciplinary proceedings that occurred at the Academy do not constitute "the consummation of the agency's decisionmaking process." ECF 30 at 4 (quoting *Bennett*, 520 U.S. at 177-78). Rather, they maintain that there will be final agency action only when the ASN (M&RA) renders a decision pursuant to 10 U.S.C. § 8462. *See* ECF 30 at 4. In addition, even after the ASN (M&RA) renders

a decision, defendants insist that this suit will not be subject to judicial review because Standage will not have exhausted his administrative remedies.  ECF 30 at 5.[23]

In Standage's view, the disciplinary proceedings constitute reviewable final agency action. In his supplemental opposition, he underscores that the proceedings involved two phases, pursuant to the Conduct Manual.  First, Deputy Commandant Matthewson found plaintiff to have violated Notice 5720 and Article 133.  *Id.* at 21.  Then, plaintiff appealed to Chief of Staff Bates, who upheld the findings of the Deputy Commandant.  *Id.*  And, since then, the Superintendent has issued his Memorandum Report to the ASN (M&RA).  Therefore, Standage asserts that the "Court is free not only to retain jurisdiction of this case, but to move forward with its consideration of Plaintiff's Motion for Preliminary Injunction, irrespective of whether and when ASN (M&RA) issues its decision on the Memorandum Report."  ECF 29 at 22.  In other words, Standage argues that, regardless of whether the ASN (M&RA) ultimately resolves to *separate* plaintiff from the Academy, the on-campus adjudication developed the facts and gave rise to legal consequences. *Id.* at 20-22.

Plaintiff undergirds this position with a markedly narrow reading of 10 U.S.C. § 8462.  He asserts that the ASN (M&RA) lacks the authority to change or remedy the underlying findings that plaintiff's tweets violated Notice 5720 or the UCMJ.  However, plaintiff does not cite any legal authority to support the proposition that, under § 8462 or any other statute or regulation on point, the ASN (M&RA) is a mere rubber stamp, powerless to remedy, alter, or revisit the underlying adjudication or the draconian sanction.

---

[23] I address exhaustion, *infra*.

Standage relies on *Rell v. Rumsfeld*, 389 F. Supp.2d 395, 400 (D. Conn. 2005), for the proposition that his adjudication constitutes final agency action because it is not "tentative, provisional, or contingent, subject to recall, revision, or reconsideration." ECF 29 at 21 n.10, 23. Factually, *Rell* was a very different case.

In *Rell*, plaintiffs sought declaratory and injunctive relief challenging a recommendation of a Department of Defense commission to relocate an Air National Guard unit as contrary to statute. *Rell*, 389 F. Supp.2d at 397. In a notably succinct analysis, the court reasoned that the challenged agency action was "sufficiently final" to be subject to judicial review because the action was not "subject to recall, revision, or reconsideration *by the issuing agency*." *Id.* at 400 (emphasis added). As the court observed, the statute that governs the relocation of National Guard units provides that after the commission issues a recommendation, the recommendation is then transmitted to the President for approval or disapproval. *Id.* at 398. It seems, then, that the *Rell* Court placed great weight on the fact that, under the relevant statutory scheme, the agency action at issue was subject to review by the President, rather than by officials or entities within the agency itself.

In any event, *Rell* is not binding authority on this Court. More important, the case is inapposite. There, the parameters of agency action were hard-coded in statute. In this case, the Naval Academy conducted an on-campus adjudication pursuant to the Conduct Manual, which in turn derives its authority from statute and regulations, including 10 U.S.C. § 8462.

The parties have not focused the Court's attention on the language of 10 U.S.C. § 8462. And, the Court is not aware of any cases that offer an interpretation of the statute that addresses the question presented here.   But, the text seems essential to resolving this dispute.[24]

Section 8462 is titled "Midshipmen: discharge for unsatisfactory conduct or inaptitude." The statute mandates that the Superintendent "shall submit to the Secretary of the Navy in writing a full report of the facts . . . whenever the Superintendent determines that the conduct of a midshipman is unsatisfactory."  As mentioned, it is undisputed that the Secretary of the Navy has delegated § 8462 authority to the ASN (M&RA), *see* ECF 8-1; ECF 8-2.  However, in construing the statute, I shall refer to "the Secretary," because it is consistent with the statutory language.

Notably, the statute does not give the Superintendent a choice as to whether to involve the Secretary in certain campus proceedings regarding a midshipman's conduct.  Rather, Congress commanded the Superintendent to involve the Secretary "whenever" the Superintendent determines that a midshipman's conduct was unsatisfactory.

By the plain language of the statute, at least, the submission of a "full report of the facts" regarding a midshipman does not turn on the Superintendent's decision to seek the Secretary's review.  Rather, the event that triggers the Superintendent's obligation under § 8462 is simply his determination of unsatisfactory conduct.  Here, it is undisputed that the Superintendent has made such a determination.

On its face, § 8462 concerns "discharge."  Thus, the statute's plain text does not appear to govern a scenario in which Naval Academy officials decide not to pursue discharge of a

---

[24] The parties have not addressed whether the Navy has rendered an authoritative interpretation of 10 U.S.C. § 8642 and what, if any, respect or deference such an interpretation would receive.

midshipman from the Academy.  As mentioned, § 4.7 of the Conduct Manual provides that, "[o]n a case-by-case basis, the Commandant may recommend to the Superintendent that a midshipman found unsatisfactory in conduct be separated from the Naval Academy."  Conceivably, a campus disciplinary proceeding could yield a finding that a midshipman violated the law or breached a rule or policy, but the Commandant might decide not to recommend to the Superintendent that the midshipman be separated.  Rather, the Commandant might decide only to order demerits or a restriction of privileges and/or require the midshipman to participate in a remediation program. Indeed, remediation is a central component of the Conduct Manual, but no such opportunity was offered to Standage.

However, in this case the Naval Academy officials involved in Standage's disciplinary proceedings have resolved to pursue Standage's discharge.  The Superintendent has determined that Standage's tweets constituted unsatisfactory conduct and, accordingly, has submitted his Memorandum Report to the Assistant Secretary, recommending plaintiff's discharge.  Therefore, the process provided for in § 8462 now takes over.

Subsection (b) of § 8462 requires that the midshipman be provided with the Memorandum Report.  The statute provides: "(b) A midshipman upon whom a report is made under subsection (a) shall be given an opportunity to examine the report and submit a written statement thereon."  It is undisputed that this provision has also been satisfied, as plaintiff filed his written statement, *i.e.,* his Show Cause Statement.  *See* ECF 29-8.

Finally, § 8462 provides: "If the Secretary believes, on the basis of the report and statement, that the determination of the Superintendent . . . is reasonable and well founded, he *may* discharge the midshipman from the Naval Academy and from the naval service."  (Emphasis added). Plaintiff is of the view that by explicitly granting the Secretary the authority to discharge a

midshipman, Congress denied the Secretary the authority to revisit or alter the determination of unsatisfactory conduct.

It is well settled, however, that a "'statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]'" *Doe v. Cooper*, 842 F.3d 833, 844 (4th Cir. 2016) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)); *see also Barnes v. Holder*, 625 F.3d 801, 806 (4th Cir. 2010) (quoting *United States v. Fisher*, 58 F.3d 96, 99 (4th Cir.1995)). Moreover, "[i]t is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *accord Bostock v. Clayton County*, ___ U.S. ___, 140 S. Ct. 1731, 1742, 1752 (2020).

In accordance with the cardinal canon of construction, a court first looks to the text of a statute to divine its meaning. *See Murphy v. Smith*, __ U.S. ___, 138 S. Ct. 784, 787 (2018); *United States v. Bryant*, 949 F.3d 168, 174 (4th Cir. 2020). When the statute's text is "unambiguous, then, this first canon is also the last," for "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Moreover, the words in a statute "'cannot be construed in a vacuum.'" *Sturgeon v. Frost*, ___ U.S. ___, 136 S. Ct. 1061, 1070 (2016) (citation omitted); *see Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126-29 (2019) (rejecting defendant's construction of statutory language as divorced from the statute's context and history).

It is significant that § 8462 mandates the involvement of the Secretary "whenever" the Superintendent makes a determination of unsatisfactory conduct. Further, discharge is predicated on the Secretary's belief that the determination is reasonable and well founded, on the basis of the

Superintendent's full report of the facts.  But, discharge is not required.  To the contrary, the Secretary "may," on that basis, discharge a midshipman.

In discussing statutory construction, the Supreme Court has instructed: "The word 'may' customarily connotes discretion."  *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 346 (2005) (citing *Haig v. Agee*, 453 U.S. 280, 294 n.26 (1981)); *accord Air Line Pilots Ass'n, Int'l v. U.S. Airways Grp., Inc.*, 609 F.3d 338, 342 (4th Cir. 2010) ("[I]t is uncontroversial that . . . the term 'may' typically indicates authorization without obligation."); *Meritage Homes of Nevada, Inc. v. F.D.I.C.*, 753 F.3d 819, 826 (9th Cir. 2014) ("In general . . . it is a principle of statutory construction that the 'word "may," when used in a statute, usually implies some degree of discretion.'") (citation omitted).  Applying this principle to § 8462, it is clear that the statute grants the Secretary both the authority and the discretion to determine whether discharge is warranted, on the basis of the Superintendent's "full report of the facts."

I can discern no reason why Congress would have intended to grant the Secretary the authority to review the Superintendent's determination as a ground for discharge, while denying the Secretary the authority to revisit or reject the Superintendent's underlying determination.  Such an interpretation would be a distortion of the statute.  The plain language of the statute authorizes the Secretary to conclude that the Superintendent's determination of unsatisfactory conduct is reasonable and well founded, or unreasonable and ill-founded, or that the determination of unsatisfactory conduct is appropriate but that the sanction is not warranted.  The ball has moved into the ASN (M&RA)'s court.[25]  She has before her both the Superintendent's Memorandum

---

[25] There is much in the Superintendent's Memorandum Report on which the ASN (M&RA) might choose to focus in considering whether or not the determination of unsatisfactory conduct is reasonable and well founded, or whether separation is the appropriate sanction.

Report and plaintiff's Show Cause statement.  Absent a determination by her, there has been no final agency action.

As to sovereign immunity, plaintiff also cites *Wasson v. Trowbridge*, 382 F.2d 807, 811 (2d Cir. 1967), for the proposition that the Court has jurisdiction to determine whether the

---

The Assistant Secretary might conclude that the Memorandum Opinion is well reasoned and that the sanction is entirely warranted.  On the other hand, she might agree with the findings but disagree with the sanction.  Or, she could reject both the findings and the sanction.

For example, in evaluating the Superintendent's determination, the ASN (M&RA) might focus on the fact that Standage was penalized under the Conduct Manual for speech in which he never identified himself as a midshipman.  The fact that others could uncover his identity is hardly uncommon, given the pervasive availability of the internet.

The ASN (M&RA) might also consider that an express purpose of the Conduct Manual "is . . . to be remedial and educational . . . ."  ECF 8-8 at 6, § 1.1(c).  In this regard, the Conduct Manual specifies at length the extensive programming at the Academy directed to remediation for a wide array of misconduct, including serious offenses.  *See id.*, § 8.4.2.  And, it is undisputed that the Naval Academy has offered programming related to racial injustice and diversity, matters closely connected to the topics addressed in Standage's tweets.  *See, e.g.*, ECF 29 at 26.  Although Buck had considered remediation, he declined to offer it to Standage, despite the fact that in three years at the Academy, Standage had been an upstanding MIDN with a stellar academic record and no indication of racist conduct or views.  The Assistant Secretary might assess whether the Memorandum Report sufficiently substantiated the determination that plaintiff, at just twenty-one years of age, cannot be rehabilitated, so as to safely lead a command.

Further, the ASN (M&RA) might consider whether the Superintendent reasonably determined that although plaintiff was "free to express" his "viewpoint condemning violent riots," he was not within his rights to publish the actual tweets at issue.  *See id.* at 4.  In other words, the ASN (M&RA) might conclude that Article 133 of the UCMJ and/or Notice 5720 do not clearly proscribe plaintiff's tweets or, if they do, that the military's interest in regulating plaintiff's speech does not outweigh plaintiff's First Amendment rights.

Moreover, the Assistant Secretary might conclude that USNA leadership was motivated by a concern about negative media attention.  And, while she may applaud the efforts of USNA leadership to eradicate all vestiges of systemic racism at the Academy, the Assistant Secretary might be concerned that Standage was caught in a political movement and that his career should not fail based on a determination that his speech was politically unpopular, offensive, or insensitive, particularly if she finds that the standard of prohibited conduct is not clearly defined.

procedures applied to plaintiff were constitutionally sufficient.  *See* ECF 12 at 18-19.  *Wasson* relied on *Ex parte Young*, 209 U.S. 123 (1908).  Commentators have stated that *Ex parte Young*, 209 U.S. 123, "recognized a cause of action for injunctive relief" against state officials, notwithstanding the Eleventh Amendment.  RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 927 (7th ed. 2015).  Of course, *Wasson* is not binding authority in the Fourth Circuit.  Moreover, even if I found *Wasson*'s reasoning applicable here, to establish subject matter jurisdiction plaintiff would still need to demonstrate that his claims are ripe for review at this time.  In light of my conclusion in the following section, *infra*, that plaintiff's claims are not yet ripe, I need not address his alternative argument for why sovereign immunity does not bar his constitutional claims.

At this juncture, plaintiff's suit is not entitled to the benefit of the waiver of sovereign immunity established in §§ 702, 704 of the APA.[26]

### E.

Ripeness "addresses 'the appropriate timing of judicial intervention.'"  *Deal v. Mercer Cty Bd. of Educ.*, 911 F.3d 183, 190 (4th Cir. 2018) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013)); *see NAACP*, 2019 WL 355743, at *8.  The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted); *see Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 632 (D.C.

---

[26] In his supplemental opposition, plaintiff asserts that the irreparable harm plaintiff has suffered as a result of viewpoint discrimination constitutes an exception to the requirement of final agency action.  ECF 29 at 22.  However, that argument is directed more towards ripeness than finality under the APA.  Accordingly, I shall address it in the following section, *infra*.

Cir. 2017) (ripeness "has both constitutional and prudential facets"), *cert. denied*, __, U.S. __, 138 S. Ct. 978 (2018).

The "ripeness doctrine 'originates in the case or controversy constraint of Article III.'" *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (citation omitted) (cleaned up). Whether a claim is ripe "is a question of subject matter jurisdiction." *Id.*; *see San Sotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013). For a case to be ripe for review, there must be presentation of "a controversy in a 'clean-cut and concrete form.'" *Id.* (quoting *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006)). In the administrative context, the doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (citations omitted).

Notably, "ripeness requirements are . . . relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 240. "When reviewing First Amendment claims for ripeness, courts 'relax' this inquiry so as 'to protect against any inhibiting chill' of free speech." *Am. Fed'n of Gov't Employees v. U.S. Office of Special Counsel*, __ F. Supp. 3d __, 19-CV-02322-PX, 2020 WL 4436378, at *4 (D. Md. Aug. 3, 2020) (quoting *Cooksey*, 721 F.3d at 240). But, "First Amendment claims are not immunized from ripeness considerations." *Am. Fed'n of Gov't Employees*, 2020 WL 4436378, at *4.

In general, ripeness depends on "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808; *accord South Carolina*, 912 F.3d at 730; *Deal*, 911 F.3d at 191. "A case is 'fit for judicial

decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties.'" *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand and Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (quoting *Miller*, 462 F.3d at 318-19). "'The hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiff.'" *Id.* (brackets omitted) (quoting *Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208 (4th Cir. 1992)); *see also Pashby v. Delia*, 709 F.3d 307, 317 (4th Cir. 2013); *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 665 (4th Cir. 1997). Thus, a claim is not ripe for judicial review "'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Scoggins*, 718 F.3d at 270 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *see also South Carolina*, 912 F.3d at 730 (an action is ripe if "final and not dependent on future uncertainties or intervening agency rulings") (quoting *Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002)).

Defendants argue that plaintiff's claims are not yet ripe because there has been no decision rendered by the ASN (M&RA) on plaintiff's case. ECF 8 at 10; ECF 27 at 5. Plaintiff counters that his claims qualify for the "irreparable injury" exception to the ripeness doctrine. ECF 12 at 19-21; ECF 29 at 22-25.

In particular, plaintiff cites *Able v. U.S.*, 88 F.3d 1280 (2d Cir. 1996), for the proposition that his constitutional claims are ripe for review, notwithstanding that the ASN (M&RA) has not yet acted on the Superintendent's Memorandum Report. *See* ECF 12 at 19-20. In *Able*, plaintiffs brought a facial challenge to the constitutionality of the statute that codified the policy "popularly termed 'Don't Ask, Don't Tell,'" which governed "the participation of homosexuals in military service." 88 F.3d at 1283. The *Able* plaintiffs also sought to enjoin the defendants from taking adverse action against them on the basis of their identification as homosexuals. *Id.* at 1287. The

defendants contended that plaintiffs could not obtain such injunctive relief before exhausting administrative remedies for any adverse actions.  The Second Circuit rejected that argument, concluding that the plaintiffs' allegations of "even minimal impairments" to their First Amendment rights created irreparable injury and exempted the plaintiffs from the requirement of administrative exhaustion.  *Id.* at 1288.

The *Able* decision is not on point for purposes of resolving the ripeness issues in this case. The portion of *Able* on which plaintiff relies concerns exhaustion, not ripeness.  Although closely related, the doctrines of ripeness and administrative exhaustion are nevertheless distinct, as the *Able* Court acknowledged.  *Id.* at 1289.  As noted, ripeness is rooted in Article III of the Constitution.  *South Carolina*, 912 F.3d at 730.  In contrast, the exhaustion doctrine "acts as a prudential rule that provides the courts 'with a method to exercise comity toward administrative agencies and to promote efficient use of judicial resources while protecting the rights of parties who have come before the court seeking relief.'"  *McDonald v. Centra, Inc.*, 946 F.2d 1059, 1063–64 (4th Cir. 1991) (quoting *Morrison–Knudsen Co., Inc. v. CHG Int'l, Inc.,* 811 F.2d 1209, 1223 (9th Cir.1987), *cert. denied,* 488 U.S. 935 (1988)).

In support of his ripeness argument, plaintiff also draws on *Useche v. Trump*, No. PX-PAH-ELH-20-02225, 2020 WL 6545886, at *5 (D. Md. Nov. 6, 2020).  *Useche* involves a constitutional challenge to a Presidential Memorandum issued in July 2020 concerning undocumented individuals and the Census.  The three-judge district court panel, on which I sat, concluded that plaintiffs had standing to sue, and that the suit was ripe, in part because plaintiffs had demonstrated a "substantial risk" of constitutional injury.  *Id.* at 5-7.  However, in that case the evidence demonstrated that the Presidential Memorandum to which plaintiffs objected would soon be "fully implement[ed]."  *Id.* at 7.  This case presents different circumstances, as the ASN

(M&RA) has yet to exercise the statutory authority granted to the Secretary by 10 U.S.C. § 8462 and delegated to the ASN (M&RA).

In any event, on justiciability grounds, the Supreme Court just dismissed a constitutional challenge to the Presidential Memorandum in a companion case to *Useche*.  *See Trump v. New York*, ___ S. Ct. ___, 2020 WL 7408998, No. 20-366 (Dec. 18, 2020) (per curiam).  There, the six-member majority of the Supreme Court vacated the judgment of a three-judge district court in the Southern District of New York, ruling that the case was not yet justiciable because the plaintiffs lacked standing and their claims were not yet ripe.  *Id.*[27]

As to standing, the Supreme Court reiterated in *Trump v. New York* that a plaintiff must demonstrate "'an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical.'"  *Trump v. New York*, 2020 WL 7408998, *2 (citation omitted).  And, in order for a case to be ripe, the Court said it cannot be "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Id.* (citation omitted).

The Court found the case flawed in both respects.  It observed that the case "was riddled with contingencies and speculation that impede judicial review."  *Id.*  Although the Presidential Memorandum identified a clear policy ("to exclude aliens without lawful status from the [Census's] apportionment base"), the Court reasoned that the policy "may not prove feasible to implement in any manner whatsoever . . . ."  *Id.* And, the Court observed that it was pure "conjecture" as to how or whether the policy would be implemented.  *Id.*

---

[27] Although ripeness and standing may, at times, involve overlapping considerations, they nevertheless require distinct analyses.  *See Renne v. Geary*, 501 U.S. 312, 320 (1991); *Am. Fed'n of Gov't Employees*, 2020 WL 4436378, at *4, n.2 (citing *Cooksey*, 721 F.3d at 234-41).

*Trump v. New York* strengthens my conclusion that this case is not ripe.  The plaintiffs' claims of a "substantial risk" of injury in *Trump v. New York* relied on "a significant degree of guesswork."  Similarly, and as explained earlier, Standage's case is pending review by the ASN (M&RA), pursuant to 10 U.S.C. § 8642.  And, it is pure conjecture as to whether the Assistant Secretary will accept, reject, or modify the Superintendent's determination that plaintiff's tweets constitute unsatisfactory conduct warranting his discharge from the Academy.  *See South Carolina*, 912 F.3d at 730; *Scoggins*, 718 F.3d at 270.

### III.  Conclusion

For the foregoing reasons, I conclude that the bar of sovereign immunity applies and that the suit is not ripe.  Accordingly, I need not address the parties' remaining arguments.

For the reasons set forth above, I shall deny the PI Motion (ECF 2).  And, I shall grant defendants' Motion to Dismiss (ECF 8, ECF 27), without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: December 22, 2020

                                                 /s/
                                       Ellen L. Hollander
                                       United States District Judge